UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>                    Plaintiff,<br><br>          v.<br><br>FISHER CAPITAL LLC, AMS CONSULTING SOLUTIONS LLC, and ALEXANDER SPELLANE a/k/a "Alexander Overlie,"<br><br>                    Defendants. | Case No.  23-CV-3121<br><br>ECF Case<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"),

by its attorneys, alleges as follows:

## I.    SUMMARY

1.     From at least June 1, 2020 and continuing to the present ("Relevant

Period"), Defendant Alexander Spellane, and the companies he controlled – AMS

Consulting Solutions LLC d/b/a Fisher Capital, and Fisher Capital LLC (collectively

"Fisher Capital Group") – have engaged and continue to engage in a fraudulent scheme

targeting a vulnerable population of mostly elderly and retirement-aged persons

throughout the United States.  Defendants' scheme was to fraudulently persuade victims,

through materially false and misleading statements and deceptive sales tactics, to invest

their retirement funds and savings in gold and silver coins ("Precious Metals") at grossly

inflated prices that frequently were double or even triple the prevailing market value of

those coins.

1

2.      Each step of Defendants' sales process was permeated with material misrepresentations, misleading half-truths, and deceptive omissions that were designed to build trust with elderly and retirement-aged customers; instill fear about the safety of traditional retirement and savings accounts; and deceive victims into purchasing grossly overpriced Precious Metals from Defendants.

3.      Defendants materially misled victims about, among other things, the identity, business model, size, scale, reputation, experience, background and history of Fisher Capital Group, its agents, and representatives; the safety and liquidity of customers' existing savings and retirement accounts as compared to Precious Metals investments; and the value of the Precious Metals sold by Defendants.  For example, Defendants falsely represented on Fisher Capital Group's website that Fisher Capital Group's mission was to help retirees secure their financial future through "safe and secure" investments in "fully liquid assets that are guaranteed on your principal," that its top priority was helping customers "invest safely and intelligently," and that its clients' had "peace of mind knowing their wealth is absolutely insured."  In calls to prospective customers, Spellane and other representatives of Defendants also falsely represented that Fisher Capital Group was "the largest wealth preservation firm in North America" and that it specialized in "getting clients into fully insured positions so that they do not lose their money."

4.      Each of these statements was materially false and misleading.  In reality, Fisher Capital Group was not a wealth preservation firm – let alone the largest such firm in North America.  Instead, Fisher Capital Group was a boiler room-type operation orchestrated by Spellane that specialized in bilking elderly and unsophisticated customers

out of their retirement savings.  Rather than offering "safe and secure" investments that would "guarantee[]" the principal of customers' investments, Defendants systematically and fraudulently deceived customers into purchasing supposedly exclusive, collectible or semi-numismatic coins that were worth far less than Defendants led victims to believe. Far from preserving or protecting their wealth, victims of Defendants' scheme routinely lost the majority of the value of their investment immediately upon entering into transactions with Defendants due to the exorbitant and fraudulent markups charged by Defendants.

5.      Defendants' scam is particularly egregious because they preyed on vulnerable and elderly victims, and persisted in their fraudulent scheme even after (i) multiple firms that served as custodians for its victims' retirement accounts terminated their relationship with Defendants, with one such party warning Spellane that Fisher Capital Group's transactions were "not [] in the best interest of" Fisher Capital Group's customers; and (ii) the CFTC and numerous state regulators commenced lawsuits against two prior employers of Spellane for similar conduct that occurred while Spellane was employed by those companies.

6.      Rather than discontinue Defendants' fraudulent scheme, Spellane told Fisher Capital Group's sales staff that Fisher Capital Group was a "pump and dump," meaning that he intended to continue defrauding customers in order to earn quick profits until Fisher Capital Group closed or was forcibly shut down.

7.      Defendants have defrauded hundreds of mostly elderly victims into investing more than $30 million in Precious Metals.

8.      The CFTC brings this lawsuit to protect the investing public and hold Defendants accountable for their misconduct.

9.      Precious Metals are commodities under Section 1a(9) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1a(9).

10.     By virtue of this conduct, and as the conduct more fully set forth below, Defendants have engaged, are engaging, and/or are about to engage in, either intentionally or recklessly, violations of the anti-fraud provisions of the CEA, Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), and CFTC Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2022).

11.     The acts, misrepresentations, omissions, and failures of Spellane and other sales representatives, officers, employees, and agents acting for Fisher Capital Group occurred within the scope of their employment, agency, or office with Fisher Capital Group.  AMS Consulting Solutions LLC and Fisher Capital LLC are therefore liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2022), as a principal for violations of the CEA and CFTC Regulations by Spellane and other agents and employees of AMS Consulting Solutions LLC and/or Fisher Capital LLC.

12.     Spellane controlled AMS Consulting Solutions and Fisher Capital LLC, did not act in good faith, and knowingly induced AMS Consulting Solutions and Fisher Capital LLC's violations of the CEA and CFTC Regulations.  As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b), Spellane is liable as a controlling person for AMS Consulting Solutions and Fisher Capital LLC's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

13.     Accordingly, pursuant to Sections 6c and 6d(1) of the CEA, 7 U.S.C. §§
13a-1, 13a-2(1), the CFTC brings this action to enjoin Defendants' unlawful acts and
practices, to compel their compliance with the CEA and CFTC Regulations, and to enjoin
them from engaging in any commodity-related activity, as set forth below.  Plaintiff also
seeks civil monetary penalties and remedial ancillary relief, including, but not limited to,
restitution, disgorgement, rescission, pre- and post-judgment interest, and such other
relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C.
§ 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original
jurisdiction over civil actions commenced by the United States or by any agency
expressly authorized to sue by Act of Congress). Section 6c(a) of the CEA, 7 U.S.C. §
13a-1(a), authorizes the CFTC to seek injunctive and other relief against any person
whenever it appears to the CFTC that such person has engaged, is engaging, or is about to
engage in any act or practice constituting a violation of any provision of the CEA or any
rule, regulation, or order thereunder.

15.     Venue lies properly in this District pursuant to Section 6c(e) of the CEA, 7
U.S.C. § 13a-1(e), because Defendants transacted business in this District, and certain
transactions, acts, practices, and courses of business in violation of the CEA and CFTC
Regulations occurred, are occurring, or are about to occur within this District, among
other places, including Defendants' solicitation of, and transactions with, customers in
this District.

### III.   PARTIES

16.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the CEA and the CFTC Regulations promulgated thereunder.

17.     Defendant **AMS Consulting Solutions LLC** is a Wyoming limited liability corporation with its principal place of business in Beverly Hills or Los Angeles, California.  AMS Consulting Solutions LLC uses or has used the business name Fisher Capital.  AMS Consulting Solutions LLC has never been registered with the Commission in any capacity.

18.     Defendant **Fisher Capital LLC** is a Wyoming limited liability corporation with its principal place of business in Beverly Hills or Los Angeles, California.  Fisher Capital LLC was initially incorporated in Wyoming on June 1, 2020. On April 26, 2021 Spellane caused Fisher Capital LLC to be dissolved, and on or about the same date, Spellane re-formed Fisher Capital LLC by purchasing Global Access International LLC, a Wyoming limited liability corporation that originally was incorporated in Wyoming in 2007, and changing its name to Fisher Capital LLC.  Upon information and belief, Global Access International LLC was a non-operating shell corporation unaffiliated with Spellane from its formation until he purchased it in 2021. Fisher Capital LLC has never been registered with the Commission in any capacity.

19.     Defendant **Alexander Spellane** is a resident of Los Angeles, California. He directly or indirectly owns 100% of Defendants AMS Consulting Solutions LLC and Fisher Capital LLC, and has exclusive authority over their business operations.  At times, Spellane has used the fictitious names "Alexander Overlie" and "Alexander Fisher." Spellane variously held himself out as a member, manager, managing partner, owner, and

6

Vice President of AMS Consulting Solutions LLC and as the sole owner, Vice President, and Chief Executive Officer of Fisher Capital LLC.  Spellane has never been registered with the Commission in any capacity.

20.    AMS Consulting Solutions LLC and Fisher Capital LLC operated as a common enterprise.  The entities shared office space, employees, and operational resources; were owned and controlled the same individual (Spellane); held themselves out as a single operation; and were operated as a single interrelated enterprise to perpetuate the fraudulent scheme.

## IV.    FACTS

### A.    Overview of Fisher Capital Group's Operations

21.    From in or about August 2020 through the present, Defendants operated a call center in California to solicit elderly and retirement aged customers to invest in Precious Metals.

22.     Prior to launching Fisher Capital Group, from approximately March 2019 to June 2020, Spellane was employed as a telemarketing salesperson at Safeguard Metals LLC ("Safeguard"), a company that subsequently was sued by the CFTC and 27 state regulatory agencies for perpetrating a nationwide precious metals fraud during the period where Spellane was employed at Safeguard.[1]  Previously, from approximately October 2017 to March 2019,  Spellane worked as a telemarketing salesperson at Chase Metals, Inc. ("Chase Metals"), which was sued by the CFTC and 30 state regulatory agencies for perpetrating a nationwide precious metals fraud during the period where Spellane was employed at Chase Metals.[2]

---

[1] *See* Complaint, *CFTC et al. v. Safeguard Metals LLC et al*, No. 22-cv-681 (C.D. Ca., Feb. 1, 2022).
[2] *See* Complaint, *CFTC et al. v. TMTE, Inc., et al.*, No. 20-cv-2910 (N.D. Tex., Sept. 22, 2020).

23.     Throughout the Relevant Period, Spellane controlled Fisher Capital Group and he made all financial, operational, and strategic business decisions for Fisher Capital Group.  For example, Spellane personally handled purchasing the Precious Metals from wholesale and retail dealers that Fisher Capital Group resold to its customers; determining which specific coins customers would be directed to purchase; setting the prices at which Fisher Capital Group sold Precious Metals to its customers; sourcing customer leads; hiring and supervising sales representatives; reviewing and approving Fisher Capital Group's website content; and drafting and approving sales scripts for Fisher Capital Group's sales representatives to follow in communicating with potential customers.  Spellane also personally solicited customers by phone.

24.     Defendants solicited customers through telephone calls, electronic messages, and web-based solicitations, including through advertisements on social media platforms, and through Defendants' website, https://fishercapitalgroup.com.

25.     Central to their scheme to defraud, Spellane and Fisher Capital Group's sales representatives focused their fraudulent solicitations on politically conservative and Christian customers who were 59 years of age and older, many of whom had no experience investing in precious metals.  Spellane instructed Fisher Capital Group's sales representatives to concentrate their solicitations on this population in order to gain access to their retirement savings, including but not limited to Individual Retirement Accounts ("IRA"), simplified employee pension plans, employer sponsored 401(k) or 457(b) plans, Thrift Savings Plans, and annuities (collectively, "Traditional Retirement Accounts").

26.     To perpetrate the scheme, Defendants fraudulently induced customers to transfer proceeds from Traditional Retirement Accounts, often consisting of funds from

liquidated securities, to newly created accounts with specific self-directed retirement account ("SDIRA") custodians recommended by Defendants for the purchase of Precious Metals.  Defendants also fraudulently induced some customers to purchase Precious Metals using non-retirement assets ("Cash Sales").

27.     Throughout the scheme, Spellane took steps to conceal his true identity, and the identity of many of Fisher Capital Group's sales representatives, from customers. For example:

    a.   When communicating with customers, Spellane used the fictitious name "Alexander Overlie."  Many of Fisher Capital Group's sales representatives also used fictitious names, including "John Wright," "Kevin Hill," "Justice Baxter" and "Jacob Anderson."

    b.   Spellane provided corporate email addresses to himself and many of Fisher Capital Group's sales representatives that concealed Spellane's and Fisher Capital Group representatives' true names.  For example, Spellane used the email address "alex.overlie@fishercapitalgroup.com."

    c.   Spellane instructed Fisher Capital Group's sales representatives and some third parties to never disclose his true name to customers.  For example, in January 2021, Spellane instructed a SDIRA custodian that Spellane's real name "should never be displayed" to Fisher Capital Group's customers.

    d.   In at least one instance, in June 2022, in response to a direct question from a prospective customer's representative, Spellane expressly and falsely denied that "Alexander Overlie" was a pseudonym for Alexander Spellane.

28.     Defendants' core strategy for profitability was to charge an exorbitant markup on sales of Precious Metals, particularly on gold and silver coins that Defendants claimed were collectible, exclusive or "semi-numismatic."

29.     Physical gold and silver coins[3] fall into three general categories: (i) bullion; (ii) numismatic; and (iii) semi-numismatic.

    a.    Bullion coins are valued based upon the prevailing spot market price of their precious metals content ("melt value").

    b.    Numismatic coins are rare, of limited availability, and sought after by specialized collectors, and so have a value substantially more than, and not primarily dependent on, the prevailing market price of the metal contained in the coin.  Unlike bullion coins, the value of numismatic coins is highly dependent upon the specific characteristics of an individual specimen, such as the mintage year, condition, provenance, and mint mark.  In general, the market for numismatic coins is less liquid, and has a significantly larger spread between bid and ask prices, than the market for bullion coins.

    c.    Semi-numismatic coins are claimed to exhibit both bullion and numismatic traits, such that their value is derived from the precious metal content, with some additional premium due to their limited circulation and recognized exclusive or collectible value.

30.     Defendants commonly sold bullion coins in the form of the following gold and silver coins:

    a.    The 1/4 oz Gold United States Mint American Eagle;

    b.    The 1/10 oz Gold United States Mint American Eagle;

    c.    The 1/4 oz Gold Royal Canadian Mint Maple Leaf;

    d.    The 1/20 oz Gold Royal Canadian Mint Maple Leaf; and

    e.    The 1 oz Silver United States Mint American Eagle.

---

[3] Within the precious metals industry, the term "coins" refers to precious metals that are issued by a sovereign mint and are legal tender.  Physical bullion also may be purchased in other forms, including rounds (which physically resemble coins but are not legal tender) and bars.

31.     Defendants sold a wide variety of different coins that they characterized as semi-numismatic, including:

   a.     A variety of 5 oz Silver United States Mint "America the Beautiful" coins (e.g. Bombay Hook, Weir Farm, American Samoa National Park, Salt River Bay National Park);

   b.     A variety of 1.5 oz Silver Royal Canadian Mint "Wildlife Series" coins (e.g., Arctic Fox, Polar Bear & Cub, Cougar, Gyrfalcon, Grizzly Bear, Orca, Bison and Snowy Owl);

   c.     The 5 oz Silver Perth Mint Australian Silver Lunar Ox;

   d.     The 1/2 oz Silver Perth Mint Australian Battle of the Coral Sea;

   e.     The 1.5 oz Silver Perth Mint Australian Bottlenose Dolphin;

   f.     The 1 oz Silver Scottsdale Mint Cayman Islands Marlin;

   g.     The 1/2 oz Gold Royal Canadian Mint Polar Bear;

   h.     A variety of 1/4 oz Gold Royal Canadian Mint "Wildlife Series" coins (e.g., Arctic Fox, Polar Bear and Cub, Gyrfalcon, Bighorn Sheep); and

   i.     The 1/4 oz Gold Saint Helena Rose Crown Guinea.

32.     In furtherance of the scheme, beginning in or about July 2020, Defendants sought to establish business relationships with (i) SDIRA custodians; (ii) Precious Metals wholesale and retail companies that could supply Precious Metals for Defendants to resell to their own customers; and (iii) depository companies to store Precious Metals on behalf of Fischer Capital Group and its customers.[4]  In connection with those efforts, Spellane intentionally or recklessly provided materially false or misleading information to certain of these companies.

---

[4] Pursuant to Internal Revenue Code Section 408(m), Precious Metals owned in SDIRA accounts must be held in the custody of a bank or an IRS-approved non-bank trustee ("depository").

33.    On July 20, 2020, Spellane, on behalf of Fisher Capital Group, submitted by email a completed "Dealer Questionnaire" to a SDIRA Custodian ("SDIRA Custodian 1"). In that questionnaire, in response to SDIRA Custodian 1's request for a list of "relevant businesses you currently work with (suppliers, depositories, etc.)," Spellane falsely listed the names of a well-known metals wholesale firm ("Supplier 1") and three SDIRA custodians that were competitors of SDIRA Custodian 1. In fact, at the time of Spellane's email, Defendants did not have a business relationship with any of the companies that Spellane identified. Indeed, Spellane had first contacted Supplier 1 to inquire about establishing a business relationship only days earlier, and Spellane was informed, prior to his submission of a Dealer Questionnaire to SDIRA Custodian 1, that Supplier 1 would not conduct business with Defendants prior to conducting a compliance review, which was ongoing. Ultimately, after completing its compliance review, Supplier 1 informed Spellane that it would not do business with Defendants.

34.    On August 12, 2020, Spellane emailed a depository company ("Depository Company 1") attaching an application for AMS Consulting Solutions LLC to obtain a commercial account at that depository. In the application, Spellane falsely represented that AMS Consulting Solutions LLC's primary compliance department contact was "Justice Baxter." In fact, AMS Consulting Solutions had no compliance department at the time, and "Justice Baxter" was a fictitious name used by a salesperson at Fisher Capital Group.

### B. Defendants Fraudulently Induced Elderly Customers to Transfer Funds From Traditional Retirement Accounts and Savings Accounts For the Purpose of Purchasing Precious Metals

35.    Defendants' sales process, which was devised by Spellane, generally followed a standardized format. On a daily basis, Fisher Capital Group distributed lists

of potential customers or "leads" to its sales representatives.  Using scripts that had been

approved by Spellane, Fisher Capital Group's sales representatives contacted leads by

telephone in order to begin the process of persuading them to purchase Precious Metals.

Typically, the initial outreach was conducted by less experienced sales representatives,

who were referred to as an "Opener" or "Dialer."  If the potential customer was receptive

to the Opener's pitch, then Spellane or another sales representative, referred to as a

"Closer," generally was brought in to continue the process of soliciting the customer.

36.     Spellane recognized that prospective customers would (rightly) be wary

upon receipt of a cold-call from an unknown Precious Metals dealer that lacked any

significant operating history and was recommending that customers invest their life

savings into particular Precious Metals that it was marketing.  As a result, Spellane

developed a sales process that employed fraud and deception to gain customers' trust.

37.     ***Affinity-Based Lies.***  Fisher Capital Group's sales representatives were

directed by Spellane to not disclose at the outset of calls to prospective customers that

Fisher Capital Group was a precious metals dealer, or that the purpose of the call was to

solicit the recipient to purchase precious metals.  Instead, at Spellane's direction,

Defendants employed strategies throughout the scheme to gain customers' trust based on

representations of shared political and religious affinity.  For example, Fisher Capital

Group sales representatives – including those who were not Christian or conservative –

were coached by Spellane to build trust with customers by claiming to be Christian and

conservative.  At times, Fisher Capital Group's sales scripts explicitly suggested that

affinity-based representations should be used to reassure prospective customers who (like

virtually every one of Fisher Capital Group's customers) had never heard of the firm.  For

13

example, one sales script specified the following response to a customer who asks "Fisher What?": "You've seen our ads before. Big supporters of [particular conservative news personalities]." Another script reflected that if a customer was concerned that Fisher Capital Group was a "scam," the sales representative could offer a stock response that included the statement: "My mother raised me with Christian Conservative values."

38.    These affinity-based tactics included intentionally or recklessly making materially false and misleading statements and material omissions to prospective customers about Fisher Capital Group's and its sales representatives' connections to and relationships with conservative television and radio programs and media personalities, including but not limited to the following:

     a.   Falsely representing that the purpose of Fisher Capital Group's call was to conduct a survey of listeners of particular conservative television and radio programs, notwithstanding that the sham survey was a ruse to conceal the true purpose of the sales solicitation call;

     b.   Falsely representing that Fisher Capital had "teamed up with conservative news outlets to warn conservatives about the coming retirement crisis";

     c.   Falsely representing that "Alex Overlie" (a fictitious name used by Spellane) had appeared on Fox News;

     d.   Falsely representing that "Justice Baxter" (a fictitious name used by a Fisher Capital Group salesperson) had "worked alongside" particular conservative television and radio personalities, had "produced many campaigns" for a conservative television program, and was "preparing to go on" a conservative radio personality's program;

     e.   Falsely representing that Fisher Capital Group was calling to express gratitude for the customer being a listener of certain conservative personalities' radio programs, and to offer a free retirement protection guide to "our listeners and supporters";

     f.   Falsely representing that the purpose of the call was because "we create content for the supporters and listeners of" particular conservative television and radio programs.

39.     ***Lies Suggesting Fisher Capital Would Recommend Safe and Secure
Investments That Were in its Customers' Best Interest.***  Building upon their efforts to
garner customers' misplaced trust through claims of shared political and religious
affinity, Spellane and Fisher Capital Group made materially false and misleading
statements and omissions intentionally and recklessly throughout the scheme to convey to
customers that Fisher Capital Group's main concern was customers' financial security,
and that it would offer safe and secure investments that were in its customers' best
interest.  For example, at times during the Relevant Period, Fisher Capital's website
contained the following statements:

    a.  Fisher Capital Group's "Mission Is to Provide Retirees A Secure &
        Wealthy Life" and "Help Retirees Secure Their Financial Future";

    b.  "Working with Fisher Capital Group will help secure your nest egg";

    c.  "We Are Committed to Your Wealth";

    d.  "Wealth Protection: We focus on fully liquid assets that are guaranteed on
        your principal.  Our clients have peace of mind knowing their wealth is
        absolutely insured";

    e.  "Self-Directed IRAs put you in full and complete control of your money
        with assistance from a team of experts to take advantage of buying a
        diversity of all IRS approved assets, in addition to traditional assets";

    f.  "Our top priority is helping you invest safely and intelligently, especially
        during these times of economic instability";

    g.  "Talk With Our Experts: Secure your financial future and live worry-free
        for life";

    h.  "Lightning fast account set up will get you out of harm's way within days
        not months.  Our dedicated account executives are there for you every step
        of the way";

    i.  "Fisher Capital is dedicated to offering you best in class service to help
        you achieve your goals.  Our custodial and client relationships are a result

of our values.  We believe in family, legacy and integrity. Our experienced staff and IRA team are committed to making it a seamless transition for you";

j.  "Your knowledge, our priority.  We help our clients understand how precious metals can secure your future.  With a team of industry veterans, our unparalleled knowledge will ensure your long-term security and conviction";

k.  "Precious Metals get you away from the fiat currency system and into the safest investment for you and your family";

l.  "Precious metals have always been trusted as a safe and secure investment."

40.     Spellane and Fisher Capital Group representatives repeated these or similar misrepresentations in telephonic and email solicitations.  In phone calls, for example, Spellane represented to customers, in words or substance, that he was a wealth protection expert who wanted to help elderly clients "get out of harm's way" and into a position where they were "bulletproof."  In response to a customer who questioned his own competence to personally manage a SDIRA account, Spellane offered the false reassurance that "Just because it's self-directed doesn't mean you're alone.  That's why I'm here.  I help clients manage these accounts."

41.     Spellane also misrepresented and omitted material facts regarding how Fisher Capital Group earned its profits.  For example, in or about August 2020, in response to a customer who asked whether Spellane was soliciting him to "move my funds with you [because] there's a lot of commission involved," Spellane stated that the way Fisher Capital Group makes its money "is through long term relationships that have been successful for my clients, that stay with me forever."  Spellane added that unlike annuity salesmen who "lock your money in some contract . . . and they make like 8% off you," Fisher Capital did not earn its profits through "getting a big payday" when

16

customers first invested.  Those statements were false and misleading because Fisher

Capital Group did not profit based on its customers' success.  Rather, the vast majority if

not all of Fisher Capital Group's profits were earned immediately upon its sale of

Precious Metals to newly defrauded customers due to the exorbitant markups charged by

Defendants (which were markedly higher than the 8% figure Spellane referenced).  The

success of customers was thus inversely related to Fisher Capital Group's own

profitability.

42.     In sales scripts provided to Fisher Capital Group's sales representatives,

Openers were directed to introduce Spellane and other Closers to potential customers as

someone who has "been doing great things for our clients for a long time" and directed to

say that the Closer "really has a heart of gold and a purpose to serve" and "I have the

utmost trust he will take care of you."  Sales scripts also directed Fisher Capital Group's

sales representatives to ask for information about clients' current retirement accounts on

the pretext that Fisher Capital Group would use its expertise to give clients a free

consultation, and offer a free "risk assessment" and tailored recommendations for

"physical tangible assets . . .that best fits your needs."   In at least one instance, a sales

script reflected that a sales representative should say "typically I don't jump on these

types of calls.  I've got people that do that . . . I don't need this account, and I do this

because I care, because I saw people lose back in 2008."

43.     Each of the above statements on Fisher Capital Group's website, in

telephonic and email solicitations, and in call scripts falsely conveyed that Defendants

would offer safe and secure investments that were in its customer's best interest.

Spellane and Fisher Capital Group knew or recklessly disregarded that each of the above

statements is false or misleading.  Spellane and Fisher Capital Group did not, and never intended to, help customers invest safely and intelligently, or help retirees secure their financial future, or otherwise recommend investments that best suited the customer's needs.  Rather, Fisher Capital Group's business model was to pressure customers to invest the entirety of their retirement account in overpriced Precious Metals so as to maximize Fisher Capital Group's own profits at the expense of customers' long-term financial security.  Nor did Fisher Capital Group focus on "fully liquid assets that are guaranteed on [customers'] principal."  Rather, Fisher Capital Group pushed customers to buy overpriced supposedly semi-numismatic coins that were less liquid than bullion coins, and offered no guarantee of preserving customers' principal.  Indeed, in reality, the only guarantee was that upon making a purchase with Fisher Capital Group, virtually every one of its customers would suffer immediate and dramatic losses on their investment.

44.    ***Lies about Fisher Capital Group's Business.***  To further build trust and establish credibility with customers, Spellane, and other Fisher Capital Group sales representatives acting at his direction, systematically made materially false and misleading statements and omissions intentionally or recklessly about Fisher Capital Group's business, including its size, history, services, and employees.  For example, Defendants' sales scripts, website, and telephonic solicitations included, in words or substance, the following statements:

   a.   Fisher Capital Group was a "multi-billion dollar firm," had "done amazing things for our clients," and had a "proven track record of success" (when, in reality, Fisher Capital Group had not yet completed a single transaction at the time the statement was first made, has never been a "multi-billion dollar firm," and virtually all of

its clients from inception to the present have suffered significant losses);

b.   Fisher Capital Group was "the largest wealth protection firm in North America," "the largest gold and silver IRA company in the nation," "the number one wealth preservation firm in the nation," "the largest conservative and Christian owned wealth preservation firms in the country" and "the #1 Precious Metals Company [sic] in the United States" (with no basis for these assertions);

c.   Fisher Capital Group is well known, has "been around for a very long time" and had been in business since 2007 (with no basis for the assertion that Fisher Capital Group was well known, and omitting to disclose that although Spellane had formed AMS Consulting Group in 2019 and then subsequently purchased an older inactive shell corporation that he renamed Fisher Capital LLC, Fisher Capital Group's business had no customers and was not an operating business until 2020);

d.   Fisher Capital Group had a "research department" with "60 years of combined experience" (when, in reality, upon information and belief, Fisher Capital Group did not have a research department);

e.   Fisher Capital Group had "thousands and thousands of clients" (when, in reality, Fisher Capital Group had less than 150 clients at the time of the statement);

f.   Fisher Capital Group's representatives were busy with *inbound* calls from potential customers (in reality, the overwhelming majority of Fisher Capital Group's customers were contacted via outgoing cold calls);

g.   Representation that "most conservatives are choosing to work with us exclusively" (with no basis for this assertion);

h.   Fisher Capital Group was "an exclusive firm" (with no basis for this assertion);

i.   Fisher Capital Group's sales representatives were licensed or certified (with no basis for this assertion);

j.   Spellane had been helping clients protect their wealth for "over 25 years" and had helped people in 2008 to "get out of the market and into an insurable position" (when, in reality, Spellane was only 27 years old at the time of these statements, and his experience did not remotely meet this description);

19

k.  Spellane worked for a "department" of Fisher Capital Group that "focuses on alternative investments that are guaranteed and insured on your principal" (when, in reality, Fisher Capital Group had less than ten employees at the time, has never had a department that focused on investments that guarantee or insure customers' principal, and aside from telemarking sales representatives employed only a single employee, who was a clerical worker);

l.  Fisher Capital Group "help[s] folks acquire physical assets.  Whether that's things like private equity, real estate, or physical gold and silver, those are things that we would help you with" (in reality, Fisher Capital Group's sole line of business was selling Precious Metals);

m.  Spellane was able to "see what performs well and what doesn't, and really how the markets move" because he managed a self-directed account with "hundreds of millions of dollars in different asset classes" (with no basis for this assertion);

n.  Spellane was "a complete expert" on wealth protection or financial matters (when, in reality, Spellane had a high school education and his only relevant work experience was as a telemarketing salesperson);

o.  References to Fisher Capital Group's "commercials on TV" (when, in reality, upon information and belief, Fisher Capital Group had no television advertisements).

p.  Representations by a Fisher Capital Group sales representative claiming "I work financial terminals 12 hours a day, 6 days a week, because I eat sleep and breathe financial news . . . My firm pays extreme dollar for information not a lot of people have access to" (with no basis for this assertion).

q.  Spellane manages "over $300 million in business," which he grew over a period of 20 years, one Fisher Capital Group sales representative manages "a book of business that's worth $250 million dollars" and a second sales representative has a "book of business that's over $150 million [] in precious metals" (with no basis for these assertions);

r.  Use of fictitious client testimonials on Fisher Capital Group's website.

45.     To further promote Fisher Capital Group's business and gain customers' trust, Spellane arranged and paid for the publication of a book written by a Fisher Capital Group Sales representative under the pseudonym "Justice Baxter," which was distributed to some of Fisher Capital's customers and prospective customers.  That book represents that Baxter had made "a small fortune during the dot com bubble," "sounded a public warning before the 2008 crash, having witnessed behind the scenes greed and corruption within the banking system," and was "a world-renowned authority on free market economics."  Each of these statements is false.

46.     After gaining prospective customers' trust, Fisher Capital Group's representatives were directed by Spellane to pressure customers to (i) open a new SDIRA account at a custodian recommended by Defendants; and (ii) transfer proceeds from the customer's Traditional Retirement Accounts, often consisting of funds from liquidated securities, into the customer's newly created SDIRA account.

47.     To induce customers to do so, Spellane and Fisher Capital Group consistently and systematically employed false and misleading statements and deceptive tactics designed to stoke customers' fear of economic collapse and scare customers into erroneously believing that their retirement accounts could be frozen or seized in the event of a stock market decline.

48.     ***False Representations that Retirement Accounts Will Be Frozen.***  In telephonic solicitations through at least February 2022, Spellane and Fisher Capital Group routinely and falsely represented to customers that the "Money Market Reform Law" allowed banks and brokerage firms to permanently freeze retirement accounts in

the event of a market downturn.  For example, Defendants' sales scripts and telephonic

solicitations included the following statements:

a.  "Did you see the BIG NEWS?!  It's talking about this monetary policy
passed by the Obama Administration called the U.S. Money Market
Reform Act. Let me tell you, what it does – it now allows institutions like
Fidelity, Edward Jones, and Vanguard as examples, what they can now do
is legally freeze you out of the account during a market crash, they can
liquidate the funds inside, and use your money to bail themselves out to
avoid going bankrupt."

b.  "The information you accessed talks about the deep state confiscating
retirement accounts such as 401ks and IRAs . . . The Federal Reserve is
coming out with some CRAZY announcements!  And Retirement
accounts are being placed DIRECTLY in the line of fire for a BANKING
FREEZE!!!";

c.  The Money Market Reform Act is a new "sneaky" law enacted "under the
rug" at the behest of big banks as part of "an agenda, a plan that they
would enact during the next financial crisis" so that "they can legally
freeze your account and take your money."

d.  The law was passed by President Obama "right before" he left office and
"they passed these sneaky laws right under our noses.  They didn't think
anybody would find out."

e.  "Most conservatives are calling in because their [sic] concerned that Wall
Street brokerage firms will freeze your retirement account and take your
money to avoid going belly up, how does that make you feel?"

f.   "We see the heads of the largest banks right now warning about accounts
being frozen";

g.  "Millions of Americans already had their accounts frozen" or had been
"locked out of their 401k's" as a result of the new law.

h.  "Does it make sense to have 100% of your life savings in an uninsured
position that can be frozen?  Of course not."

i.  "What most of our clients are doing is rolling over . . . into a . . . Self
Directed IRA and it's because when you rollover it'll be FDIC insured
bank guaranteed under your name instead of being frozen in a money
market account. . ."

49.     Defendants knew or were reckless in disregarding that these representations were false and misleading.  In fact, there was no law that allowed banks or brokerage firms to freeze investors' retirement accounts, nor had millions of Americans had their accounts frozen.  The "law" referenced by Spellane and Fisher Capital Group is actually a 2014 regulation promulgated by the Securities and Exchange Commission ("SEC"), Money Market Fund Reform Amendments to Form PF, 70 Fed. Reg. 47,736 (Aug. 14, 2014).  That regulation was not enacted by President Obama; was not enacted shortly before he left office, and was not done in secret.  Defendants failed to disclose that regulation applied only to money market fund investments and it allowed liquidity fees and redemption gates to be implemented for money market investments temporarily under certain rare circumstances, and furthermore, that liquidation follows when redemptions are permanently suspended thereby allowing investors to recover funds.

50.     To amplify their false warnings of account freezes, and to create a false sense of urgency, Spellane and Fisher Capital Group sales representatives told prospective customers that the United States was anticipated to imminently suffer a market crash or recession.  For example, Defendants' sales scripts and solicitations by phone and email included the following statements:

    a.  "The rumor on the Street is that this market is ready to sell-off by end of Jan[.] according to all these financial institutions";

    b.  "You probably already know the markets [sic] going to crash in the next couple of months";

    c.  "Most folks are concerned about the dollar devaluing and the market crashing within the next few months";

    d.  "Most financial experts say the dollar will crash very soon";

e. "Do you remember back in 2008, people lost 40-60% overnight being in the market. . . The average rate of return in the stock market is about 7%. Right now you're risking losing half of [your] money to get a 7% return. It doesn't make sense for someone of your age to take that kind of risk. . . now is the time to get more defensive and protective of what you've worked hard for . . . something is wrong with the economy right now and it could result in your legacy being affected for the rest of your life. . . This is going to be a recession like we've never seen, and it could even turn in to a global depression.";

f. "From our sources, we can't see the markets going up much higher";

g. "It's turning into a great depression";

h. The Federal Reserve is "triggering a stress test which is predicting that the market could crash above 55% in the next few months."

51.     Spellane and Fisher Capital knew or were reckless in disregarding that these statements were false and misleading and contained material omissions.  Each of these statements misleadingly fail to disclose that Spellane and Fisher Capital Group's sales representatives were not licensed to provide financial advice and lacked specialized financial or economic training.  Moreover, references to the possibility that customers might lose 40%-60% in the stock market misleadingly failed to disclose that customers would be *guaranteed* to lose a substantial amount of the value of their investments in their Traditional Retirement Accounts if they took Fisher Capital Group's advice and purchased grossly overpriced Precious Metals in an SDIRA account.  Finally, Fisher Capital Group's representation that the Federal Reserve was "predicting" a 55% market crash was false and misleading because it omits to disclose that the cited figure represented  a hypothetical decline in equity prices utilized by the Federal Reserve Board solely for the purpose of annually assessing the strength and resilience of banking organizations under one of several potential scenarios, and the Federal Reserve Board

24

expressly admonishes that each such scenario "does not represent a forecast of the Federal Reserve."[5]

52.     ***False Representations Regarding Insurance.***  In solicitations of potential customers through at least February 2022, Spellane and Fisher Capital Group intentionally or recklessly routinely misrepresented, as a purported rationale for customers to establish SDIRA accounts to invest in Precious Metals, that Traditional Retirement Accounts are uninsured.  These statements are false and misleading, and contain material omissions, in multiple respects.  In reality, investor protections and insurance are offered through the Securities Investor Protection Corporation ("SIPC") for many types of securities investments in Traditional Retirement Accounts, some Traditional Retirement Account cash holdings are covered by insurance through the Federal Deposit Insurance Corporation ("FDIC"), and many brokerage firms offer optional additional insurance for their clients in excess of SIPC insurance limits. Moreover, Spellane and Fisher Capital Group omitted to disclose that the Precious Metals that it sold were not insured by SIPC or FDIC.

53.     ***Efforts to Dissuade Customers from Consulting with Independent Third Parties.***  As a further element of Defendants' fraudulent scheme, in order to dissuade customers from conducting independent research or consulting with financial advisors or other third parties, Spellane instructed Fisher Capital Group's sales representatives to attempt to keep customers on the phone continuously until the customer agreed to open a SDIRA account and had provided Fisher Capital Group with sufficient personal

---

[5] *See* Federal Reserve Board, Dodd-Frank Act Stress Test Publications: 2021 Stress Test Scenarios (February 2021), available at https://www.federalreserve.gov/publications/stress-test-scenarios-february-2021.htm.

information for Fisher Capital Group representatives to prepare a SDIRA account application for the customer's signature.  As a result, initial calls with Customers frequently lasted an hour or more.

54.     As a further tactic to dissuade customers from consulting with independent third parties, Spellane and Fisher Capital Group sought to preemptively cast doubt on the expertise and motivations of customers' financial advisors and retirement account custodians.  For example, in call scripts, Fisher Capital Group representatives were directed to tell customers that financial advisors had not informed their customers about the risks associated with Traditional Retirement Accounts because "if they did, they would lose their job," and that financial advisors were supposedly legally barred from advising their clients to "move to cash."

### C.     Defendants Fraudulently Charged Exorbitant Price Markups on Precious Metals

55.     After a customer had transferred funds from their Traditional Retirement Account to a newly-created SDIRA account (or for Cash Purchases, after a customer transmitted funds to Fisher Capital Group), Spellane and Fisher Capital Group proceeded to execute Defendants' core strategy of selling fraudulently overpriced Precious Metals.

56.     This component of the sales process typically occurred in several stages. First, Defendants would conduct a non-recorded call with the customer, in which the customer was notified that they would be receiving a call from the "Fisher Capital Trade Desk" on a recorded line to conduct a "trade."  Customers were told that they needed to answer "yes" to every question on the recording, and that if they gave any other answer or asked any questions, they would have to start over.

57.     Next, Defendants contacted the customer again via a recorded telephone line.  That recorded call, which was typically only a few minutes in length, was referred to internally by Defendants as the "Coin Call" (also referred to as the "Trade Call.").

58.     Defendants employed a variety of false and deceptive tactics, including materially false and misleading statements and omissions, both before, during, and after the Coin Call in order to mislead customers about the value of the Precious Metals being sold and Fisher Capital Group's markup.

59.     One such tactic was to provide favorable information to customers relating to *bullion* coins, without disclosing that the information was inapplicable to the supposedly exclusive or collectible semi-numismatic coins into which Fisher Capital Group directed the vast majority of customers' funds.  For example, in emails to prospective customers, Fisher Capital Group emphasized that "Gold is one of the most highly traded financial assets, with low transaction costs and universal acceptance."  That statement misleadingly omits to disclose that Fisher Capital Group overwhelmingly directed customers' investments into lesser-known supposedly collectible semi-numismatic coins that are not a "highly traded financial asset," and involve (at least when sold by Fisher Capital Group) huge transaction costs for the customer.

60.     Defendants also materially misrepresented to customers the value of semi-numismatic coins by representing in words or substance that such coins were rare, special, exclusive, or collectible and therefore had a value substantially above their melt value.  Spellane and Fisher Capital Group knew or recklessly disregarded that the supposedly semi-numismatic coins sold by Fisher Capital Group were not rare, were not

exclusive to Fisher Capital Group, and had little if any numismatic or semi-numismatic value.

61.     Defendants materially misrepresented to customers that semi-numismatic coins were a better investment than bullion coins, and falsely assured customers in words or substance that the customer would likely earn substantial profits due to projected appreciation in the value of such coins.  In reality, as Defendants knew or recklessly disregarded, purchasing grossly overpriced coins at prices that ranged from at least 43% to more than 200% of the market value of such coins guaranteed that customers would suffer immediate and substantial losses.  No factual basis existed to project that customers would ever earn a profit on such investments, or that such investments would perform better than bullion coins.  For example, in or about March 2021, Spellane falsely told a customer that by converting his Traditional Retirement Account into Precious Metals, he could expect to double his money within six months to one year because the price of gold and silver would rise.  In fact, as Spellane knew or recklessly disregarded, the customer instantly lost more than half of the value of his retirement account upon transacting with Fisher Capital Group because Spellane directed virtually all of the customer's retirement funds into grossly overpriced supposedly semi-numismatic coins at markups ranging from 137% to 145%.

62.     In sales scripts and telephonic solicitations to customers, Defendants misleadingly touted the favorable pricing that a customer would receive on bullion coins, while intentionally and misleadingly failing to disclose that the markup that the customer would be charged on supposedly semi-numismatic, exclusive or collectible coins would be orders of magnitude higher.

63.     For example, Fisher Capital Group represented in a verbal pitch to a customer that if the customer were to acquire silver, Fisher Capital Group "charge[s] a 2% cost over spot price for that bullion, and that's it.  There's no cost to hold it.  There's no cost to sell it."  That statement was false and misleading because it materially understated the price that Fisher Capital Group charged on bullion silver coins,[6] and failed to disclose that Fisher Capital Group directed the vast majority of all customer funds into supposedly non-bullion coins it characterized as semi-numismatic, at markups frequently exceeding 150%. The statement that there is "no cost to hold" precious metals also is false, because SDIRA custodians and depository institutions impose significant fees and costs to store Precious Metals in an IRA account.

64.     As Defendants knew, Fisher Capital Group paid its sales representatives a commission of 8% (split between the Opener and Closer) on the total amount charged to customers when coins were purchased; thus Fisher Capital Group's transactions with customers included markups of more than (and typically much more than) 8%.

65.     In a telephonic solicitation in or about June 2022, Spellane employed a similar tactic by emphasizing the favorable pricing that a customer would be offered on particular bullion coins, while failing to disclose that the markup that the customer would be charged on supposedly semi-numismatic coins would be orders of magnitude higher.

66.     Similarly, a Fisher Capital Group sales script stated: "Where we make money is when you make the decision to hold real tangible assets[,] for example[,] when

---

[6] Fisher Capital Group at times charged a markup of more than 7% on silver bullion coins over its own *cost*.  However, those prices at times translated to a markup *over spot* that exceeded 40% on silver bullion coins because Fisher Capital Group acquired bullion coins from other vendors who had already marked up those coins.

you decide to move to Physical Gold and Silver we make an industry standard of 1-3% on Physical Bullion on that one transaction and that's it" (capitalization in original).  That statement was materially false and misleading because, as Defendants' knew, Fisher Capital Group profited by systematically directing the vast majority of all customer funds into supposedly non-bullion coins, at markups frequently exceeding 150%.

67.     Defendants' core strategy, however, was to exploit their customers' erroneous belief (induced through Defendants' misrepresentations earlier in the sales process) that Fisher Capital Group was a well-known firm that shared their political and religious affiliations and was committed to acting in its clients' best interest.  In that regard, Spellane and Fisher Capital Group trained its sales representatives that: "if the client feels that you don't have their best interest [in mind] then you and [the] client will be butting heads about why the client does not want the coins that you recommended them to buy," but if the initial portions of the solicitations are done effectively then the Coin Call "is much easier."  In other words, Spellane and Fisher Capital Group's strategy was to fraudulently induce vulnerable elderly and retirement-aged customers to believe that Defendants would act in customers' best interest, so that during the Coin Call, Spellane and Fisher Capital Group could defraud those customers out of their retirement funds with ease.

68.     In advance of the recorded Coin Call, Spellane determined the various coins that would be sold to the relevant customer, along with the prices that the customer would be charged for each coin.  To benefit Defendants' own interest, Spellane generally directed the vast majority of each customers' funds into supposedly collectible semi-numismatic coins that Defendants claimed had numismatic or semi-numismatic value.

Until approximately December 2021, Defendants charged an average markup of approximately 140% over their own cost on semi-numismatic coins.  After December 2021, Defendants charged an average markup of approximately 43% over their own cost on semi-numismatic coins.  On information and belief, Spellane made that change in or about December 2021 after receiving notice of governmental investigations into Fisher Capital Group's operations.

69.     To distract customers and conceal the fraud, Spellane generally directed a small fraction (typically less than 5%) of each customer's funds into bullion coins at prices close to Fisher Capital Group's cost.

70.     Spellane directed Fisher Capital Group's sales representatives to not inform customers in advance of the recorded Coin Call of the price that they would be paying for any particular supposedly semi-numismatic coins.  Instead, Fisher Capital Group's representatives were directed by Spellane to only explain in general terms the concept of bullion, semi-numismatic and numismatic coins, while persuading customers that semi-numismatic coins would best serve the customer's investment objectives.

71.     Next, Defendants' sales representatives would contact the customer on a recorded line and verbally state, in rapid succession, the quantity and prices of the various coins that the customer would be purchasing.

72.     Notably, the recorded "Coin Call" was typically the very first time that Defendants' customers were told the specific prices, quantities and types of the supposedly semi-numismatic coins that they would be sold.  Elderly customers – who had been duped into believing they were dealing with a reputable and well-known wealth preservation firm that would help them achieve financial security – frequently failed to

recognize during Defendants' rapid-fire Coin Call script that they were being charged unconscionably high markups for certain coins.

73.     Following the Coin Call, Spellane contacted the customer's SDIRA custodian to notify the custodian of the customer's purchase, and request payment to Fisher Capital Group.  Spellane also arranged for the Precious Metals ordered by the customer to be delivered to either (i) the customer's residence for Cash Sales, or (ii) to a depository company, for SDIRA account purchases.  In doing so, Fisher Capital Group effectively acted as an unnecessary middle-man to add additional mark-up on Precious Metals that customers frequently could have purchased themselves from the very same online retail vendor or a variety of other sources for a fraction of the cost charged by Fisher Capital Group.  In many instances, Spellane fulfilled customer orders by simply ordering the relevant Precious Metals from other online Precious Metals vendors – including, at times, well-known online retail vendors that are readily available to the general public – and arranging for those vendors to deliver the Precious Metals directly to the customer's residence or the depository account.  In other instances, Fisher Capital Group purchased Precious Metals from distributors in anticipation of future customer orders.

74.     Spellane and Fisher Capital Group took steps to prevent or delay customers from realizing that they had been grossly overcharged.  For example, Fisher Capital Group drafted customers' SDIRA application forms to designate Fisher Capital Group as the customer's designated representative and specified that SDIRA custodians should solely contact Fisher Capital Group, and not the customer themselves, for verbal verification when disbursing funds.  In addition, until at least approximately April 2022,

Fisher Capital Group's representatives, at Spellane's direction, did not send customers any written receipt or other confirmation of their purchase.

75.     Throughout the scheme, at least until December 2021, in telephone solicitations and on the recorded Coin Calls, Spellane and Fisher Capital Group systematically failed to disclose: the total number of ounces of gold or silver purchased by customers, the applicable spot price of gold or silver, the markup charged by Defendants, or the percentage by which the customers' Precious Metals would need to appreciate for customers to break even.

76.     Until approximately December 2021, the sole written disclosure that customers received regarding Fisher Capital Group's commissions or markups was contained in a "Shipping and Transaction Agreement," which was a nine-page document in small print font that was drafted or approved by Spellane.  In that document, Spellane and Fisher Capital Group deceptively failed to disclose to customers that the average markup that Defendants charged on semi-numismatic coins averaged approximately 140%.  Instead, the document stated:

> "Fisher Capital's Precious Metals product quotes to Customer for
> common bullion Precious Metals products (i.e. rounds and bars that
> ordinarily trade in concurrence with the Spot Price for the given
> commodity such as American Eagle coins, Canadian Maple Leaf
> coins, good delivery bars, etc.) are typically four percent (4%) for
> cash, and seven percent (7%) for IRA purchases.  These numbers
> are only examples of general ranges and approximations which are
> subject to change for various reasons.  Spreads vary based on the
> quantity of purchase, the availability of Precious Metals products,
> market forces such as sudden spikes in demand and the timing of
> transactions, among other things.  The actual Spread on any
> transaction could be within – or outside of – the above stated price
> ranges.  For instance, proceeds on exclusive and/or Numismatic
> Precious Metals products such as Saint Gaudens, Barber Half
> Dollars (and all other graded, exclusive or collectible Metals
> products) are upwards of twenty percent (20%) and proof products

over twenty three (23%).  Spreads for exclusive and Numismatic
Precious Metals vary on any particular transaction and could be any
amount within or outside of those ranges."

77.     Defendants knew, or were reckless in disregarding, that the above
language misleadingly fails to disclose that Defendants charged uniformly exorbitant
markups, averaging approximately 140%, on supposedly semi-numismatic coins sold
through approximately December 2021.

78.     Many customers, including elderly persons, never realized that the value
of their retirement account dropped substantially on the day that they purchased Precious
Metals from Defendants.  Others customers first became concerned when they viewed
statements from their new SDIRA custodians showing that their account values declined
substantially following their purchase of Precious Metals from Fisher Capital Group.

79.     When customers contacted Fisher Capital Group about the disparity
between their original investment and the value assigned by SDIRA custodians, Spellane
and Defendants misleadingly assured customers that that SDIRA custodians considered
only the melt value of the Precious Metals, and that the value of the customer's Precious
Metals was supposedly much higher than valuation specified in the customer's SDIRA
statement.  This explanation omitted to disclose that, as Defendants knew or recklessly
disregarded, the resale value of the Precious Metals that Defendants marketed and sold
was much lower than the prices customers paid for those Precious Metals.  Defendants
also falsely represented to customers that SDIRA statements displayed only the melt
value of the Precious Metals because it purportedly provided a tax break to the customer.

80.     Due to the acts, omissions and failures of Defendants, at least two SDIRA
custodians (SDIRA Custodian 1 and SDIRA Custodian 2) terminated their business

relationship with Spellane and Fisher Capital Group in late 2020.  In a letter communicating that termination to Spellane on or about October 22, 2020, SDIRA Custodian 1 stated, in pertinent part, that:

> [I]t has come to our attention that certain trades made in accounts represented by Fisher Capital appear to not be in the best interest of the IRA owner with the values of the accounts being significantly less after the trade activity than the values of the accounts prior to the trades.

**D.      Spellane Controlled the Operations of Fisher Capital Group and Is Therefore Liable for Its Actions**

81.      During the Relevant Period, Spellane was the controlling person of Fisher Capital Group (including AMS Consulting LLC and Fisher Capital LLC).  Spellane directly or indirectly held 100% ownership of those companies, and held exclusive authority over their business decisions.

82.      As the controlling person, Spellane made all significant business decisions on behalf of Fisher Capital Group.  He was authorized to make, and did make, personnel decisions about hiring and firing of employees.  Spellane provided training to Fisher Capital Group's sales representatives, and drafted or approved sales scripts.  Spellane also determined and set the prices at which Fisher Capital Group sold Precious Metals to the public.

83.      During the Relevant Period, Spellane was the only signatory on Fisher Capital Group's bank accounts and served as the only person authorized to enter into financial transactions on behalf of Fisher Capital Group.

84.      Spellane did not act in good faith or has knowingly induced Fisher Capital Group's violations of the CEA and Commission Regulations.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT 1

### Fraud

### FRAUD BY DECEPTIVE DEVICE OR CONTRIVANCE – VIOLATION OF SECTION 6(c)(1) OF THE ACT, 7 U.S.C. § 9(1) AND REGULATION 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021)

85.    Paragraphs 1 through 84 are realleged and incorporated herein by reference.

86.    7 U.S.C. § 9(1) makes it unlawful for any person, directly or indirectly, to:

[U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

87.    17 C.F.R. § 180.1(a) provides, in part:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . .

88.    By reason of the conduct describe above, Defendants, by and through Spellane, and Defendants officers, employees, and agents, directly or indirectly, in connection with contracts of sale of commodities in interstate commerce, intentionally or recklessly violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

36

89.     By reason of the conduct described above, the acts, misrepresentations, omissions, and failures of Spellane and other officers, employees, and agents acting for Defendants AMS Consulting Solutions and Fisher Capital LLC occurred within the scope of their employment, agency, or office with AMS Consulting Solutions and Fisher Capital LLC.  Defendants AMS Consulting Solutions and Fisher Capital LLC are therefore liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), and CFTC Regulation 1.2, 17 C.F.R. § 1.2 (2021), as a principal for Spellane's violations of the CEA and CFTC Regulations.

90.     Spellane controlled AMS Consulting Solutions and Fisher Capital LLC and has not acted in good faith or has knowingly induced, directly or indirectly, the acts constituting AMS Consulting Solutions and Fisher Capital LLC's violations alleged in this Count. As a result, pursuant to Section 13(b) of the CEA, 7 U.S.C. § 13c(b), Spellane is liable for AMS Consulting Solutions' and Fisher Capital LLC's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3), as controlling person.

91.     Each use or employment or attempted use or employment of any manipulative device, scheme, or artifice to defraud; untrue or misleading statement of fact, omission of material fact necessary to make statements not untrue or misleading; or act of engaging, or attempting to engage, in acts, practices or courses of business that operated or would have operated as a fraud or deceit on Defendants' customers is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3).

## VI.    <u>RELIEF REQUESTED</u>

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.      Find that Defendants violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1),
        and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2022);

B.      Find that Defendant Spellane is liable pursuant to 7 U.S.C. § 13c(b) as a
        controlling person for AMS Consulting Solutions' and Fisher Capital
        LLC's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3);

C.      Find that Defendants AMS Consulting Solutions and Fisher Capital LLC
        are liable under 7 U.S.C. § 2(a)(1)(B), and 17 C.F.R. § 1.2 (2022) as
        principals for the acts, omissions, or failures as alleged herein;

D.      Enter an order of permanent injunction enjoining Defendants and any of
        their affiliates, agents, servants, employees, successors, assigns, attorneys,
        and all persons in active concert with them, who receive actual notice of
        such order by personal service or otherwise, from violating 7 U.S.C. § 9(1)
        and 17 C.F.R. § 180.1(a)(1)–(3);

E.      Enter an order of permanent injunction restraining and enjoining
        Defendants and any of their affiliates, agents, servants, employees,
        successors, assigns, attorneys, and persons in active concert with them,
        from directly or indirectly:

        1)      Trading on or subject to the rules of any registered entity (as that
                term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40);

        2)      Entering into any transactions involving "commodity interests" (as
                that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), or
                precious metals that are commodities, as that term is defined
                herein, for accounts held in the name of any Defendant or for any
                account in which any Defendant has a direct or indirect interest;

        3)      Having any commodity interests, or precious metals that are
                commodities, as that term is defined herein, traded on any
                Defendants' behalf;

4)  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or precious metals that are commodities, as that term is defined herein;

5)  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6)  Applying for registration or claim exemption from registration with the Commission in any capacity, or engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or

7)  Acting as a principal (as that term is defined in Regulation 3.l(a), 17 C.F.R. § 3.1 (a) (2021)), agent or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

F.  Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599–600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act and Regulations, as described herein;

G.  Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived,

directly or indirectly, from the acts or practices which constituted violations of the Act, as described herein, including pre-judgment and post-judgment interest;

H.      Enter an order directing Defendants and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between them and any customer or investor whose funds and/or assets were received by Defendants as a result of the acts and practices which constituted violations of the Act, as amended, as described herein;

I.      Enter an order directing Defendants, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

J.      Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

K.      Enter an order providing such other and further relief as the Court may deem necessary and appropriate under the circumstances.

*      *      *

## VIII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.


Dated:  April 25, 2023                                    Respectfully submitted,

                                                         **ATTORNEYS FOR PLAINTIFF**

                                                         **COMMODITY FUTURES**
                                                         **  TRADING COMMISSION**

                                                         Manal M. Sultan
                                                         Deputy Director
                                                         Commodity Futures Trading
                                                              Commission
                                                         Division of Enforcement

                                                         By: /s/ Jacob Mermelstein
                                                         Jacob Mermelstein, Trial Attorney
                                                         David W. MacGregor, Chief Trial Attorney[7]

                                                         COMMODITY FUTURES
                                                           TRADING COMMISSION
                                                         Ted Weiss Federal Office Building
                                                         290 Broadway, Suite 600
                                                         New York, NY 10007
                                                         Phone: (646) 746-9700
                                                         Fax: (646) 746-9938
                                                         dmacgregor@cftc.gov
                                                         jmermelstein@cftc.gov

---

[7] *Pro hac vice application to be submitted.*