UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

COMMODITY FUTURES TRADING
COMMISSION,

                                 Plaintiff,

                       - against -

FISHER CAPITAL LLC, AMS CONSULTING
SOLUTIONS LLC, and ALEXANDER
SPELLANE a/k/a "Alexander Overlie",

                          Defendants.

---------------------------------------------------------------- x

:     Case No. 23-CV-3121

:     Hon. Carol Bagley Amon


**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**


DAVIS WRIGHT TREMAINE LLP
Alexander F. Porter (admitted *pro hac vice*)
Marcy Blattner Micale (admitted *pro hac vice*)
865 South Figueroa Street, Suite 2400
Los Angeles, CA 90017-2566
alexporter@dwt.com
marcymicale@dwt.com

Gaurav K. Talwar
1251 Avenue of the Americas, 21st Floor
New York, NY  10020-1104
(212) 489-8230 Phone
(212) 489-8340 Fax
gtalwar@dwt.com

*Attorneys for Defendants
Fisher Capital LLC, AMS Consulting Solutions LLC,
and Alexander Spellane*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT BACKGROUND ....................................................................................... 2

LEGAL STANDARD..................................................................................................... 4

ARGUMENT .................................................................................................................. 5

I.      THE CFTC LACKS JURISDICTION TO PURSUE A FRAUD CLAIM FOR
        THE RETAIL SALE AND DELIVERY OF PRECIOUS METALS ................................ 5

        A.      The CFTC's Jurisdiction Under the CEA Does Not Extend to Retail Cash
                Commodity Sales That Result in Actual Delivery to Customers ......................... 6

        B.      No Appellate Court Has Held That CEA Section 6(c)(1) Extends to
                Non-Leveraged Cash Commodity Transactions.................................................... 8

        C.      The Legislative History Shows That Section 6(c)(1) Was Not Meant to
                Radically Expand the CFTC's Jurisdiction Over All Retail Cash
                Commodity Sales ................................................................................................. 9

        D.      The CFTC's Overbroad Interpretation of Section 6(c)(1)
                Would Improperly Expand the CFTC's Jurisdiction Without a
                Clear Statement from Congress ......................................................................... 11

II.     THE CFTC'S COMPLAINT FAILS TO STATE A CLAIM FOR FRAUD ................. 13

        A.      The CFTC's Allegations That Fisher Capital Sold "Fraudulently
                Overpriced" Coins are Completely Unsupported ................................................ 15

        B.      The CFTC's Allegations That Customers "Lost" Money are Baseless ............... 17

        C.      Fisher Capital Accurately Disclosed Its Markups to Customers ......................... 19

        D.      Alleged Representations About Coins Being a "Safe Investment"
                Were Not False ................................................................................................. 22

        E.      Fisher Capital's Statements About Accounts Being Frozen and
                Not Being Insured Were Not Knowingly False or Reckless ............................... 22

        F.      The Other Alleged Misstatements Are Not Material........................................... 24

CONCLUSION............................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Andersons, Inc. v. Horton Farms, Inc.*,
    166 F.3d 308 (6th Cir. 1998) ...................................................................................6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................................................4, 5

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1998)...........................................................................................17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................4

*Brookhaven Town Conservative Comm. v. Walsh*,
    258 F. Supp. 3d 277 (E.D.N.Y. 2017) ...................................................16, 19, 22

*CFTC v. Erskine*,
    512 F.3d 309 (6th Cir. 2008) ...............................................................................7

*CFTC v. Gorman*,
    587 F. Supp. 3d 24 (S.D.N.Y. 2022).....................................................................5

*CFTC v. Hunter Wise Commodities, LLC*,
    749 F.3d 967 (11th Cir. 2014) ......................................................................5, 7, 8

*CFTC v. LaMarco*,
    No. 2:17-v-04087 (ADS)(AKT), 2019 WL 4247632 (E.D.N.Y. Sept. 5, 2019) ....................14

*CFTC v. McDonnell*,
    332 F. Supp. 3d 641 (E.D.N.Y. 2018) ..........................................................14, 24

*CFTC v. Monex Credit Co.*,
    931 F.3d 966 (9th Cir. 2019) ...............................................................................8

*CFTC v. Standard Forex, Inc.*,
    No. CV-93-0088 (CPS), 1993 WL 809966 (E.D.N.Y. Aug. 9, 1993)........................14, 20, 23

*CFTC v. Zelener*,
    373 F.3d 861 (7th Cir. 2004) ...............................................................................6

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014).................................................................................24

*Cohen v. Abrahams,*
    710 F. Supp. 981 (S.D.N.Y. 1989) ..........................................................22

*In re: Emmons-Sheepshead Bay Dev., LLC,*
    662 F. App'x 100 (2d Cir. 2016) ............................................................22

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000).............................................................................13

*Fried v. LVI Servs, Inc.,*
    No. 10 Civ. 9308 (JSR), 2001 WL 2119748 (S.D.N.Y. May 23, 2011)...........................16, 19

*Grain Land Coop v. Kar Kim Farms, Inc.,*
    199 F.3d 983 (8th Cir. 1999) .................................................................6

*Marketxt Holdings Corp. v. Engel & Reiman, P.C.,*
    693 F. Supp. 2d 387 (S.D.N.Y. 2010).......................................................21

*McNulty v. Comm'r,*
    157 T.C. 120 (2021)...............................................................................3

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.,*
    No. 19 Civ. 7536, 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ............................5

*Nagel v. ADM Investor Servs. Inc.,*
    217 F.3d 436 (7th Cir. 2000) .................................................................6

*Posner v. Coopers & Lybrand,*
    92 F.R.D. 765 (S.D.N.Y. 1981) .............................................................20

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)...................................................................24

*Sackett v. EPA,*
    598 U.S. 651 (2023)...............................................................................11

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,*
    75 F.3d 801 (2d Cir. 1996).....................................................................19

*Sawabeh Info. Servs. Co. v. Brody,*
    832 F. Supp. 2d 280 (S.D.N.Y. 2011).....................................................21

*Shields v. Citytrust Bancorp, Inc.,*
    25 F.3d 1124 (2d Cir. 1994)..............................................................23, 25

*Tsirelman v. Daines,*
    794 F.3d 310 (2d Cir. 2015)...................................................................4

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014)..................................................................................12, 13

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022)..............................................................................12, 13

*Woolf v. Strada*,
    949 F.3d 89 (2d Cir. 2020)...............................................................................12

**STATUTES AND RULES**

7 U.S.C.
    § 1 ................................................................................................................ *passim*
    § 1a(9) ...............................................................................................................14
    § 1a(27) .............................................................................................................12
    § 2.......................................................................................................................7
    § 2(a)(1)(A)........................................................................................................7
    § 2(c)(2)(D).........................................................................................................8
    § 2(c)(2)(D)(i).....................................................................................................7
    § 6..................................................................................................................1, 9
    § 6(c).................................................................................................................10
    § 6(c)(1) ...................................................................................................... *passim*
    § 9 (2010)...........................................................................................................9
    § 9(1)..............................................................................................................5, 9
    § 9(2)...................................................................................................................9
    § 9(3)...................................................................................................................9

28 U.S.C. § 1331 .......................................................................................................5

FED. R. CIV. P.
    8.......................................................................................................................15
    9(b)............................................................................................................ *passim*
    12(b)(6) ..........................................................................................................1, 4

Pub.L. 111-203, Title VII,
    § 753(a) ..............................................................................................................9
    § 753(d) ..............................................................................................................9

**REGULATIONS**

17 C.F.R. § 180.1 ....................................................................................................10

17 C.F.R. § 240.10b-5.......................................................................................10, 17

76 Fed. Reg.
    41398-01 ...........................................................................................................10
    41401.................................................................................................................10

79 Fed. Reg. (August 14, 2014)
    47,736 ...................................................................................................................23
    47,750-51 .............................................................................................................23

**OTHER AUTHORITIES**

155 Cong. Rec.
    S9489 ...................................................................................................................10
    S9557 ...................................................................................................................10

156 Cong. Rec.
    H5205 ...................................................................................................................11
    S3295 ...................................................................................................................11
    S5869 ...................................................................................................................10
    S5924 ...............................................................................................................10, 11

*In re Rawlin L. Stovall and Stovall & Stovall, Inc.*, CFTC No. 75-7 ............................................12

Defendants Fisher Capital LLC, AMS Consulting Solutions LLC, and Alexander Spellane (collectively, "Defendants") respectfully submit this Memorandum of Law in support of its Motion to Dismiss the Complaint of Plaintiff Commodity Futures Trading Commission ("CFTC") under Federal Rules of Civil Procedure, Rules 9(b) and 12(b)(6).

## PRELIMINARY STATEMENT

The CFTC's self-declared mission is "to promote the integrity, resilience, and vibrancy of the U.S. derivatives markets through sound regulation."[1]  But this matter does not involve derivatives.  It does not involve futures, and it does not involve any kind of leveraged transaction.  Rather, this case involves the retail cash sales of precious metals, gold and silver, that were actually delivered to customers.  Nevertheless, the CFTC has filed this Complaint against Defendants, alleging a single violation of Section 6(c)(1) of the Commodity Exchange Act ("CEA").  The Complaint should be dismissed because the CFTC is acting outside the scope of its authority under the CEA and has failed to state a claim of fraud.

First, the CFTC is exceeding its jurisdictional authority by pursuing a CEA claim against Defendants.  Fisher Capital sells gold and silver bullion, numismatic, and semi-numismatic coins to customers across the country and actually delivers those items to customers.  As such, the transactions at issue fall outside of the CFTC's statutory jurisdiction, which exempts retail sales of commodities that result in actual delivery.  Nevertheless, the CFTC has asserted that under Section 6(c)(1) of the CEA, as amended by the Dodd-Frank Act, it has the authority to bring stand-alone fraud claims against any person engaged in the sale of a commodity, even if those sales result in actual delivery and have no impact on any market for that commodity.  However, no U.S. Court of Appeals has accepted the CFTC's overreaching interpretation of

---

[1] https://www.cftc.gov/About/AboutTheCommission.

Section 6(c)(1), and its position in this matter would lead to the absurd result that the CFTC could regulate virtually every retail sale of commodities in the country – *e.g.*, sale of groceries, jewelry, etc.  Such a broad interpretation is inconsistent with the CFTC's agency history and the statutory structure of the CEA, and it finds absolutely no support in the legislative history of the statute.

Second, even if the CFTC has jurisdiction, its Complaint fails to allege that Defendants engaged in a scheme to defraud its customers or that any customers were actually defrauded and damaged.  There is no allegation in this case that Fisher Capital's customers did not receive the items they purchased, and the CFTC has not identified a single customer who claims to have been misled in his or her purchase.  Instead, the CFTC's core theory is that customers were defrauded because they purchased "overpriced" precious metals, specifically gold and silver coins.  But the CFTC has provided no basis for its claim that the precious metals were "overpriced."  The CFTC takes issue with the fact that Fisher Capital applied a markup to the coins it sold, but the markups were disclosed to customers in Fisher Capital's Shipping and Transaction Agreement ("Shipping Agreement").  Indeed, the CFTC entirely omits from the Complaint the terms of Fisher Capital's Shipping Agreement after December 2021, which clearly disclosed to customers that the company charged no more than a 43% spread on its coins. Because the CFTC has not and cannot allege an actionable fraud scheme, the Complaint should be dismissed in its entirety with prejudice.

## <u>RELEVANT BACKGROUND</u>

Fisher Capital is a precious metals company based in Los Angeles, California.  Compl. ¶ 18.  During the relevant time period of this case, from August 2020 to April 2023, Fisher Capital sold precious metals, specifically gold and silver, primarily in the form of bullion and coins.  *Id.* ¶ 30.  Fisher Capital engaged in the sale of precious metals both on a cash basis and to

customers who sought to hold precious metals in a Self-Directed Individual Retirement Account ("SDIRA").  *Id.* ¶ 26.  There is no allegation that Fisher Capital sold precious metals on a leveraged basis.  Nor is there any allegation that Fisher Capital engaged in transactions involving futures, derivatives, or other financial instruments.

Once a customer purchased precious metals from Fisher Capital, the company delivered the metals to the customers.  Compl. ¶ 73.  For cash transactions (*i.e.*, sales where customers are not purchasing the metals to be held in an SDIRA), Fisher Capital delivered the metals to the customer's residence.  *Id*.  For SDIRA purchases, Fisher Capital delivered the metals to a depository company, which held the metals in a depository account in the name of that customer. *Id.*  This practice of delivering the coins to the customer's designated depository account was required for the customer to receive the tax benefits of holding their investment in an SDIRA account.  *See McNulty v. Comm'r*, 157 T.C. 120, 129 (2021) (explaining that the owner of an SDIRA may not have "unfettered possession of the IRA assets").  The Complaint contains no allegation that Fisher Capital defrauded its customers by not providing them with the metals that the customers purchased.  Indeed, all of Fisher Capital's customers actually received the metals they purchased, either by having the precious metals delivered to their homes (for cash transactions), or to their individually designated depository account for SDIRA purchases. Compl. ¶ 73.

Instead, the CFTC's core theory of liability alleges that customers supposedly lost money because Fisher Capital sold "overpriced" metals to customers.  *Id.* ¶ 2.  The precious metals Fisher Capital sold include gold or silver bullion as well as "numismatic" or "semi-numismatic" coins.  *Id.* ¶ 29.  Bullion is valued based upon the "spot price" or "melt value" of gold or silver, which fluctuates on a daily basis and can be easily determined based on the price of gold or

silver in the market.  *Id.*  However, "numismatic" and "semi-numismatic" coins have a value above and beyond the "spot price" of gold or silver in the open market – this additional value is referred to as "numismatic value."  *Id.*  As the Complaint explains, "numismatic value" is similar to a collector's value, which means that the coins "have a value substantially more than, and not primarily dependent on, the prevailing market price of the metal contained in the coin."  *Id.* ¶ 29(b); *see also id.* ¶ 29(c) (noting that the value of "semi-numismatic" coins "is derived from the precious metal content, with some additional premium due to their limited circulation and recognized exclusive or collectible value.").  In other words, "numismatic" and "semi-numismatic" coins have a value substantially above the "spot price" for gold or silver that comes from the collector's value of the coin, and Fisher Capital's customers who purchased those coins received exactly what they bargained for.

The CFTC's core theory finds zero factual support in the Complaint and cannot form the basis for liability in this matter.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual allegations sufficient "to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Furthermore, a complaint must "state a claim to relief that is plausible on its face."  *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  While a court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff," *Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (citation omitted), courts should not accept

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft*, 556 U.S. at 678.[2]

For fraud claims, a plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See*, *e.g.*, *CFTC v. Gorman*, 587 F. Supp. 3d 24, 38–39 (S.D.N.Y. 2022); *see also Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19 Civ. 7536, 2021 WL 1199035, at *8 (S.D.N.Y. Mar. 30, 2021) (noting securities fraud claims based on misrepresentations and omissions must satisfy Rule 9(b)). To meet the particularity standard required by Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Gorman*, 587 F. Supp. 3d at 38-39 (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

## ARGUMENT

I.  **THE CFTC LACKS JURISDICTION TO PURSUE A FRAUD CLAIM FOR THE RETAIL SALE AND DELIVERY OF PRECIOUS METALS**

The CFTC exceeds its jurisdictional authority by pursuing a fraud claim against Defendants based upon Section 6(c)(1) of the CEA. 7 U.S.C. § 9(1). The CFTC is tasked with regulating futures and derivatives markets and other financial products related to commodities. This case, however, does not involve futures, derivatives, or any leveraged purchase of commodities. Instead, it involves straightforward retail sales of precious metals – where Fisher Capital sold gold and silver bullion and coins to customers, which were delivered directly to

---

[2] While the Court has jurisdiction over the CFTC's claims, pursuant to 28 U.S.C. § 1331, because its claim arises under federal law, Defendants challenge the CFTC's authority to bring this enforcement action under the CEA and, as such, is more akin to an argument that the CFTC has not stated a claim for relief. *See CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 974 (11th Cir. 2014) (finding that challenge to preliminary injunction for lack of authority to bring enforcement action was akin to a claim that there was no cause of action).

customers' homes or to a depository company that held the precious metals on the customers'

behalf.  Compl. ¶ 73.

Nevertheless, the CFTC asserts that the Dodd-Frank amendments to Section 6(c)(1)

massively expanded the CFTC's enforcement authority to now cover every single cash retail sale

of every commodity across the United States, even if such sales have no impact on the market for

that commodity.  The CFTC's interpretation of the CEA, however, would result in an absurd

expansion of its jurisdiction without clear Congressional authority and would lie in conflict with

the rest of the CEA and the legislative history behind the Dodd-Frank amendments to the CEA.

A.     **The CFTC's Jurisdiction Under the CEA Does Not Extend to
       Retail Cash Commodity Sales That Result in Actual Delivery to Customers**

Throughout its history, the CEA has never extended to non-leveraged cash commodity

transactions.  *See*, *e.g.*, *Nagel v. ADM Investor Servs. Inc.*, 217 F.3d 436, 440 (7th Cir. 2000)

("It is because commodity-futures contracts are a type of security that Congress has seen fit to

subject them to a regulatory scheme, the Commodity Exchange Act. . . . There was no intention

of regulating the commerce in agricultural commodities itself."); *Grain Land Coop v. Kar Kim

Farms, Inc.*, 199 F.3d 983, 990 (8th Cir. 1999) ("the legislative history of the CEA and its

predecessors points to a congressional distinction between . . . commodities futures contracts

traded on markets like the CBOT and [cash market contracts]").  As numerous courts have

recognized, the CFTC's jurisdiction is limited to futures contracts and does not extend to "cash

forward" transactions like those at issue in this case.  *See*, *e.g.*, *CFTC v. Zelener*, 373 F.3d 861,

863 (7th Cir. 2004); *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 318 n.14 (6th Cir.

1998).  As the Sixth Circuit explained in *Andersons*, "[b]ecause the CEA was aimed at

manipulation, speculation, and other abuses that could arise from the trading in futures contracts

and options, as distinguished from the commodity itself, Congress never purported to regulate

'spot' transactions (transactions for the immediate sale and delivery of a commodity), or 'cash forward' transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred)." 166 F.3d at 318 n.14 (quoting *Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 970 (4th Cir. 1993)).

The CFTC's limited jurisdiction over futures contracts and leveraged commodities transactions is codified in Section 2 of the CEA, entitled "Jurisdiction of Commission," which states that the CFTC's jurisdiction extends to transactions "involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). "Expressly excluded from the term 'future delivery,' and therefore excluded from CFTC regulation, is 'any sale of any cash commodity for deferred shipment or delivery,' commonly referred to as a 'forward contract.'" *CFTC v. Erskine*, 512 F.3d 309, 314–15 (6th Cir. 2008) (quoting 7 U.S.C. § 1(a)(19)).

The CEA further grants the CFTC jurisdiction over retail commodity transactions only to the extent they are "entered into . . . on a leveraged or margined basis[.]" 7 U.S.C. § 2(c)(2)(D)(i). In fact, the CEA contains an express exception for retail commodity transactions that result in actual delivery of the commodity purchased. *Id.* § 2(c)(2)(D)(ii) (the "Actual Delivery Exception"). The Actual Delivery Exception exempts from the CFTC's jurisdiction any "contract of sale that . . . results in actual delivery within 28 days." *Id.*

In this case, it is undisputed that Fisher Capital customers purchased precious metals with cash or through SDIRAs, and Fisher Capital then actually delivered all of the precious metals that it sold to its customers – either to their homes or to a depository institution to be held on behalf of the customers. Compl. ¶ 73. Accordingly, the sales transactions at issue in the Complaint fall outside of the scope of the CFTC's jurisdiction. *See CFTC v. Hunter Wise Commodities, LLC*, 749 F.3d 967, 979 (11th Cir. 2014) (noting that "actual delivery" includes

"the act of giving real and immediate possession to the buyer or the buyer's agent") (citations omitted).  The CFTC's Complaint should be dismissed on this basis alone.

**B.      No Appellate Court Has Held That CEA Section 6(c)(1)**
**Extends to Non-Leveraged Cash Commodity Transactions**

With its allegations in the Complaint, the CFTC takes the position that Section 6(c)(1) of the CEA extends to retail cash commodity transactions that do not involve leverage of any kind. This is an untested theory that the Court should not accept.  Indeed, no U.S. Court of Appeals has accepted the CFTC's overreaching jurisdictional argument.

In *Hunter Wise*, the CFTC brought a civil enforcement action alleging defendants conducted off-exchange and fraudulent retail commodity transactions.  749 F.3d at 971.  The Eleventh Circuit found the CFTC had jurisdiction under Section 2(c)(2)(D) of the CEA over retail commodity transactions offered on a leveraged or margined basis that did not result in actual delivery of the underlying commodity.  *Id.* at 975-77.  While the CFTC also argued that it had jurisdiction under Section 6(c)(1) of the CEA, the Eleventh Circuit specifically declined "to reach this question because the [CFTC] had authority under § 2(c)(2)(D)."  *Id.* at 981.

Following *Hunter Wise*, the Ninth Circuit in *CFTC v. Monex Credit Co.*, 931 F.3d 966, 971 (9th Cir. 2019), analyzed a similar CFTC enforcement action against off-exchange and fraudulent retail commodity transactions involving leveraged precious metal trading.  The Ninth Circuit specifically analyzed whether Section 6(c)(1) of the CEA covers fraud claims in the absence of manipulation, and found that it does apply to stand-alone fraud claims in the sale of leveraged commodities.  *Id.* at 977.  However, the Ninth Circuit specifically stated that its opinion did not address whether Section 6(c)(1) "extends to non-leveraged sales," or, more simply put, to retail cash commodity sales like those at issue in this case.  *Id.*

To date, no U.S. Court of Appeals has held that Section 6(c)(1) of the CEA allows for the CFTC to bring stand-alone fraud claims based on retail cash commodity sales and the Court should not make such a finding here.

**C.      The Legislative History Shows That Section 6(c)(1) Was Not Meant to Radically Expand the CFTC's Jurisdiction Over All Retail Cash Commodity Sales**

In 2010, as part of the Dodd-Frank Act, Section 6 of the CEA was amended and broken into three parts – fraud-based manipulation, false information, and price-based manipulation. 7 U.S.C. §§ 9(1), 9(2), and 9(3).  Although amendments were made to Section 6(c)(1), the legislative history reveals that Congress never intended to rewrite the CEA to give the CFTC plenary fraud jurisdiction over all retail cash commodity sales.  Instead, the legislative history very clearly shows that Congress intended to maintain the boundaries that previously existed, which limited the CFTC's ability to pursue cases involving leveraged commodity sales or price manipulation.

Prior to Dodd-Frank, the CEA already prohibited knowingly "manipulating or attempting to manipulate . . . the market price of any commodity, in interstate commerce[.]"  7 U.S.C. § 9 (2010), *amended by* Pub.L. No. 111-203, Title VII, §§ 753(a), (d).  This provision, however, required specific intent to manipulate.  After the amendments, Section 6(c)(1) entitled "Prohibition against manipulation," states:

> It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010[.]

7 U.S.C. § 9(1).

With these amendments, Congress permitted a general recklessness standard for fraud-based manipulation under Section 6(c) (the same standard as the SEC under Rule 10b-5) as an alternative to the previous heightened manipulation scienter element.  76 Fed. Reg. 41398-01, 41401 (July 14, 2021) (citing 17 C.F.R. § 240.10b-5); 17 C.F.R. § 180.1.  There is no indication, however, that Congress intended to massively expand the CFTC's jurisdiction over cash commodity transactions, which had previously been beyond the CFTC's reach, by merely adopting a lower scienter standard for manipulation claims over which it already had jurisdiction.

To the contrary, the legislative history shows that Congress was only focused on lowering the scienter standard as to the CFTC's pre-existing anti-manipulation authority.  One Senator commented that Congress was adding "a new anti-manipulation provision to the [CEA] addressing fraud-based manipulation . . . [i]mportantly, this new enforcement authority being provided to the CFTC supplements, and does not supplant, [the CFTC's] existing anti-manipulation authority[.]"  Porter Decl.,[3] Ex. A; Request for Judicial Notice ("RJN"), at 1-2 (156 Cong. Rec. S5869, S5924).  Further, it was noted that the amendment "re-formats CEA Section 6(c), which is where the new anti-manipulation authority is placed, to make it easier for courts and the public to use and understand.  Changes made to existing text as part of this re-formatting were made to streamline or eliminate redundancies, not to effect substantive changes to these provisions."  *Id.*

Another Senator noted that the amendment gives "the CFTC the same anti-manipulation standard currently employed by the SEC," meaning the "reckless conduct" standard that the SEC, FERC, and FTC employ.  Porter Decl., Ex. B; RJN, at 2 (155 Cong. Rec. S9489, S9557);

---

[3] References herein to the "Porter Decl.," are to the Declaration of Alexander F. Porter, dated September 15, 2023, submitted herewith in support of Defendants' Motion to Dismiss the Complaint.

*see also* Ex. C, at 2 (156 Cong. Rec. S3295, S3348) (noting it was important to have a strong "law on the books against manipulation"); *id.* ("I hope my colleagues will support this strong antimanipulation standard being inserted into the Commodity Exchange Act.").

Additionally, in discussing the provisions of the amendments designed to "enhance the protections afforded to customers in retail commodity transactions," there were no discussions of amending Section 6(c)(1) to expand the CFTC's jurisdiction to bring stand-alone fraud claims for retail cash commodity sales. *See* Porter Decl., Ex. A (156 Cong. Rec. S5924) (explaining how amendments to the CEA clarified that the prohibition on off-exchange retail futures contracts, addressing the risk of regulatory arbitrage regarding foreign currency transactions, and attempts to avoid National Futures Association regulations by moving businesses off-shore).[4]

In sum, the legislative history of the Dodd-Frank amendments to Section 6(c)(1) of the CEA clearly shows that Congress never intended to give the CFTC plenary jurisdiction over all non-leveraged cash commodity transactions.

**D.     The CFTC's Overbroad Interpretation of Section 6(c)(1) Would Improperly Expand the CFTC's Jurisdiction Without a Clear Statement from Congress**

The CFTC's interpretation of Section 6(c)(1) would radically expand the CFTC's jurisdictional power despite the lack of a clear statement from Congress to justify such an expansion of power. But as the Supreme Court has repeatedly held, "Congress does not 'hide elephants in mouseholes' by 'alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions.'" *Sackett v. EPA*, 598 U.S. 651, 677 (2023) (*citing Whitman v.*

---

[4] Even in the U.S. House of Representatives, there was an understanding that the Dodd-Frank amendments to the CEA would not expand the CFTC's jurisdiction to cash forward sales like Fisher Capital's retail cash commodity sales. Porter Decl., Ex. D (156 Cong. Rec. H5205, H5247) ("Excluding physical forward contracts . . . is consistent with the CFTC's longstanding view that physical forward contracts in which the parties later agree to book-out their delivery obligations for commercial convenience are excluded from its jurisdiction. Nothing in this legislation changes that result with respect to commercial forward contracts.").

*American Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)).  During the entire 87-year history of

the CEA, it has been clear that retail cash commodity transactions are exempted from the scope

of the CFTC's jurisdictional reach.  *See In re Rawlin L. Stovall and Stovall & Stovall, Inc.*,

CFTC No. 75-7 (C.F.T.C.), Comm. Fut. L. Rep. P. 20941, 1979 WL 11475, at *2 (1985)

("[U]nder Section 2(a)(1) of the [CEA] the term 'future delivery' does not include any sale of

any cash commodity for deferred shipment or delivery.").[5]  And the Dodd-Frank amendments

did not indicate that Congress intended to, or did, change established precedent to bring the

entire universe of ordinary retail commodities transactions within the agency's scope.  Without a

clear statement from Congress, the Court should not interpret Section 6(c)(1) to reach such a

broad scope of new transactions within the CFTC's jurisdiction.  *See*, *e.g.*, *Woolf v. Strada*, 949

F.3d 89, 94 (2d Cir. 2020) ("Had Congress intended to change this fundamental principle of law

in the ADA's regulatory scheme, Congress could have done so.  Indeed, Congress 'does not alter

the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does

not, one might say, hide elephants in mouseholes.'").

Similarly, the CFTC's purported expansion of authority triggers the Major Questions

Doctrine, which holds that an "[e]xtraordinary grant[] of regulatory authority" requires "clear

congressional authorization," and courts "presume that Congress intends to make major policy

decisions itself, not leave those decisions to agencies."  *West Virginia v. EPA*, 142 S. Ct. 2587,

2608-09 (2022) (citation omitted).  Further, courts "expect Congress to speak clearly if it wishes

to assign to an agency decisions of vast 'economic and political significance.'"  *Util. Air*

*Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) (citations omitted).  Where a governmental

---

[5] Congress has amended the CEA eight times between 1936 and 2010, yet each time Congress allowed to remain that cash-forward contracts, like the sale of retail cash commodities, were excluded from the CFTC's jurisdiction.  *See* 7 U.S.C. §§ 1, 1a(27).

agency like the CFTC seeks to wield unheralded power "to regulate an industry constituting a significant portion of the American economy," "we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000). The underlying assumption is that Congress would speak clearly about granting an agency, like the CFTC, expanded jurisdiction with tremendous economic and political consequences, and not through "modest words," "vague terms," or "subtle device[s]." *West Virginia*, 142 S. Ct. at 2605, 2609 (citation omitted). "Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always 'give effect to the unambiguously expressed intent of Congress.'" *Util. Air Regulatory Grp.*, 573 U.S. at 326 (citations omitted).

To adopt the CFTC's interpretation of Section 6(c)(1) would have significant implications for the economy. If this Court adopts the CFTC's interpretation of Section 6(c)(1), the CFTC will have jurisdiction to bring stand-alone fraud claims in the retail cash sale of any commodity—essentially *any* good or service —including any retail purchase of jewelry, watches, precious stones, or groceries, without a showing of market manipulation. Nothing in the history of the CEA, the plain meaning of Section 6(c)(1), or the legislative history supports such an absurd expansion of jurisdiction without a clear Congressional statement.

Because the CFTC lacks clear statutory authority to bring stand-alone fraud claims against cash commodity sales, the Court should find that Section 6(c)(1) of the CEA does not apply to non-leveraged retail cash commodity sales and dismiss this action.

## II. THE CFTC'S COMPLAINT FAILS TO STATE A CLAIM FOR FRAUD

In addition to alleging a claim outside of its jurisdiction, the CFTC's Complaint should be dismissed because it fails to adequately plead a fraudulent scheme. The CFTC's critical allegation that Fisher Capital sold "fraudulently overpriced" gold and silver coins to its customer

is completely unsupported where the CFTC does not and cannot identify a specific sale or customer or how the coins were overpriced compared to the coins' market value.  The CFTC also cannot support its allegations that Fisher Capital customers lost money when they purchased gold and silver coins, particularly where Fisher Capital accurately disclosed its mark-ups to its customers.  Additionally, the CFTC has failed to allege how Fisher Capital's representations about gold and silver coins being "safe investment[s]," were false and how the remaining alleged misstatements were knowingly false or reckless, or material.

To establish a violation of Section 6(c)(1) and Regulation 180.1(a), the CFTC must show that defendants "[1] engaged in prohibited conduct (i.e., employed a fraudulent scheme; made a material misrepresentation, misleading statement or deceptive omission; or engaged in a business practice that operated as a fraud); [2] with scienter; and [3] in connection with a contract of sale of a commodity in interstate commerce."  *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 717 (E.D.N.Y. 2018).[6]

Under the applicable pleading standards, the CFTC must show more than a "mere conclusory statements" and must state a "plausible claim for relief."  *CFTC v. LaMarco*, No. 2:17-v-04087 (ADS)(AKT), 2019 WL 4247632, at *2 (E.D.N.Y. Sept. 5, 2019) (*quoting Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009)) ("threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice").  Moreover, the CFTC must allege each element of the alleged fraud with particularity, which means it must allege the who, what, why, and where of the alleged scheme.  FED. R. CIV. P. 9(b); *CFTC v. Standard Forex,*

---

[6] While the statutory definition of "commodity" includes a broad range of products, it does not specifically identify gold or silver bullion or coins.  *See* 7 U.S.C. § 1a(9).  The CFTC has not adequately alleged in its Complaint that the gold and silver precious metals at issue in this case fall within the definition of "commodity."  *See* Compl. ¶ 9.

*Inc.*, No. CV-93-0088 (CPS), 1993 WL 809966, at *15 (E.D.N.Y. Aug. 9, 1993) ("Thus Rule 9(b) has frequently been understood as requiring specifications of 'the time, place, speaker, and sometimes even the content of the alleged misrepresentations.'") (quoting *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir. 1990)).

Here, the CFTC has not met these standards.  As described below, the Complaint is based on a flawed and entirely unsupported premise and consists of conclusory allegations that are insufficient to support its flawed theory.  Because the CFTC's Complaint fails to meet both the plausibility and particularity standards, it must be dismissed.  *See* FED. R. CIV. P. 8, 9(b).

## A.   The CFTC's Allegations That Fisher Capital Sold "Fraudulently Overpriced" Coins are Completely Unsupported

At its core, the CFTC alleges that Fisher Capital committed fraud by selling "overpriced" precious metals, including gold and silver bullion and numismatic and semi-numismatic gold and silver coins.  This conclusory allegation permeates the Complaint, including, for example, allegations that Fisher Capital sold coins at "grossly inflated prices," that the coins were "grossly overpriced," and that Fisher Capital sold coins at "exorbitant and fraudulent markups."  *See*, *e.g.*, Compl. ¶¶ 1, 2, 5, 43, 51, 55, 61.  This allegation forms the basis for the CFTC's sole CEA claim even though customers received exactly what they purchased from Fisher Capital at prices that were fully disclosed to them.  There was no deception, misrepresentation, or deceit involved.

Indeed, the CFTC offers no support for *why* or *how* the coins were "overpriced."  As the Complaint alleges, most of the coins at issue had numismatic or semi-numismatic value, meaning they had additional traits that ultimately increased their value.  Compl. ¶ 29.  The Complaint acknowledges that bullion coins have value that is close to the "spot price" of gold or silver, but that numismatic and semi-numismatic coins definitionally have value that is "more than . . . the prevailing market price of the metal contained in the coin."  *Id.* ¶ 29.

Despite conceding that numismatic and semi-numismatic coins are worth substantially more than the "spot price" for gold or silver, the CFTC baldly asserts that Fisher Capital sold "fraudulently overpriced" coins without any support.  Compl. ¶ 55.  The CFTC does not, for example, identify *any* specific sale, either by customer or by specific coin sold, along with the price the coins were sold for, and then compare that price to their "market value" for the same date – as would be required to show that the coin was in fact "overpriced."[7]  The Complaint makes passing reference to a purported but unidentified "prevailing market value" (Compl. ¶ 1), but at no time does it say what that value was for any of the many types of coins at issue in this case.

Instead, the CFTC relies entirely on sweeping allegations that coins were "overpriced," without providing any basis for this allegation.  The CFTC's *ipse dixit* allegations are plainly insufficient.  *See Fried v. LVI Servs, Inc.*, No. 10 Civ. 9308 (JSR), 2001 WL 2119748, at *6 (S.D.N.Y. May 23, 2011) (upholding dismissal of claims that involved *ipse dixit* allegations which were insufficient to support plaintiff's claim that directors were acting at behest of the corporation).  Without more in the way of explaining why these coins were "overpriced" such that the pricing was indicative of fraud, the CFTC has failed to state a claim for fraud.  *See Brookhaven Town Conservative Comm. v. Walsh*, 258 F. Supp. 3d 277, 287 (E.D.N.Y. 2017) (finding that "sweeping and general allegations" of fraud that did not "explain why the statements were fraudulent" were insufficient to meet Rule 9(b) pleading standards) (citations omitted).

---

[7] Furthermore, nowhere in the 41-page Complaint does the CFTC identify a single customer who was supposedly misled about the "true" value of the coins versus what the customer actually paid.

**B.      The CFTC's Allegations That Customers "Lost" Money are Baseless**

Similarly, throughout the Complaint, the CFTC alleges that customers "lost" their investment when they purchased coins from Fisher Capital due to the "exorbitant and fraudulent markups" on the coins. *See*, *e.g.*, Compl. ¶¶ 4, 61. However, just like its allegation that the coins were supposedly "overpriced," this conclusory allegation that customers "lost" money is similarly misleading and lacks any supporting allegations in the Complaint.

That Fisher Capital factored in a profit margin on the coins it sold—like any retailer in any industry—is not unusual or illegal and certainly does not support a claim for fraud. Even the U.S. Mint marks up the coins that it sells into the market as much as nearly 2400%. Porter Decl., Ex. E, at 5 (noting, as examples, 2,393 percent markup on one-dollar Native American gold coins and a mark-up of $13.75 on quarters with a melt value of only $19.20).[8] Furthermore, it is not illegal or improper, much less "fraudulent," to charge a premium for a product that consumers believed had value to them including, for example, as an investment that could provide security in the face of uncertain market conditions. Indeed, Fisher Capital expressly informed customers that the coins they purchased should be held for at least five to ten years to give the customer an opportunity to overcome the spread. Spellane Decl.,[9] Ex. 1, at 4; Ex. 2, at

---

[8] Congressional testimony identifying the U.S. Mint's markups was provided in the context of a bill proposed in the U.S. House of Representatives that would have required precious metals companies like Fisher Capital to disclose their price markups to customers. Porter Decl., Ex. E, at 5. Congress, however, did not pass the bill into law. Indeed, there is no general duty for a seller to disclose its profit margin to a buyer in an ordinary retail transaction. *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1998) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").

[9] References herein to the "Spellane Decl.," are to the Declaration of Alexander Spellane, dated September 14, 2023, submitted herewith in support of Defendants' Motion to Dismiss the Complaint.

5.[10]  Fisher Capital's customers did not lose money – instead, they paid a premium on a valuable asset that they believed would provide long-term stability and security.

The fallacy of the CFTC's allegation that customers "lost" money can be illustrated by example.  If a person decided to put money into jewelry as an investment, does that person lose money by purchasing the jewelry?  After the purchase is completed at a retailer (and particularly from a brand name retailer), the resale value of the jewelry is likely to be lower than what the customer purchased it for.  Assuming the jewelry is made from precious metals, the melt value of the jewelry is likely to be even lower than the resale value of the item.  But the customer gets the security of owning the physical item, which he or she may expect to appreciate in value over time.  More importantly, ownership of the physical item provides the customer with security in case of unstable financial markets and possibly other types of risks that would apply to more traditional investments.  While the CFTC might not agree with this investment strategy,[11] it is not the CFTC's role to second-guess individuals' investment decisions.[12]

---

[10] Fisher Capital refers the Court to its Shipping and Transaction Agreements (respectively each the "Shipping Agreement"), which are referenced in the Complaint and the subject of Fisher Capital's concurrently filed Request for Judicial Notice.  *See* RJN, at 4-5.

[11] Moreover, should the Court find that the CFTC has jurisdiction here, the CFTC would also have jurisdiction over these kinds of transactions, particularly from brand name jewelry retailers whose jewelry products sell for far more than the melt value of the jewelry item.

[12] In its Complaint, the CFTC attempts to give the impression that customers "lost" money because their SDIRA account statements showed that customers' account balances decreased following the purchase of precious metals from Fisher Capital.  Compl. ¶ 78.  But as the CFTC well knows, when a customer holds coins in an SDIRA, the SDIRA custodian typically states the value of the coins based on the "spot price" of the metal on the date of the account statements, which is based solely on the coins' melt value and does not take into account their numismatic value.  *See id.* ¶ 79.  Thus, the SDIRA account statements often do not reflect the true value of the assets held in the account.

The CFTC's allegations that customers "lost" money is unfounded and misunderstands the nature of Fisher Capitals' sales and therefore cannot form the basis of its fraud claim. *See Fried*, 2001 WL 2119748, at *6 (upholding dismissal of claim based on *ipse dixit* allegations); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996) (upholding dismissal because "[p]laintiffs do not… enjoy a 'license to base claims of fraud on speculation and conclusory allegations'") (citation omitted).

### C.   Fisher Capital Accurately Disclosed Its Markups to Customers

Despite the CFTC's allegations that customers were misled, the Complaint itself confirms that Fisher Capital informed its customers about the precious metals they were purchasing, including its markup.

First, before sales were completed Fisher Capital sales representatives conducted recorded sale confirmation calls with customers where they explained various aspects about the transaction.  On confirmation calls, Fisher Capital sales representatives explained the difference between bullion, numismatic, and semi-numismatic coins.  Compl. ¶ 70.  They also confirmed the quantities and prices of the coins the customer had agreed to purchase and obtained audible confirmation from the customers that they understood the terms of their purchase.  *Id.* ¶ 71.  Without support, the CFTC casts aside the sales confirmation calls and claims customers did not understand what they were being told or what they agreed to on the recorded call.  *Id.* ¶ 72.  But the CFTC offers no facts to support its conclusion that customers did not understand what they were being told on the recorded sales confirmation calls.  Moreover, the CFTC has not identified a ***single customer*** who claims to have been deceived or claims to have misunderstood the terms of their purchase.  As such, these conclusory allegations fail to negate the fact that Fisher Capital made clear disclosures to customers about the coins they purchased.  *Brookhaven Town Conservative Comm.*, 258 F. Supp. 3d at 287.

Second, the CFTC's claims that Fisher Capital's disclosures about the markup were false are undermined by the disclosures themselves.  *See* Compl. ¶ 76; Spellane Decl., Exs. 1-2.[13]  As an initial matter, despite its assertion that a fraud scheme existed from August 2020 to the filing of the Complaint in April 2023, the CFTC only references Fisher Capital's disclosures to customers before December 2021.  Compl. ¶ 76.  The CFTC asserts no allegations about disclosures made *after* December 2021.  The failure to make specific allegations regarding *any* events that took place after December 2021 is fatal to their claim based on sales made after December 2021.  *See Standard Forex, Inc.*, 1993 WL 809966, at *15 (requiring plaintiff to plead the "the time, place, speaker, and sometimes even the content of the alleged misrepresentations" to meet Rule 9(b) requirements) (citations omitted); *see also Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 769 (S.D.N.Y. 1981) (dismissing complaint for insufficient pleading because "the plaintiff must supply some factual basis for the allegation that [the basis for the fraud] had reached this conclusion at some point during the time period alleged").

Further, Fisher Capital's Shipping Agreements truthfully disclosed markups to customers.  First, the Shipping Agreement in effect before December 2021 truthfully stated that spreads could vary based on a number of factors, including supply and demand and other market forces.  Spellane Decl., Ex. 1, at 4 (¶ 10(a)).  It also disclosed that "proceeds on exclusive and/or Numismatic Precious Metals products such as Saint Gaudens, Barber Half Dollars (and all other graded, exclusive or collectible Metals products) are upwards of twenty percent (20%) and proof products over twenty-three (23%)."  *Id.* at 3 (¶ 9(b)).  The CFTC alleges that these disclosures were false because the average markup that Fisher Capital charged was "approximately 140%"

---

[13] The Court can consider the Shipping Agreements under the incorporation by reference doctrine, and because the Agreements are integral to the Complaint.  *See* RJN, at 4-5.

(Compl. ¶ 68), but the CFTC fails to explain how this allegedly "average" markup was calculated, including, for example, whether it was calculated using Fisher Capital's purchase price or melt value as the baseline for the markup or, even if true, why it would be misleading to tell customers that the spread on those coins was "*upwards*" of 20% or "*over*" 23%.  Compl. ¶ 76 (emphasis added).  Indeed, the Shipping Agreement went on to explicitly state that "[s]preads for exclusive and Numismatic Precious Metals vary on any particular transaction and *could be any amount within or outside of those ranges*."  *Id.* (emphasis added).

Second, the CFTC ignores the changes to Fisher Capital's Shipping Agreement and pricing disclosures after December 2021, which makes up the majority of the time period at issue in the Complaint.  Compl. ¶ 21 (noting time period of "August 2020 through the present [April 25, 2023]").  The CFTC acknowledges that after December 2021, Fisher Capital's markup did not exceed 43%, but intentionally omits that Fisher Capital's markup disclosures also changed at this time.  *Id.* ¶ 68.  The Shipping Agreement in effect after December 2021 clearly disclosed its markup to customers: "Fisher Capital's Precious Metals products price quotes to Customer for exclusive and/or Numismatic Precious Metals products . . . are *upwards of forty-three percent (43%).*"  Spellane Decl., Ex. 2, at 4 (¶ 9(b)) (emphasis added).

Contrary to the CFTC's unsupported allegations, Fisher Capital made clear disclosures to its customers such that the CFTC's claim cannot proceed on a fraudulent omission theory.  *See Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 302 (S.D.N.Y. 2011) (noting that an omission is actionable only "when the failure to disclose renders a statement misleading") (citation omitted); *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 396 (S.D.N.Y. 2010) (dismissing fraud claims where allegations "regarding fraudulent omission" were "lacking").

**D.      Alleged Representations About Coins Being a "Safe Investment" Were Not False**

The CFTC does not explain why alleged statements by Fisher Capital that gold and silver were "safe and secure investments," Compl. ¶ 43, constitute actionable misrepresentations.  *See Brookhaven Town Conservative Comm.*, 258 F. Supp. 3d at 287.  The CFTC's only attempt at an explanation is to assert that Fisher Capital's "business model was to pressure customers to invest . . . in ***overpriced*** Precious Metals so as to maximize Fisher Capital Group's own profits at the expense of customers' long-term financial security."  Compl. ¶ 43 (emphasis added).  But the CFTC provides no support for its allegation that statements that gold and silver—traditional investments particularly in times of high volatility or inflation—are "safe and secure investments" were false or misleading.  The CFTC's failure to support its claim that Fisher Capital's statements were false or misleading prevents it from moving past the pleading stage. *See Brookhaven Town Conservative Comm.*, 258 F. Supp. 3d at 287 (dismissing fraud claim due to "sweeping" allegations); *see also In re: Emmons-Sheepshead Bay Dev., LLC*, 662 F. App'x 100, 103 (2d Cir. 2016) (dismissing fraud claim because complaint only presented "conclusory allegations that defendants fraudulently and intentionally misled" the victim and "no factual allegations to substantiate those claims or to support an inference, let alone a strong inference, of fraudulent intent"); *Cohen v. Abrahams*, 710 F. Supp. 981, 982 (S.D.N.Y. 1989) (dismissing fraud claim because the "allegations of fraud are entirely conclusory").

**E.      Fisher Capital's Statements About Accounts Being Frozen and Not Being Insured Were Not Knowingly False or Reckless**

The CFTC alleges two categories of allegedly false statements about frozen accounts and available insurance that Fisher Capital sales representatives made but fails to allege how those statements were false, much less that Fisher Capital sales representatives made such statements with knowledge or reckless disregard for their truth or falsity.

First, the CFTC claims that Fisher Capital sales representatives falsely informed customers that their accounts could be frozen.  Compl. ¶ 48.  These statements were true according to an existing SEC final rule, which allows the federal government to freeze money market accounts in emergency situations.  *See* Money Market Fund Reform; Amendments to Form PF, 79 Fed. Reg. 47736, 47750-51 (August 14, 2014).  The CFTC's argument that Fisher Capital should have disclosed that the regulation only applied "under certain rare circumstances" (Compl. ¶ 49), does not render the statements untrue.  And the CFTC fails to allege how the absence of its proposed disclosure renders the statements false or misleading.  Moreover, even if it had, the CFTC fails to adequately allege that the statements were knowingly or recklessly false when made.  As such, statements about account freezing cannot support the CFTC's claim.  *See Standard Forex, Inc.*, 1993 WL 809966, at *17 ("In this Circuit, Rule 9(b)'s requirement that intent and knowledge may be averred generally is tempered by a requirement that the complaint allege facts that give rise to a strong inference of the requisite intent to defraud."); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (finding that "conclusory allegations—that Defendants 'knew but concealed' some things, or 'knew or were reckless in not knowing' other things—do not satisfy the requirements of Rule 9(b)." (citation omitted)).

Fisher Capital's statements about retirement accounts being uninsured were also true – the FDIC does not insure stocks or mutual fund investments.  *See* Porter Decl., Ex. F; RJN, at 3-4.  The CFTC claims that Fisher Capital should have informed customers about insurance offered through the Securities Investor Protection Corporation ("SIPC").  Compl. ¶ 52.  But again, the CFTC completely fails to allege that anyone at Fisher Capital knew or was reckless in not knowing about the availability of SIPC insurance, or even whether that type of insurance would have covered the range of customers' pre-existing investments.  Fisher Capital's

statements about insurance, therefore, cannot form the basis of its CEA claim.  *See McDonnell*, 332 F. Supp. 3d at 717 ("To prove a violation of [Rule] 180.1(a),. . . the Commission must show that Defendants engaged in prohibited conduct . . . with scienter.").

## F.     The Other Alleged Misstatements Are Not Material

In a last resort effort to obscure the flaws in its core theory of "overpriced" precious metals, the CFTC has dressed up the Complaint with various other statements that have minimal relevance to this case.  For example, the statements in Fisher Capital's applications to the SDIRA custodians and depositories, Compl. ¶¶ 33-34, are immaterial because these play no role with respect to the customers' investment decisions as the customers were not privy to these applications.  *See McDonnell*, 332 F. Supp. 3d at 720 (a statement of fact is material "if a *reasonable investor* would consider it important in deciding whether to make an investment" (emphasis added) (citation omitted)).

A number of the other statements made to customers are not actionable because they amount to nothing more than sales puffery.  *See*, *e.g.*, Compl. ¶¶ 39(c) ("We Are Committed to Your Wealth"); 39(f) ("Our top priority is helping you invest safely and intelligently"); 39(h) ("Our dedicated account executives are there for you every step of the way"); 39(i) ("Fisher Capital is dedicated to offering you best in class service to help you achieve your goals."); 39(l) ("Precious metals have always been trusted as a safe and secure investment."); 42 (the company has "been doing great things for our clients for a long time"); and 42 ("I have the utmost trust he will take care of you.").  Such vague statements of optimism or ordinary sales tactics are not actionable.  *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (finding that aspirational statements about reputation and integrity are too general and not actionable); *Rombach*, 355 F.3d at 175 ("[P]uffery or 'misguided optimism' is not actionable as fraud," and "[t]o meet the pleading requirement of Rule 9(b), plaintiffs cannot

rest on their say-so that these statements are fraudulent; they must explain why."); *Shields*, 25 F.3d at 1129-30 (upholding dismissal of fraud claim because defendant's statements "predicting a prosperous future" were insufficient to support an inference of fraud).  The Court should disregard these alleged misstatements as they are nothing more than immaterial allegations which are insufficient to save the CFTC's Complaint from dismissal.

## <u>CONCLUSION</u>

In conclusion, the CFTC does not have jurisdiction to pursue this case against Defendants, and even if it did, the Complaint does not adequately state a claim for fraud. Accordingly, the Court should grant Defendants' Motion to Dismiss the Complaint with prejudice.

Dated:  New York, New York
       September 15, 2023

                Respectfully submitted,

                DAVIS WRIGHT TREMAINE LLP

                By: */s/ Alexander F. Porter*
                    Alexander F. Porter
                    (admitted *pro hac vice*)
                    Marcy Blattner Micale
                    (admitted *pro hac vice*)
                    Gaurav K. Talwar

                865 South Figueroa Street, Suite 2400
                Los Angeles, CA 90017-2566

                1251 Avenue of the Americas, 21st Floor
                New York, NY  10020
                (212) 489-8230 Phone
                (212) 489-8340 Fax

                *Attorneys for Defendants*
                *Fisher Capital LLC, AMS Consulting Solutions LLC,*
                *and Alexander Spellane*