1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2   - - - - - - - - - - - - - - - X
                                     :
 3   COMMODITY FUTURES TRADING        :   23-CV-03121(CBA)
     COMMISSION,                      :
 4                                    :
              Plaintiff,              :
 5                                    :   United States Courthouse
                                      :   Brooklyn, New York
 6      -against-                     :
                                      :
 7                                    :   December 1, 2023
                                      :   2:00 p.m.
 8   FISHER CAPITAL LLC, et           :
     al.,                             :
 9                                    :
              Defendants.             :
10                                    :
     - - - - - - - - - - - - - - - X
11
          TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
12         BEFORE THE HONORABLE CAROL BAGLEY AMON
               UNITED STATES DISTRICT JUDGE
13
                 A P P E A R A N C E S:
14
     For the Plaintiff:        COMMODITY FUTURES TRADING COMMISSION
15                             DIVISION OF ENFORCEMENT
                               290 Broadway, Suite 6th Floor
16                             New York, NY 10007

17                             BY:  JACOB MERMELSTEIN, ESQ.
                                    ALYSON COHEN, ESQ.
18                                  KATHERINE RASOR, ESQ.
                                    DAVID MacGREGOR, ESQ.
19
     For the Defendant:        DAVIS WRIGHT TREMAINE LLP
20                             865 S. Figueroa Street, Suite 2400
                               Los Angeles, CA 90017
21
                               BY:  ALEXANDER PORTER, ESQ.
22                                  GAURAV TALWAR, ESQ.

23   Court Reporter:           DENISE PARISI, RPR, CRR
                               E-mail:  DeniseParisi72@gmail.com
24
     Proceedings recorded by computerized stenography.  Transcript
25   produced by Computer-aided Transcription.
```

*Proceedings*                                                      2

1          (In open court.)

2          THE COURTROOM DEPUTY:  This is CFTC versus Fisher

3   Capital, LLC, number 23-CV-3121 on for an oral argument on

4   defendants' motion to dismiss and motion to transfer venue.

5          Can the parties please state their appearances

6   beginning with counsel for defendants.

7          MR. PORTER:  Good afternoon, Your Honor.

8          Alex Porter and Gaurav Talwar on behalf of

9   defendants.

10         THE COURT:  Good afternoon.

11         MR. MERMELSTEIN:  Good morning, Your Honor.

12         Jacob Mermelstein, David MacGregor, Alyson Cohen,

13  and Katherine Rasor for plaintiff.

14         THE COURT:  Good afternoon.

15         Everyone can be seated.

16         Mr. Porter, you are going to argue for the

17  defendant?

18         MR. PORTER:  Yes, Your Honor.

19         THE COURT:  You can remain seated because of the

20  microphone setup here.  It's hard to hear you if you are

21  standing up leaning into the microphone.  Not the best setup,

22  but what do you expect from GSA.

23         Anyway, let me hear your argument as to why you

24  think the complaint should be dismissed.

25         I guess there's several prongs to your argument; you

1   have a venue argument, you contend that the statute doesn't

2   cover this type of conduct, and also that the complaint

3   doesn't state cause of action, it's insufficient, so whatever

4   order you would like to take them in.

5           MR. PORTER:  Okay.  If Your Honor doesn't mind, I

6   think I will start with the motion to transfer venue.

7           So, Your Honor, with respect to the motion to

8   transfer venue, there's no substantial connection to this

9   district in this case.  This is a California defendants, they

10  are all California defendants, California companies,

11  California individual, all of the companies' operations

12  occurred in California.

13          So when you look at the operative facts, the locus

14  of the operative facts, which is the -- really the main

15  consideration, we would submit, for the motion to transfer

16  venue, it's all in California.  There is no substantial

17  connection to this district.  I'm not saying there's no

18  connection because clearly there were a handful of customers,

19  less than 1 percent, I believe, of the overall customer base

20  that were here --

21          THE COURT:  Where is the major customer base, as far

22  as you understand it?

23          MR. PORTER:  My understanding is that the largest

24  number of customers is in Texas.  And Florida and California

25  are close second, I believe.

*Proceedings*                                                    4

1      THE COURT:  But you don't want it transferred to

2  Texas.

3      MR. PORTER:  No, because when you look at the

4  factors that are relevant to the motion to transfer venue,

5  when you are looking at a case like this where the Government

6  alleges there was a fraud, they allege that there were

7  misrepresentations that were made, you look at where those

8  misrepresentations were made from, not where the customers are

9  located.  And there's clear case law on that issue, which we

10 cited in our reply brief, which says you don't look at, you

11 know, where the customers are located who may have received

12 the alleged misrepresentations; you look at where those were

13 made from, and all of those statements were made from

14 California.  I don't think there's any dispute about that.

15      THE COURT:  What about the concept of plaintiff's

16 choice of venue?  What weight should that be given?

17      MR. PORTER:  When there's no material or substantial

18 connection to the district, it's not given any weight.  That's

19 what the case law says.  When there's no material or

20 substantial connection to this district, which there isn't,

21 that is not even -- it's given no weight.  In fact, the cases

22 say that transfer should be granted if there's no material or

23 substantial connection to the district, which is exactly the

24 case here, because when you look at what the CFTC has

25 submitted as to what the connection is to this district -- and

*Proceedings*                                                                5

1    I will go through what they've identified -- one, they've

2    identified two customers that they claim they would call as

3    witnesses.  Again, when you are looking at the locus of

4    operative facts, you are not looking where the person

5    allegedly receiving the misrepresentation is located; you are

6    looking at where those misrepresentations are made from.

7            And, in addition, one of those customers wasn't even

8    a customer during the operative time period of the complaint.

9    It's somebody that they've identified more recently after the

10   complaint was filed, and so it's irrelevant to the case.

11   They've also identified a CFTC investigator that they would

12   like to call as a summary witness to summarize phone

13   records -- presumably bank records, things like that -- and

14   that person is located in New York.  And this is a summary

15   witness.  Anybody can do that.  That does not create a

16   substantial connection to this district because their chosen

17   summary witness is located here.

18           And then they've identified an individual in an

19   advertising agency that they claim that they would call to

20   testify, but that advertising agency isn't mentioned anywhere

21   in the complaint.  There's no reference at all to that being

22   an important part of their case in their 25-plus-page

23   complaint.

24           So, respectfully, we don't think that any of their

25   purported witnesses create any substantial connection to this

1  district.  It's very clear that this is a California case.

2  Why it was filed here, you know, I can only speculate as to

3  why that decision --

4         THE COURT:  Probably the reputation of the bench;

5  right?

6         MR. PORTER:  I agree you, Your Honor, yes.

7         But I think that -- you know, look, I understand

8  it's convenient for the CFTC to litigate the case here, but

9  convenience to the lawyers representing the CFTC is expressly

10  not a factor that the Court is to consider.

11         So there's no way that this case should be here.

12  It's very clear this should be in the Central District of

13  California.  The CFTC has filed multiple other cases in the

14  Central District of California.  We have cited to the recent

15  cases they've filed, seem to have no problem filing there, so

16  why it's filed here, we just don't understand.  And it would

17  create a substantial burden for my clients.  They would have

18  to travel to New York, pay for hotel rooms.  They're going to

19  be multiple witnesses from the company who are going to have

20  to --

21         THE COURT:  That couldn't be handled by Zoom

22  depositions or something of that nature?

23         MR. PORTER:  Well, depositions, I think, are another

24  thing because we have to figure out where those are taken, but

25  for actual trial testimony -- and that's what the Court needs

*Proceedings*                                                          7

1   to look at is what is the burden for actually trying this

2   case, it's a substantial burden on three parties that have

3   been identified, and all of the people that work there are

4   going to be witnesses in this case.

5            So, respectfully, we submit that this case should be

6   transferred to the Central District of California.

7            THE COURT:  Why don't we take this one argument at a

8   time because I understand that different plaintiff's counsel

9   is going to make different arguments, so whoever is addressing

10  the issue of venue, who is that going to be?

11           MR. MERMELSTEIN:  I will, Your Honor.

12           THE COURT:  Okay.

13           MR. MERMELSTEIN:  Good morning.

14           THE COURT:  Good morning.

15           MR. MERMELSTEIN:  At the pre-motion conference, Your

16  Honor, I cautioned defendants that the motion to transfer

17  venue may be a nonviable waste of time, and the briefing here

18  has confirmed that is the case.  The fraud charge here has a

19  substantial connection to New York.

20           THE COURT:  What is the substantial connection to

21  New York?

22           MR. MERMELSTEIN:  They've solicited customers in

23  New York, defrauded elderly victims in New York, hired a

24  New York based marketing firm and directed that firm to market

25  to New York residents.

*Proceedings*                                                          8

1          THE COURT:  Is that the new allegation, the

2    New York-based marketing firm?  Is that in the complaint?

3          MR. MERMELSTEIN:  I will say -- it's not in the

4    complaint, but I think defendants are confused in focussing on

5    whether the allegations regarding venue are in the complaint

6    or not.  Allegations regarding venue do not need to be in the

7    complaint.  All of defendants' allegations regarding a motion

8    to transfer venue to California were introduced for the first

9    time in their motion to transfer venue in the supporting

10   affidavit, so -- and as is typical and appropriate, the CFTC

11   required by introducing additional details on the location of

12   witnesses, which would not typically be --

13         THE COURT:  Well, tell me about this marketing firm.

14   What does this marketing firm have to do with the case?

15         MR. MERMELSTEIN:  It was the marketing firm that

16   they hired and paid a substantial amount of money to.  We do

17   not have complete discovery on that, but tens of thousands of

18   dollars to market their services to residents in a variety of

19   states.  They specifically identified, I believe, six states,

20   one of which was New York.

21         THE COURT:  And these people, they're not named as

22   defendants.

23         MR. MERMELSTEIN:  Correct.

24         THE COURT:  So when you say "marketed," what was

25   their role?

*Proceedings*                                                    9

1           MR. MERMELSTEIN:  Crafting marketing materials;

2    emails to customers, online advertisements.

3           Again, discovery in this case has not yet begun,

4    so --

5           THE COURT:  Where is this marketing company located?

6           MR. MERMELSTEIN:  They're located in New York State,

7    not in this district.  I believe -- I can't remember the name

8    of the county, but Rockland County, I believe.

9           THE COURT:  What does this district, the Eastern

10   District of New York, have to do with anything?  I mean, their

11   CFTC is not here; correct?  Or are they?

12          MR. MERMELSTEIN:  The CFTC's office is located in

13   Manhattan across the river.  The --

14          THE COURT:  What's the connection here?

15          MR. MERMELSTEIN:  There are victims in this

16   district.

17          THE COURT:  And there are no victims in Manhattan?

18          MR. MERMELSTEIN:  There may be.  Again, we have not

19   completed discovery, but at the time we filed, we were aware

20   of victims in this district.

21          THE COURT:  How many?  Do you know?

22          MR. MERMELSTEIN:  We are aware of, I believe, five

23   victims in this district.

24          THE COURT:  How many victims do you think there are

25   all together?

*Proceedings*                                                    10

1          MR. MERMELSTEIN:  Hundreds.

2          THE COURT:  When you are talking about an issue of

3    venue, do I consider ties that are outside of this district?

4    In other words, you are talking about a marketing firm in

5    Rockland County.

6          MR. MERMELSTEIN:  Your Honor, the key

7    considerations -- there are a variety of factors the courts

8    can consider in having a wide discretion of venue, but --

9          THE COURT:  Right.

10         MR. MERMELSTEIN:  -- the most important

11   considerations are generally the deference -- as a starting

12   point -- the deference given to plaintiff's choice of forum

13   and then the convenience of third-party witnesses because

14   party witnesses can be --

15         THE COURT:  Who are the third-party witnesses?

16         MR. MERMELSTEIN:  Victims, and witnesses like the

17   representative of the marketing firm that they contracted

18   with, who would have knowledge on -- firsthand knowledge of

19   their description of how they wanted to portray Fisher Capital

20   to customers.  And that's key because a core part of the fraud

21   was misrepresenting the identity of the salespeople at Fisher

22   Capital, the operating history of the company, and the overall

23   services that it would provide.

24         THE COURT:  What is your position with respect to

25   this marketing group?  Or are they a potential defendant or --

1    it's interesting that you talk about this group.  What's your

2    view of them in this case?

3              MR. MERMELSTEIN:  We have not sued them.  I can't

4    rule anything out, but we don't have any present intention to

5    amend --

6              THE COURT:  So you are considering them a, quote,

7    third party, then?

8              MR. MERMELSTEIN:  Correct.  A witness who would have

9    knowledge of the -- of what Elaine, another representative of

10   Fisher Capital, knew and said at the time about what their

11   business actually was designed to do.  Meaning, they marketed

12   it as a wealth preservation firm that had a long and

13   successful operating history and would help protect victims'

14   retirement funds, guarantee the principle of victims'

15   retirement when, in fact, what they did was uniformly push

16   victims into liquidating retirement, buying gold and silver

17   coins in transactions that guaranteed victims an instantaneous

18   profit routinely causing victims to lose more than half of

19   their retirement.

20             So the marketing firm, in designing online

21   advertisements -- we annexed to our motion papers one lengthy

22   communication with the marketing firm about how Fisher Capital

23   wanted to portray itself, which gives some indication about

24   why they would have relevant knowledge.  For example, the

25   marketing firm pointed out in that document that there were

*Proceedings*                                                          12

1   some statements that Fisher Capital wanted to make that seemed

2   potentially misleading.

3         THE COURT:  Counsel points -- I think it's a

4   decision of Judge Atkins in the Southern District that talks

5   about the real issue when you are looking at venue being where

6   the fraudulent statements are coming from, not who they are

7   presented to.  Do you think that case is wrongly decided, or

8   can you somehow distinguish it?

9         MR. MERMELSTEIN:  I can distinguish it.  I think

10  that defense counsel is conflating two different issues.  One

11  is the locus of operative effects and the other is the

12  location of witnesses who will actually testify at trial.

13        The much more important issue is the location of --

14  the actual convenience to third-party victims and third-party

15  witnesses who will testify.

16        THE COURT:  You haven't charged every single person

17  who worked for the firm.

18        MR. MERMELSTEIN:  That's correct.

19        THE COURT:  Aren't they people that would be

20  potential witnesses that would be considered third-party

21  witnesses, people who work there and made the calls and all of

22  that that aren't named as defendants; aren't they third-party

23  witnesses?

24        MR. MERMELSTEIN:  What the case law says is that the

25  convenience and location of defendants and their employees is

*Proceedings*                                                           13

1    of a less concern than the location of unaffiliated

2    third-party witnesses because defendants have some control

3    over their employees and can get them to testify.

4              THE COURT:  Wouldn't the marketing people come, sort

5    of, in that group that you have just named as being not people

6    you look to?

7              MR. MERMELSTEIN:  Whether defendants have control

8    over them and can compel them to show up?  I don't have

9    information one way or the other, but they are a vendor.  They

10   are not an affiliate --

11             THE COURT:  An employee, you mean.

12             MR. MERMELSTEIN:  As far as we understand, they are

13   not an employee or affiliate of Fisher Capital.  They are a

14   established marketing company that provides services to many

15   different companies.

16             THE COURT:  Okay.  Anything else you wanted to add?

17             MR. MERMELSTEIN:  If you would just give me one

18   second, Your Honor.

19             THE COURT:  Okay.

20             MR. MERMELSTEIN:  This is not a California-focussed

21   case; this is a national fraud.

22             So defendants defrauded victims around the country

23   in virtually every state.  As they mentioned, the location in

24   which the greatest number of customers are is in Texas.  We

25   didn't file in Texas, in part, because we are not located in

1   Texas and neither are defendants, so it wouldn't serve the

2   convenience of either entity.  And there are so many defrauded

3   customers that there are plenty of victim witnesses who will

4   be able to testify who are located close to this courthouse as

5   there would be in Texas.

6           As for the witnesses who defendants intend to call,

7   their submission -- their affidavit is woefully inadequate.

8   On a motion to transfer venue, defendants need to provide

9   specific information about the identity of the witnesses they

10  intend to call, the testimony that those witnesses will intend

11  to offer, and they don't do so.  They say that they will call

12  employees of Fisher Capital and potentially customers.  They

13  do not identify any customer.  They don't even identify the

14  location of the customer.  They don't say that the customers

15  are in California who they intend to call.

16          Now, it may be that they do not, in fact, know of

17  any customers who would be able to provide helpful testimony

18  on their behalf.  They don't say one way or the other.

19          THE COURT:  Who has the burden of showing venue?

20  Don't you have the burden of showing that you brought it in

21  the appropriate place?

22          MR. MERMELSTEIN:  No, Your Honor.  On a motion that

23  challenges the propriety of venue, the plaintiff has the

24  burden.  But on a motion to transfer venue under the Court's

25  discretion and authority, defendants have a heavy burden to

*Proceedings*                                                          15

 1   establish that a transfer of venue would be materially more

 2   convenient.

 3            THE COURT:  Okay.

 4            All right.  Do you have any replay to that before we

 5   go on to the next issue?

 6            MR. PORTER:  Yes.  I mean, I would just say with the

 7   marketing agency, if this was such an important part of their

 8   case, which, you know, they have outlined their case in their

 9   complaint, like, it would -- you would think it would be

10   identified somewhere in the complaint.  I mean, it kind of

11   strikes me as a post hoc justification for why the case was

12   filed here rather than it genuinely being a real part of the

13   case.

14            With respect to the affidavit that was submitted, I

15   think that our affidavit, if you look at the case law, it is

16   more than sufficient to satisfy what is required to meet our

17   burden to -- on a motion to transfer venue.

18            And, again, when there is no material or substantial

19   connection to the district, which there isn't here, then

20   transfer should be granted.  That's what the case law says.

21   We've identified in our affidavit customers -- excuse me, not

22   customers, employees; obviously the principal, Mr. Spellane.

23   And, frankly, one of the reasons why we didn't identify

24   specific customers is because the complaint doesn't identify

25   any specific customers.

1          So we haven't gotten to discovery yet to know what
2    customers the CFTC is alleging were defrauded or any of the
3    individual sales representatives that the CFTC claims made
4    misrepresentations because that's not identified in the
5    complaint.  We haven't gotten to discovery yet.  But it's
6    undisputed that all of our operations are in California; all
7    of our salespeople are in California; there's the second
8    largest number of customers who are in California; and there's
9    simply no --
10          THE COURT:  And this is an ongoing entity; correct?
11          MR. PORTER:  Yes, Your Honor.
12          THE COURT:  So Fisher Capital is still in business
13    selling whatever it is they're selling, the coins and bullion
14    and --
15          MR. PORTER:  Yes, precious metals, yes.
16          THE COURT:  -- precious metals.
17          Okay.  Why don't you turn to your next issue.
18          MR. PORTER:  So next I would like to address the
19    jurisdictional issue, which we have raised, and whether the
20    CFTC has jurisdiction to bring this claim against our client.
21          So this is a case that involves non-leverage
22    commodities transactions.  So these are simple retail sales of
23    precious metals.
24          THE COURT:  Doesn't it come within the term of
25    contract of sale of any commodity in interstate commerce?

*Proceedings*                                                            17

1         MR. PORTER:  I think that if you look at the -- I

2    think the parties would not dispute that before the

3    amendments, the Dodd-Frank amendments in 2010, it's very clear

4    that this was excluded from the CFTC's jurisdiction.  Parties,

5    I think, would agree to that.  The only question is whether

6    this recent amendment, whether that expanded jurisdiction over

7    non-leveraged --

8         THE COURT:  Well, the first thing you do when you

9    analyze a statute is look at the plain language of the

10   statute; correct?

11        MR. PORTER:  Yes, Your Honor.

12        THE COURT:  And doesn't the phrase "a contract of

13   sale of any commodity in interstate commerce" cover what your

14   client was doing?

15        MR. PORTER:  Well, I don't believe that Congress

16   intended that language to --

17        THE COURT:  Well, they said it.  Whether they

18   intended -- I mean, basically you don't go behind it unless

19   it's not clear.  What could be clearer than that language?

20   Maybe they messed up, but that's what the language says.

21        MR. PORTER:  Well, Second Circuit case law says that

22   you can look behind it and you can look to the legislative

23   history.  If the plain language interpretation would pervert

24   the purpose of statute -- what is the language on that?  Hold

25   on one second.

*Proceedings*                                                      18

1          Yes, you can look at the legislative history of the

2     enactment to determine whether the literal application statute

3     would pervert its manifest purpose.

4          So the statue is the CEA, the Commodities Exchange

5     Act, and its manifest purpose is to regulate leverage

6     commodity transactions, derivatives, other types of

7     complicated instruments, and not retail transactions.

8          So you can look at the legislative history here and

9     when you look at the legislative history, what it shows is

10    that when they passed this amendment, nobody said -- no

11    congressman or -woman, no senator -- nobody said, look, when

12    we pass this amendment, what we're going to be doing is we're

13    going to be changing the entire jurisdiction of the CFTC to

14    now regulate retail commodities transactions.  The purpose of

15    the amendment was simply to add language that was similar to

16    10(b) under the Securities Exchange Act to the statute so that

17    when the CFTC pursued manipulation claims, claiming that

18    somebody manipulated derivatives markets, that the scienter

19    requirement would be the recklessness requirement, not the

20    specific intent to manipulate.  That was the entire purpose of

21    this amendment.  That's what this was all about.

22          And so there was never --

23          THE COURT:  What about this language?  Is there any

24    discussion in the legislative history about this specific

25    language?

*Proceedings*                                                    19

1        MR. PORTER:  I think it just comes from the

2   Securities Exchange Act, which they adopted similar language,

3   and without intending that it would ever expand the

4   jurisdiction of the CFTC to cover ordinary retail commodities

5   transactions.

6             And so, I mean, the CFTC has not identified anything

7   in the legislative history to say, no, actually this is what

8   Congress meant.  They meant that now we are going to have

9   jurisdiction to go after all sorts of retail transactions that

10  we never could have gone after before.  And even in this case

11  where we have a specific exemption under the Commodity

12  Exchange Act, the actual delivery exception, which would say

13  that said if it's delivered within 14 days, which the CFTC

14  doesn't dispute, that is what occurred here.  It was entirely

15  exempted from the statute.

16        THE COURT:  Well, I believe it's their intention

17  that that doesn't apply to this language.

18        MR. PORTER:  Sorry, Your Honor, I didn't hear you.

19        THE COURT:  I think it's their position that the

20  portion that you just quoted about the 14 days delivery does

21  not apply to this section.

22        MR. PORTER:  Yes, I think that is their position.

23  But the point is that this was a regulatory structure that was

24  set up, it exempted certain transactions, it didn't exempt

25  other transactions, and then this new language came along and

*Proceedings*                                                          20

1    there was never an intent to broadly expand the jurisdiction

2    of this federal agency.  And some of the Supreme Court case

3    law that we cite to says that Congress does not hide elephants

4    in mouseholes.  Congress does not fundamentally restructure --

5              THE COURT:  When this issue was raised before the

6    Ninth Circuit, they -- although, I clearly didn't resolve the

7    issue -- they sort of were not impressed by that argument;

8    correct?

9              MR. PORTER:  I disagree with that interpretation.  I

10   mean, they obviously didn't reach --

11             THE COURT:  Well, there's a line that says:  It's

12   not at a all clear that I'm presented with an elephant in a

13   mousehole.  The *Monex* decision.  Isn't that what they said in

14   response?

15             MR. PORTER:  That was said, but I don't think they

16   ever addressed the issue.  And I don't know that they were

17   presented with the same arguments that were presented here.

18             And if you look at the district court decisions that

19   the CFTC relies on, a couple of those cases, I believe, were

20   pro se decisions.  The one here in the Eastern District of New

21   York, that was a pro se case where this issue was not fully

22   addressed --

23             THE COURT:  That was Judge Weinstein; right?

24             MR. PORTER:  Yes.

25             THE COURT:  He usually figures out what most of the

*Proceedings*                                                    21

 1    issues were even if it was done by a pro se, so I don't know

 2    how strong that argument would be.  You can argue that it's

 3    wrong, but . . .

 4              MR. PORTER:  Well, I don't believe that --

 5              THE COURT:  And all the cases you cite are before

 6    the amendment -- correct? -- which you are interpreting the

 7    statute before the amendment; right?

 8              MR. PORTER:  Yes, well -- yes, all of them that we

 9    are saying this is the original structure of this --

10              THE COURT:  Right.

11              MR. PORTER:  -- this is the original structure of

12    the regulation, the statute.  This is a statute that

13    establishes a federal agency and its jurisdiction is limited

14    in a certain way, and so then to come along with this

15    amendment without saying anything that we are now

16    fundamentally restructuring how this agency is going to work,

17    I believe, has serious implications for -- for -- well,

18    separation of powers.  Congress needs to speak clearly --

19              THE COURT:  Separation of powers?  I mean, your

20    view, I take it, that Congress wasn't careful here in adding

21    this language to the statute.  I mean, the language on its

22    face clearly covers this kind of transaction, so your argument

23    would have to be that they were sloppy and how does that

24    invoke separation of powers?

25              MR. PORTER:  Well, because I think that Congress

*Proceedings*                                                  22

1    needs to speak clearly under the major questions doctrine if

2    it's going to be actually changing the fundamental structure

3    of a federal agency.

4              THE COURT:  Let me turn to plaintiff's counsel.

5              Who is arguing this one?

6              MS. COHEN:  I am, Your Honor.  Alyson Cohen.

7              THE COURT:  It does seem odd that, based on

8    counsel's description of what the CFTC's role was,

9    jurisdiction is, how do you explain what this language means

10   in terms of the legislative history?

11             MS. COHEN:  Well, so --

12             THE COURT:  Why were they adding this to an agency

13   that had never before had this type of jurisdiction?  And

14   shouldn't something have been said about it if that was

15   intended to be done?

16             MS. COHEN:  First, I just want to say that Your

17   Honor hits the nail on the head when you say that the language

18   is clear, that it covers this exact instance, and that's -- so

19   there is no need to look at the legislative history.  But

20   accepting Your Honor's question that we look behind the clear

21   language of the statute and look at the legislative history,

22   the legislative history supports the CFTC's expansion of its

23   jurisdiction in this case.

24             I would point Your Honor to the statement of Senator

25   Maria Cantwell at 156 congressional record number 67 S3348,

*Proceedings*                                                    23

1   May 6, 2010.  And Senator Cantwell says:  My amendment

2   strengthens the Commodity Futures Trading Commission's

3   authority to go after manipulation and attempted manipulation

4   in the swaps and commodities markets.

5          And she goes on to say that some people might be

6   thinking, why do we need legislation like that, don't we

7   already have something in place?  Unfortunately, current law

8   does not have enough protection for our consumers, and we have

9   found in other areas that it is very important to have a

10  strong bright line, a law on the books against manipulation.

11  We want the CFTC to have strong tools to go after this kind of

12  behavior.  This amendment is about protecting the integrity of

13  markets from people who rely on them for their business.

14         So right there, Senator Cantwell, who is the author

15  of this amendment, makes clear that this was no accident; that

16  61 expanded the CFTC's jurisdiction and gave them additional

17  authority that we did not have prior to Dodd Frank.

18         And I want to point Your Honor to the language of 61

19  because it really does -- it's the beginning and end of this

20  issue, frankly.  It renders it unlawful for any person

21  directly or indirectly to use or employ or attempt to employ

22  in connection with any swap -- and I want to emphasize this

23  next phrase -- or contract of sale of any commodity in

24  interstate commerce or for future delivery any manipulative or

25  deceptive device or contrivance in contravention of such rules

*Proceedings*                                                    24

1    and regulations as the commitment shall promulgate.

2           And the commission, in turn, promulgated regulation

3    181.A, which tracks that language.

4           So really this is just squarely within the

5    jurisdiction that Congress gave the CFTC as part of

6    Dodd-Frank.

7           THE COURT:  Does any other federal agency have

8    jurisdiction over this type of issue, over this type of --

9           MS. COHEN:  Not that we are aware of, Your Honor.

10   We have been bringing cases in this area for over ten years,

11   since Dodd-Frank, and we are not aware of --

12          THE COURT:  You have been bringing this type of case

13   for over ten years?

14          MS. COHEN:  Yes.  Since Dodd-Frank.

15          THE COURT:  And there's no appellate decision one

16   way or the other on this?

17          MS. COHEN:  No, Your Honor, because it's so clear

18   that we have this authority under the statute.  Congress has

19   known that we are bringing these types of cases and it hasn't

20   moved at all to narrow our jurisdiction.  No court has

21   narrowed our jurisdiction and all of the district court

22   cases -- all the district courts that have considered this

23   issue have found that it is within the clear jurisdiction of

24   the CFTC.

25          And as we see here, defendant merely has to rely on

*Proceedings*                                                    25

1   this argument that Congress could not mean what they said they

2   meant, and there's no basis on which to believe that Congress

3   did not mean what they said when they said that this is

4   clearly within the authority to bring these cases.

5          Also, in the briefing, defendant kind of puts forth

6   a variety of hypotheticals to basically say, this has gone too

7   far, the jurisdiction of the CFTC has gone too far.  None of

8   those hypotheticals are in line with the facts of this case.

9   This case is clearly within our jurisdiction.

10         And furthermore, defendant ignores clear limitations

11  on the CFTC's jurisdiction which limit us to bringing these

12  cases when there is fraud and manipulation, and that's a clear

13  limitation on the CFTC's authority that makes clear that, one,

14  something has to be a commodity -- not everything is a

15  commodity.  It has to qualify under the definition of

16  "commodity" under the --

17         THE COURT:  What is the definition of "commodity"?

18         MS. COHEN:  It lists particular examples of which

19  precious metals is one.  So precious metals is a clear

20  definition of "commodity" under the statute, but it lists

21  other examples; you know, grains, things that are commonly

22  understood as commodities.

23         THE COURT:  So it wouldn't cover any nationwide

24  fraudulent activity selling some other type of product, then?

25         MS. COHEN:  No.  So it would be definitely a facts

*Proceedings*                                                        26

1    and circumstances analysis, but would have to both fit the

2    definition of a "commodity" and fit the definition of "fraud"

3    or "manipulation" in order to fit under our authority in 61.

4            And, furthermore, that's just simply not the facts

5    that are present in this case that we're just trying to reach

6    any kind of commodity.  Precious metals -- fraud is bread and

7    butter of the kinds of commodities that we look at.  There's

8    clearly a futures market in precious metals, and we've been

9    bringing these exact kind of cases, even against

10   Mr. Spellane's former employer -- Safeguard.  There was a

11   case, this same issue was raised, and the Court dismissed the

12   motion to dismiss on that basis and allowed to proceed.  Red

13   Rock Securities, another case where the same issue was brought

14   up, similar facts to here in terms of selling coins and

15   bullion and precious metals to consumers through fraud, and

16   these same issues were brought on a motion to dismiss and the

17   Court found, no, this is squarely within the jurisdiction of

18   the CFTC and dismissed the motion and allowed the case to

19   proceed.  So it's just clearly the case that this is within

20   our jurisdiction.

21           I also want to agree with Your Honor about your

22   characterization of our argument about the actual delivery

23   exception, that the language that defendants rely on

24   specifically says, this subsection shall not apply to, and

25   then cases where there's actual delivery.  It never says, the

*Proceedings*                                                      27

1      entire CEA shall not apply to.

2              THE COURT:  And what is that subsection?

3              MS. COHEN:  It's 2(c)(2)(D).

4              THE COURT:  And what does it cover?

5              MS. COHEN:  It covers leveraged futures, trading on

6      leverage, which both defendant and CFTC agreed is not at issue

7      here.  We didn't exercise our authority on the basis that

8      these sales were leveraged.

9              So it's simply not -- not relevant.  And moreover,

10     the fact that Congress was able to create -- showed that it

11     was able to create an actual delivery exception to one

12     subsection shows that Congress knew how to create natural

13     delivery exception if they wanted to and they chose not to

14     create one to 61.  So it's clear that that actual delivery

15     exception is simply not relevant in this case.

16             THE COURT:  All right.  Thank you.

17             Do you have anything?

18             I think I understand both sides' views of this

19     issue.

20             Do you have anything further you want to address?

21             MR. PORTER:  Yes.  I think that the excerpt that was

22     read from the legislative history from Senator Cantwell does

23     not do anything to actually support their argument.  It's

24     talking specifically about price manipulation and about new

25     enforcement authority that is needed to enforce price

*Proceedings* 28

1  manipulation, and price manipulation happens in leveraged

2  commodity markets.  It doesn't happen in a retail commodity

3  market.

4          So it has nothing to do with addressing this

5  specific issue, and I believe that a fair reading of the

6  legislative history is that this was never contemplated.  It

7  was never contemplated that the CFTC was going to somehow be

8  regulating all commodities transactions -- which, by the way,

9  the definition of "commodity" is extremely broad, and I don't

10  believe that it specifically identifies precious metals.

11          THE COURT:  No, I don't think she said it was

12  limited to precious metals.

13          MR. PORTER:  I don't think she said that it was

14  limited to, but she said it specifically identifies precious

15  metals.  I don't believe it does.  I'm pulling up the

16  definition here.  But the CFTC has used this definition of

17  commodity which says -- it's very vague language, and it could

18  essentially be construed to cover anything.  It now covers

19  crypto currencies somehow.

20          And so this is the CFTC's regulatory kind of creep,

21  I believe, that Congress never, never intended by passing this

22  statute.

23          Do you want to turn to your last argument, your

24  claim somehow that the complaint is deficient?

25          MR. PORTER:  Yes, Your Honor.

*Proceedings*                                                    29

1           So as we've pointed out in our papers, the

2    complaint, while 25 pages long, I believe is heavy on

3    conclusory statements, is heavy on generalizations, it's heavy

4    on statements that are not attributed to any specific

5    individual, but it lacks --

6           THE COURT:  How about things like, we've been in the

7    business for 25 years, or I've been in the business for

8    25 years, and the personal is only 27?  How about something

9    like that?  Isn't that one of the allegations, or am I

10   misremembering?

11          MR. PORTER:  That may be one of the allegations, but

12   our problem --

13          THE COURT:  I mean, there are a number of

14   allegations that are unsupported, or there is alleged

15   unsupported about the experience of the company and how long

16   the company has been in business.  Why aren't those critical

17   to an investment?

18          MR. PORTER:  Because this is a retail commodity --

19   this is a retail transaction.  This is an ordinary type of

20   selling.  It's like if you go to the store and you buy

21   something from the store, there's going to be some type of

22   profit margin in that product.  So just the fact --

23          THE COURT:  You don't expect to buy something and

24   lose half of its value ten days later; right?

25          MR. PORTER:  Well, okay, if you were to go to -- I

*Proceedings*                                                    30

1    will take the argument.  If you go to a car dealership and you

2    purchase a car from a car dealership, you drive that car off

3    the lot, and then you come back to the car dealership ten days

4    later and you say I want to sell the car back to the

5    dealership, you are not going to get the full retail price.

6              THE COURT:  Well, did the dealership tell you in

7    that case that your investment was protected; that we're

8    conservatives, we're Christians, we're not going to sell you a

9    car that's going to be devalued?  We've been in the business

10   for 25 years, and the car dealership has been there only two

11   years?  I mean, maybe in the context of a car dealership you

12   wouldn't necessarily rely on statements like that, but these

13   are the type of statements that are made here about investing

14   in gold.  I mean, all you have to do is turn on the TV and

15   hear people talking about gold all day long.

16             MR. PORTER:  But they haven't identified a single

17   customer.  They haven't identified a single customer who was

18   allegedly mislead.  They haven't identified a single customer

19   and showed what they, quote/unquote, lost.  The whole concept

20   of customers --

21             THE COURT:  If there are repeated statements about

22   falsehoods that were made to customers, that's not sufficient?

23   And the allegation is these false statements cause people to

24   invest their life savings, invest their IRA money into this,

25   they were told how secure it was, gold is more secure than

*Proceedings*                                                     31

1  anything else in these times.  And the false names.  Everybody

2  is giving false names.

3          MR. PORTER:  There are different reasons for that --

4          THE COURT:  The equivalent is getting calls from

5  Indian call centers or something where the guy says, my name

6  is Bob, or I'm Clayton, or something that's obviously not the

7  person's name, but it's more obvious in that context.  But

8  they're giving false names, they're making false statements

9  about the company, and a lot of the statements that they

10  allege here would be material.  Why isn't that sufficient?

11  And the complaint does allege, I believe, that people lost

12  money; correct?

13          MR. MERMELSTEIN:  That's correct, Your Honor.

14          THE COURT:  What more do you have to say?  I mean,

15  it's replete with false statements -- or alleged false

16  statements, I should say.  I don't know what else you would

17  expect it to say.

18          MR. PORTER:  Well, I think if the CFTC's theory is

19  that customers were buying over-priced metals, what the CFTC

20  needs to do is to identify a specific purchase that happened

21  to identify what the actual value of that item was and then

22  how the customer was supposedly overcharged.  This is a

23  transaction that the customer is told the price, the customer

24  is given disclosures and a shipping agreement -- and by the

25  way --

*Proceedings*                                                        32

1          THE COURT:  What is the shipping agreement, by the

2   way?

3          MR. PORTER:  Excuse me?

4          THE COURT:  What is the timing of the shipping

5   agreement?  Is that after you've made the purchase?

6          MR. PORTER:  That's what closes the transaction, the

7   customer has to sign the shipping agreement and that's the

8   sale, just like with any transaction.

9          THE COURT:  So that's what they document is?

10         MR. PORTER:  Yes.

11         THE COURT:  In other words, they sign that document

12   and the sale isn't done until that document is --

13         MR. PORTER:  Yes.  That's the sale agreement.

14         And so this is just like any ordinary retail

15   transaction where you get the price.  And, in this case,

16   they're actually told what the markup is, you know, very

17   clearly after December of 2021, and the CFTC conspicuously

18   leaves out what those disclosures were after December of 2021.

19   I mean, at the very least, I believe the CFTC should be

20   required to allege fully what the true facts are here, which

21   is that after December 2021, the markup wasn't any higher than

22   43 percent, and the shipping agreement clearly disclosed that

23   43 percent to the customers, and there was also a recorded

24   sales confirmation call where they were told about the

25   43 percent as well.

*Proceedings*                                                    33

1          THE COURT:  What were they told about 43 percent?
2    That what?

3          MR. PORTER:  That was the spread.  That was the
4    markup.

5          THE COURT:  In other words, they were paying half
6    again more than it was worth?

7          MR. PORTER:  Not more than what it was worth, Your
8    Honor.  Fisher Capital buys wholesale and they sell at retail
9    just like any other company, so the markup is 43 percent from
10   the wholesale price to the retail price.  So that's the
11   disclosure that was made.

12         It's just like, again, if you go to the car
13   dealership and they say, we bought this car for $10,000 and
14   we're going to sell it to you for $20,000.  You don't even get
15   that disclosure when you go to the car dealership, but you get
16   that here, and they made that disclosure to the customers.

17         THE COURT:  That's only one of the allegations here.
18   There are a lot of other allegations about the safety of the
19   investment.  That's just one portion of it.  There are a lot
20   of other allegations in terms of fraudulent inducement that
21   are in the complaint, aren't there?

22         MR. PORTER:  There are other allegations, but I
23   think that those are all -- those are not central to the case.
24   I mean, a lot of these are what I would refer to as sales
25   puffery, so, kind of, statements of optimism, things that are

*Proceedings*                                                            34

1   not actually material.  When it goes to the actually material

2   statements made to customers -- and, again, they haven't

3   identified any specific customers, what was actually said to

4   them -- the complaint is --

5           THE COURT:  What case do you have that says in a

6   fraud case they have to specifically identify by name

7   customers?  Is there a case that you can point me to that says

8   that?

9           MR. PORTER:  I believe we cited to a couple in our

10  reply brief where courts had dismissed complaints where that

11  type of detail was not provided.

12          THE COURT:  Who is arguing this for --

13          MS. RASOR:  Katie Rasor, Your Honor.

14          THE COURT:  Let me just turn to the argument about

15  the markup.

16          Wasn't the markup revealed?  Because one of the

17  allegation you do make is that people didn't understand the

18  markup.  Wasn't the markup revealed in that agreement?

19          MS. RASOR:  So, a couple points about that.  I

20  think, first of all, I just -- I want to say that Your Honor's

21  question sort of eluded to the bigger issue in this case which

22  it's not just about the markup.  It's about -- that's one

23  piece, but it's also about all of the other lies that these

24  people were told before their retirement funds were drained

25  from them by this fraud.

*Proceedings*                                                      35

1          So setting that as the, sort of, background to the

2     discussion about the markup, I just want to clarify.

3          So there's, sort of, two different documents when

4     we're talking about disclosure.  The earlier one, we do refer

5     to briefly in our complaint, and that document didn't disclose

6     markups at all.

7          THE COURT:  Is that within the statute of

8     limitations, the earlier document?

9          MS. RASOR:  Yes, Your Honor.

10         So that document, you know, we think it's

11    appropriate for the Court to consider.

12         The other document, the sort of post December 2021

13    shipping agreement, we don't mention it in our complaint.

14    It's not integral to our complaint in any way, and, you know,

15    there's a reason for that.  We don't know that any customer

16    has ever saw it.  We have no evidence that customer saw it.

17         THE COURT:  Didn't they have to sign it, too?

18         MS. RASOR:  That's what they said, but that's not in

19    our complaints.  And if they want to get into that in

20    discovery or raise it as a defense as a factual issue, I think

21    that that might be a more appropriate time to, sort of, vet

22    these claims.  But, as far as we're concerned, that's really a

23    factual dispute.  It's not really appropriate for

24    consideration on a motion to dismiss where you have our

25    complaints where the allegations have to be taken as true.

*Proceedings*                                                    36

1          I will just add, Your Honor -- and, you know, we

2    cite this in our papers, but even if you put a disclosure in

3    some fine print and the customer signs it, after you've told

4    them --

5          THE COURT:  No one has a copy of the -- I mean, I

6    know this is outside the complaint, but I just don't recall

7    now.  Did you append a copy of the shipping agreement to your

8    papers?

9          MR. PORTER:  Yes, Your Honor.  As part of our

10   request for judicial notice because it is integral to the

11   complaint.

12         THE COURT:  Well, they don't mention that document

13   in the complaint, do they?

14         MR. PORTER:  They refer to the shipping agreement,

15   but then they only attach one version of the shipping

16   agreement, so we believe under Second Circuit case law it's

17   integral to the complaint, because this is a case about what

18   was disclosed to the customers, and they have only included

19   one version of the complaint, and for the CFTC to say that

20   they didn't -- they don't know the customer has received this

21   complaint, there was a year and a half long investigation that

22   happened before this case was filed, and we shared clearly

23   with the CFTC these disclosures.  So it wasn't left out -- I

24   don't know why it was left out, but it was left out.

25         MS. RASOR:  Your Honor, even their own declaration

*Proceedings* 37

1    says that the agreement was in effect.  It doesn't identify

2    that anyone actually saw it or the circumstances under which

3    it was given to customers, so, in our view, it's not

4    appropriate for inclusion in the complaint or the Court's

5    consideration, but even if the Court were inclined to consider

6    it, it doesn't change the fact that this was a fraud because

7    of all of the other misrepresentations that are alleged in

8    great detail in the complaint that, you know, if you sell

9    someone at a 43 percent markup after lying about your name,

10   your experience in the industry, the assets under management

11   that your company has, how long you've been in business, and

12   you've told them the investment is safe and secure when it

13   isn't, you know, we think that those things really inform the

14   scheme here.  It's not really just about the markup.

15           THE COURT:  Counsel, could you tell me where the

16   statement is in -- I have the two agreements here.  It's in

17   Exhibit 2?

18           MR. PORTER:  Yes, Your Honor.  It's Exhibit 2, the

19   declaration of Alexander Spellane.

20           THE COURT:  Where in the agreement itself?

21           MR. MERMELSTEIN:  Your Honor, if I can be

22   presumptuous, if you were a customer receiving that agreement,

23   it is not easy to find where any disclosure of markup exists,

24   and customers are not --

25           THE COURT:  I'm asking that question now so I don't

*Proceedings*                                                         38

1    read the entire agreement.

2         MR. PORTER:  It's on page 4, Your Honor, of

3    Exhibit 2 to the Spellane declaration, and it's the last

4    sentence.

5         THE COURT:  On page 4 of 12?

6         MR. PORTER:  Yes, 4.

7         THE COURT:  The last sentence under Customer Quotes?

8         MR. PORTER:  Product Quotes.

9         THE COURT:  I don't know that I would know what that

10   meant.  Can you explain it to me?

11        It says:  The actual spread on any transaction.

12        MR. PORTER:  It's the last two sentences.

13        So paragraph B talks about spread.

14        THE COURT:  Right.

15        MR. PORTER:  So paragraph B is talking about

16   spreads, so if you go to -- it says:  Spreads vary based on

17   the quantity of purchase, the availability of precious metals

18   products, market forces such as --

19        THE COURT:  What does "spreads" mean according to --

20        MR. PORTER:  That's defined in the previous

21   paragraph.

22        Paragraph A says:  Within the precious metals

23   marketplace, the difference between Fisher Capital's cost on

24   the day of purchase, the price for which customers agreed to

25   buy, known as the spread.

*Proceedings* 39

1          So that's the spread of the markup.

2          And so paragraph B says that spreads -- so it goes

3   on to say:  Fisher Capital's precious metals price quotes to

4   customers for exclusive and/or numismatic precious metals

5   products -- it goes on to list them -- are upwards of

6   43 percent.  Spreads for exclusive and numismatic precious

7   metals vary on any particular transaction and could be any

8   amount within or outside of those ranges.

9          THE COURT:  Okay.  All right.  Is there anything

10  further either side wishes to address?

11         MS. RASOR:  Your Honor?

12         THE COURT:  Go ahead.

13         MS. RASOR:  If I could just note, too -- I think

14  it's clear, but in case it wasn't -- our complaint does go

15  back to June 1st, 2020, so there are many customers that we

16  are alleging that never received that agreement that we're

17  looking at.

18         THE COURT:  What would be the limitations period

19  here?

20         MS. RASOR:  I think going back to June 1st, 2020.

21         THE COURT:  When did you bring the complaint?

22         MS. RASOR:  It's five years, Your Honor.

23         THE COURT:  It's five years.

24         When did you bring the complaint?

25         MS. RASOR:  April 2023.  So it would go back

*Proceedings*                                                           40

1   potentially further even.  But the relevant period in the

2   complaint is June of 2020.

3               THE COURT:  I see.  All right.

4               Counsel, anything else?

5               MR. PORTER:  I would just say to that, I mean, that

6   seems to suggest that it doesn't matter what the later

7   disclosures are, but if --

8               THE COURT:  Well, it means presumably that you could

9   be held liable for a period of time.  I mean, even if you were

10  correct in your analysis, it would mean the complaint wouldn't

11  be dismissed, it would be -- I'm just looking at this issue

12  now -- it would be viable up until the time they changed the

13  agreement.

14              MR. PORTER:  Yes.  And that would be significant,

15  Your Honor, because it was very -- a much smaller number of

16  transactions that occurred from 2020 up until December of

17  2021.  So that's why this is important because they have

18  only -- they've cherry-picked that time period, and the

19  disclosures that were made in that time period, and have not

20  included the disclosures that were made subsequent to then,

21  which is the majority --

22              THE COURT:  Well, the time of the fraud goes past.

23              MR. PORTER:  Exactly, Your Honor.  They are alleging

24  the fraud goes past that point, but they are not including the

25  disclosures that were made.

*Proceedings*                                                              41

1      MS. RASOR:  Your Honor, we haven't cherry-picked

2   anything.  The people who have maybe -- or maybe not -- were

3   signing those disclosures, those people were defrauded, too,

4   and that's what we contend, that's what the complaint

5   describes, because of the many, many, different types of

6   misrepresentations, not just about markup but about --

7      THE COURT:  I don't recall, do you have a specific

8   representation that you contend is false that they didn't tell

9   people about the markup?  I'm just trying remember whether

10  that specific allegation is in your complaint.

11      MS. RASOR:  Well, I think that there's an allegation

12  that some customers were not told what the markup was and that

13  it would be two to three times as much as -- I mean, they are

14  talking about 43 percent, but in many cases it was more, Your

15  Honor.  They said again and again that we don't have specific

16  examples in our complaint, but if you look at paragraph 61,

17  for example, it gives a specific customer who was defrauded.

18  It says that, In or about March 2021, Spellane falsely told

19  the customer that by converting his traditional retirement

20  account --

21      THE COURT:  Slow down a little bit.  The court

22  reporter has to take it down.

23      MS. RASOR:  Sorry -- Spellane falsely told the

24  customer in or about March of 2021 that by converting his

25  traditional retirement account into precious metals he could

1    expect to double his money within six months to one year

2    because the price of gold and silver would rise.  In fact, as

3    Spellane knew, or recklessly disregarded, the customer

4    instantly lost more than half the value of his retirement

5    account upon transacting with Fisher Capital Group because

6    Spellane directed virtually all of the customer's retirement

7    funds into grossly overpriced, supposedly semi-numismatic

8    coins, at markups ranging from 137 percent to 145 percent.

9              This is the kind of thing that we're talking about.

10             And, you know, to their point about specific

11   customer, it's not our practice to put names of private

12   individuals in our complaints, but, of course, that's

13   something that they would have access to in discovery.  No one

14   is trying to hide the ball on anything.  I think there's a lot

15   of specifics here to fairly put them on notice of what our

16   case is.

17             THE COURT:  All right.

18             MR. PORTER:  May I?  Your Honor asked earlier if we

19   had a case that said they needed to identify customers.

20             THE COURT:  Right.

21             MR. PORTER:  On paragraph page 12 of our reply brief

22   we cite to *Evercrete Corp. vs. H-Cap Limited* case where the

23   Court dismissed a complaint because it did not identify

24   specific customers and the specific statements that were made

25   to --

*Proceedings*                                                      43

1          THE COURT:  And where was that case from?  I'm

2    sorry.

3          MR. PORTER:  That's from the Southern District of

4    New York 2006.

5          THE COURT:  2006.

6          They dismissed a complaint because they didn't name

7    the customers by name?

8          MR. PORTER:  Well, Your Honor, I'm not asking for

9    the actual names of the customers.  We can always anonymize

10   the names of the customers.  So to say that we can't put in

11   specific customers because we don't want to identify

12   private --

13         THE COURT:  What are you asking?  What do you say

14   should be there?

15         MR. PORTER:  Yes, I think that there should be

16   examples.  There should be examples of specific customers --

17         THE COURT:  Wasn't that an example that was just

18   read?

19         MR. PORTER:  I don't believe -- maybe I missed it.

20         MS. RASOR:  I can read it again.  It's paragraph 61

21   of the complaint.

22         And, Your Honor, with respect to the case they're

23   discussing, my understanding is that there was a lack of

24   specific misrepresentations and statements in that complaint,

25   and there's many, many, many of those in this complaint.

44

1          I would also -- in terms of specific representations

2     to particular individual customers, there are also some of

3     those in paragraph 27 D, in paragraph 40, and in paragraph 41

4     of the complaint just as a starting point, so . . .

5          THE COURT:  Yes.

6          You know, having reviewed this, I think plaintiff's

7     motion to dismiss the complaint under 12(b)(6) is denied.  To

8     me, the complaint is more than sufficient in terms of the

9     amount of false statements that are alleged, and I think the

10    complaint adequately meets all of the requirements of 9(b).

11         I'm going to reserve decision on the venue issue

12    and on the other issue about what this statute means.  But in

13    terms of 12(b)(6), in my view, the complaint is clearly

14    sufficient, so there won't be a need to further address that,

15    but I will address the other two issues in a subsequent

16    opinion, so thank you, ladies and gentlemen.

17         MR. MERMELSTEIN:  Thank you, Your Honor.

18         MR. PORTER:  Thank you, Your Honor.

19         MR. TALWAR:  Thank you, Your Honor.

20         MS. RASOR:  Thank you, Your Honor.

21         MS. COHEN:  Thank you, Your Honor.

22         (Matter concluded.)

23

24

25

## $

**$10,000** [1] - 33:13
**$20,000** [1] - 33:14

## 1

**1** [2] - 1:7, 3:19
**10(b** [1] - 18:16
**10007** [1] - 1:16
**12** [2] - 38:5, 42:21
**12(b)(6** [2] - 44:7, 44:13
**137** [1] - 42:8
**14** [2] - 19:13, 19:20
**145** [1] - 42:8
**156** [1] - 22:25
**181.A** [1] - 24:3
**1st** [2] - 39:15, 39:20

## 2

**2** [3] - 37:17, 37:18, 38:3
**2(c)(2)(D)** [1] - 27:3
**2006** [2] - 43:4, 43:5
**2010** [2] - 17:3, 23:1
**2020** [4] - 39:15, 39:20, 40:2, 40:16
**2021** [7] - 32:17, 32:18, 32:21, 35:12, 40:17, 41:18, 41:24
**2023** [2] - 1:7, 39:25
**23-CV-03121(CBA** [1] - 1:3
**23-CV-3121** [1] - 2:3
**2400** [1] - 1:20
**25** [4] - 29:2, 29:7, 29:8, 30:10
**25-plus-page** [1] - 5:22
**27** [2] - 29:8, 44:3
**290** [1] - 1:15
**2:00** [1] - 1:7

## 4

**4** [3] - 38:2, 38:5, 38:6
**40** [1] - 44:3
**41** [1] - 44:3
**43** [8] - 32:22, 32:23, 32:25, 33:1, 33:9, 37:9, 39:6, 41:14

## 6

**6** [1] - 23:1
**61** [6] - 23:16, 23:18, 26:3, 27:14, 41:16, 43:20
**67** [1] - 22:25
**6th** [1] - 1:15

## 8

**865** [1] - 1:20

## 9

**9(b)** [1] - 44:10
**90017** [1] - 1:20

## A

**able** [4] - 14:4, 14:17, 27:10, 27:11
**accepting** [1] - 22:20
**access** [1] - 42:13
**accident** [1] - 23:15
**according** [1] - 38:19
**account** [3] - 41:20, 41:25, 42:5
**Act** [4] - 18:5, 18:16, 19:2, 19:12
**action** [1] - 3:3
**activity** [1] - 25:24
**actual** [10] - 6:25, 12:14, 19:12, 26:22, 26:25, 27:11, 27:14, 31:21, 38:11, 43:9
**add** [3] - 13:16, 18:15, 36:1
**adding** [2] - 21:20, 22:12
**addition** [1] - 5:7
**additional** [2] - 8:11, 23:16
**address** [5] - 16:18, 27:20, 39:10, 44:14, 44:15
**addressed** [2] - 20:16, 20:22
**addressing** [2] - 7:9, 28:4
**adequately** [1] - 44:10
**adopted** [1] - 19:2
**advertisements** [2] - 9:2, 11:21
**advertising** [2] - 5:19, 5:20
**affidavit** [5] - 8:10, 14:7, 15:14, 15:15, 15:21
**affiliate** [2] - 13:10, 13:13
**afternoon** [3] - 2:7, 2:10, 2:14
**agency** [9] - 5:19, 5:20, 15:7, 20:2, 21:13, 21:16, 22:23, 22:12, 24:7
**agree** [2] - 6:6, 17:5, 26:21
**agreed** [2] - 27:6, 38:24
**agreement** [17] - 31:24, 32:1, 32:5, 32:7, 32:13, 32:22, 34:18, 35:13, 36:7, 36:14, 36:16, 37:1, 37:20, 37:22, 38:1, 39:16, 40:13
**agreements** [1] - 37:16
**ahead** [1] - 39:12
**aided** [1] - 1:25
**al** [1] - 1:8
**Alex** [1] - 2:8
**Alexander** [1] - 37:19
**ALEXANDER** [1] - 1:21
**allegation** [5] - 8:1, 30:23, 34:17, 41:10, 41:11
**allegations** [11] - 8:5, 8:6, 8:7, 29:9, 29:11, 29:14, 33:17, 33:18, 33:20, 33:22, 35:25
**allege** [4] - 4:6, 31:10, 31:11, 32:20
**alleged** [5] - 4:12, 29:14, 31:15, 37:7, 44:9
**allegedly** [2] - 5:5, 30:18
**alleges** [1] - 4:6
**alleging** [3] - 16:2, 39:16, 40:23
**allowed** [2] - 26:12, 26:18
**Alyson** [2] - 2:12, 22:6
**ALYSON** [1] - 1:17
**amend** [1] - 11:5

## A

**amendment** [11] - 17:6, 18:10, 18:12, 18:15, 18:21, 21:6, 21:7, 21:15, 23:1, 23:12, 23:15
**amendments** [2] - 17:3
**AMON** [1] - 1:12
**amount** [3] - 8:16, 39:8, 44:9
**analysis** [2] - 26:1, 40:10
**analyze** [1] - 17:9
**Angeles** [1] - 1:20
**annexed** [1] - 11:21
**anonymize** [1] - 43:9
**anyway** [1] - 2:23
**appearances** [1] - 2:5
**appellate** [1] - 24:15
**append** [1] - 36:7
**application** [1] - 18:2
**apply** [4] - 19:17, 19:21, 26:24, 27:1
**appropriate** [6] - 8:10, 14:21, 35:11, 35:21, 35:23, 37:4
**April** [1] - 39:25
**area** [1] - 24:10
**areas** [1] - 23:9
**argue** [2] - 2:16, 21:2
**arguing** [2] - 22:5, 34:12
**argument** [14] - 2:3, 2:23, 2:25, 3:1, 7:7, 20:7, 21:2, 21:22, 25:1, 26:22, 27:23, 28:23, 30:1, 34:14
**ARGUMENT** [1] - 1:11
**arguments** [2] - 7:9, 20:17
**assets** [1] - 37:10
**Atkins** [1] - 12:4
**attach** [1] - 36:15
**attempt** [1] - 23:21
**attempted** [1] - 23:3
**attributed** [1] - 29:4
**author** [1] - 23:14
**authority** [9] - 14:25, 23:3, 23:17, 24:18, 25:4, 25:13, 26:3, 27:7, 27:25
**availability** [1] - 38:17
**aware** [4] - 9:19, 9:22, 24:9, 24:11

## B

**background** [1] - 35:1
**BAGLEY** [1] - 1:12
**ball** [1] - 42:14
**bank** [1] - 5:13
**base** [2] - 3:19, 3:21
**based** [4] - 7:24, 8:2, 22:7, 38:16
**basis** [3] - 25:2, 26:12, 27:7
**BEFORE** [1] - 1:12
**beginning** [2] - 2:6, 23:19
**begun** [1] - 9:3
**behalf** [2] - 2:8, 14:18
**behavior** [1] - 23:12
**behind** [3] - 17:18, 17:22, 22:20
**bench** [1] - 6:4
**best** [1] - 2:21
**between** [1] - 38:23
**bigger** [1] - 34:21

2

**bit** [1] - 41:21
**Bob** [1] - 31:6
**books** [1] - 23:10
**bought** [1] - 33:13
**bread** [1] - 26:6
**brief** [3] - 4:10, 34:10, 42:21
**briefing** [2] - 7:17, 25:5
**briefly** [1] - 35:5
**bright** [1] - 23:10
**bring** [4] - 16:20, 25:4, 39:21, 39:24
**bringing** [5] - 24:10, 24:12, 24:19, 25:11, 26:9
**broad** [1] - 28:9
**broadly** [1] - 20:1
**Broadway** [1] - 1:15
**Brooklyn** [1] - 1:5
**brought** [3] - 14:20, 26:13, 26:16
**bullion** [2] - 16:13, 26:15
**burden** [8] - 6:17, 7:1, 7:2, 14:19, 14:20, 14:24, 14:25, 15:17
**business** [8] - 11:11, 16:12, 23:13, 29:7, 29:16, 30:9, 37:11
**butter** [1] - 26:7
**buy** [3] - 29:20, 29:23, 38:25
**buying** [2] - 11:16, 31:19
**buys** [1] - 33:8
**BY** [2] - 1:17, 1:21

## C

**CA** [1] - 1:20
**California** [18] - 3:9, 3:10, 3:11, 3:12, 3:16, 3:24, 4:14, 6:1, 6:13, 6:14, 7:6, 8:8, 13:20, 14:15, 16:6, 16:7, 16:8
**California-focussed** [1] - 13:20
**Cantwell** [4] - 22:25, 23:1, 23:14, 27:22
**Cap** [1] - 42:22
**CAPITAL** [1] - 1:8
**Capital** [11] - 2:3, 10:19, 10:22, 11:10, 11:22, 12:1, 13:13, 14:12, 16:12, 33:8, 42:5
**Capital's** [2] - 38:23, 39:3
**car** [12] - 30:1, 30:2, 30:3, 30:4, 30:9, 30:10, 30:11, 33:12, 33:13, 33:15
**careful** [1] - 21:20
**CAROL** [1] - 1:12
**case** [57] - 3:9, 4:5, 4:9, 4:19, 4:24, 5:10, 5:22, 6:1, 6:8, 6:11, 7:2, 7:4, 7:5, 7:18, 8:14, 9:3, 11:2, 12:7, 12:24, 13:21, 15:8, 15:11, 15:13, 15:15, 15:20, 16:21, 17:21, 19:10, 20:2, 20:21, 22:23, 24:12, 25:8, 25:9, 26:5, 26:11, 26:13, 26:18, 26:19, 27:15, 30:7, 32:15, 33:23, 34:5, 34:6, 34:7, 34:21, 36:16, 36:17, 36:22, 39:14, 42:16, 42:19, 42:22, 43:1, 43:22
**cases** [13] - 4:21, 6:13, 6:15, 20:19, 21:5, 24:10, 24:19, 24:22, 25:4, 25:12, 26:9, 26:25, 41:14
**CAUSE** [1] - 1:11
**causing** [1] - 11:18

**cautioned** [1] - 7:16
**CEA** [2] - 18:4, 27:1
**centers** [1] - 31:5
**Central** [3] - 6:12, 6:14, 7:6
**central** [1] - 33:23
**certain** [2] - 19:24, 21:14
**CFTC** [30] - 2:2, 4:24, 5:11, 6:8, 6:9, 6:13, 8:10, 9:11, 16:2, 16:3, 16:20, 18:13, 18:17, 19:4, 19:6, 19:13, 20:19, 23:11, 24:5, 24:24, 25:7, 26:18, 27:6, 28:7, 28:16, 31:19, 32:17, 32:19, 36:19, 36:23
**CFTC's** [9] - 9:12, 17:4, 22:8, 22:22, 23:16, 25:11, 25:13, 28:20, 31:18
**challenges** [1] - 14:23
**change** [1] - 37:6
**changed** [1] - 40:12
**changing** [2] - 18:13, 22:2
**characterization** [1] - 26:22
**charge** [1] - 7:18
**charged** [1] - 12:16
**cherry** [2] - 40:18, 41:1
**cherry-picked** [2] - 40:18, 41:1
**choice** [2] - 4:16, 10:12
**chose** [1] - 27:13
**chosen** [1] - 5:16
**Christians** [1] - 30:8
**Circuit** [3] - 17:21, 20:6, 36:16
**circumstances** [2] - 26:1, 37:2
**cite** [4] - 20:3, 21:5, 36:2, 42:22
**cited** [3] - 4:10, 6:14, 34:9
**CIVIL** [1] - 1:11
**claim** [4] - 5:2, 5:19, 16:20, 28:24
**claiming** [1] - 18:17
**claims** [3] - 16:3, 18:17, 35:22
**clarify** [1] - 35:2
**Clayton** [1] - 31:6
**clear** [17] - 4:9, 6:1, 6:12, 17:3, 17:19, 20:12, 22:18, 22:20, 23:15, 24:17, 24:23, 25:10, 25:12, 25:13, 25:19, 27:14, 39:14
**clearer** [1] - 17:19
**clearly** [13] - 3:18, 20:6, 21:18, 21:22, 22:1, 25:4, 25:9, 26:8, 26:19, 32:17, 32:22, 36:22, 44:13
**client** [2] - 16:20, 17:14
**clients** [1] - 6:17
**close** [2] - 3:25, 14:4
**closes** [1] - 32:6
**COHEN** [12] - 1:17, 22:6, 22:11, 22:16, 24:9, 24:14, 24:17, 25:18, 25:25, 27:3, 27:5, 44:21
**Cohen** [2] - 2:12, 22:6
**coins** [4] - 11:17, 16:13, 26:14, 42:8
**coming** [1] - 12:6
**commerce** [3] - 16:25, 17:13, 23:24
**commission** [1] - 24:2
**COMMISSION** [2] - 1:3, 1:14
**Commission's** [1] - 23:2
**commitment** [1] - 24:1

**commodities** [7] - 16:22, 18:14, 19:4, 23:4, 25:22, 26:7, 28:8
**Commodities** [1] - 18:4
**Commodity** [2] - 19:11, 23:2
**commodity** [16] - 16:25, 17:13, 18:6, 23:23, 25:14, 25:15, 25:16, 25:17, 25:20, 26:2, 26:6, 28:2, 28:9, 28:17, 29:18
**COMMODITY** [2] - 1:3, 1:14
**commonly** [1] - 25:21
**communication** [1] - 11:22
**companies** [2] - 3:10, 13:15
**companies'** [1] - 3:11
**company** [9] - 6:19, 9:5, 10:22, 13:14, 29:15, 29:16, 31:9, 33:9, 37:11
**compel** [1] - 13:8
**complaint** [48] - 2:24, 3:2, 5:8, 5:10, 5:21, 5:23, 8:2, 8:4, 8:5, 8:7, 15:9, 15:10, 15:24, 16:5, 28:24, 29:2, 31:11, 33:21, 34:4, 35:5, 35:13, 35:14, 36:6, 36:11, 36:13, 36:17, 36:19, 36:21, 37:4, 37:8, 39:14, 39:21, 39:24, 40:2, 40:10, 41:4, 41:10, 41:16, 42:23, 43:6, 43:21, 43:24, 43:25, 44:4, 44:7, 44:8, 44:10, 44:13
**complaints** [4] - 34:10, 35:19, 35:25, 42:12
**complete** [1] - 8:17
**completed** [1] - 9:19
**complicated** [1] - 18:7
**Computer** [1] - 1:25
**Computer-aided** [1] - 1:25
**computerized** [1] - 1:24
**concept** [2] - 4:15, 30:19
**concern** [1] - 13:1
**concerned** [1] - 35:22
**concluded** [1] - 44:22
**conclusory** [1] - 29:3
**conduct** [1] - 3:2
**conference** [1] - 7:15
**confirmation** [1] - 32:24
**confirmed** [1] - 7:18
**conflating** [1] - 12:10
**confused** [1] - 8:4
**Congress** [14] - 17:15, 19:8, 20:3, 20:4, 21:18, 21:20, 21:25, 24:5, 24:18, 25:1, 25:2, 27:10, 27:12, 28:21
**congressional** [1] - 22:25
**congressman** [1] - 18:11
**connection** [14] - 3:8, 3:17, 3:18, 4:18, 4:20, 4:23, 4:25, 5:16, 5:25, 7:19, 7:20, 9:14, 15:19, 23:22
**conservatives** [1] - 30:8
**consider** [5] - 6:10, 10:3, 10:8, 35:11, 37:5
**consideration** [3] - 3:15, 35:24, 37:5
**considerations** [2] - 10:7, 10:11
**considered** [2] - 12:20, 24:22
**considering** [1] - 11:6
**conspicuously** [1] - 32:17

construed [1] - 28:18
consumers [2] - 23:8, 26:15
contemplated [2] - 28:6, 28:7
contend [3] - 3:1, 41:4, 41:8
context [2] - 30:11, 31:7
contract [3] - 16:25, 17:12, 23:23
contracted [1] - 10:17
contravention [1] - 23:25
contrivance [1] - 23:25
control [2] - 13:2, 13:7
convenience [5] - 6:9, 10:13, 12:14, 12:25, 14:2
convenient [2] - 6:8, 15:2
converting [2] - 41:19, 41:24
copy [2] - 36:5, 36:7
core [1] - 10:20
Corp [1] - 42:22
correct [11] - 8:23, 9:11, 11:8, 12:18, 16:10, 17:10, 20:8, 21:6, 31:12, 31:13, 40:10
cost [1] - 38:23
counsel [7] - 2:6, 7:8, 12:3, 12:10, 22:4, 37:15, 40:4
counsel's [1] - 22:8
country [1] - 13:22
county [1] - 9:8
County [2] - 9:8, 10:5
couple [3] - 20:19, 34:9, 34:19
course [1] - 42:12
COURT [112] - 1:1, 2:10, 2:14, 2:19, 3:21, 4:1, 4:15, 6:4, 6:21, 7:7, 7:12, 7:14, 7:20, 8:1, 8:13, 8:21, 8:24, 9:5, 9:9, 9:14, 9:17, 9:21, 9:24, 10:2, 10:9, 10:15, 10:24, 11:6, 12:3, 12:16, 12:19, 13:4, 13:11, 13:16, 13:19, 14:19, 15:3, 16:10, 16:12, 16:16, 16:24, 17:8, 17:12, 17:17, 18:23, 19:16, 19:19, 20:5, 20:11, 20:23, 20:25, 21:5, 21:10, 21:19, 22:4, 22:7, 22:12, 24:7, 24:12, 24:15, 25:17, 25:23, 27:2, 27:4, 27:16, 28:11, 29:6, 29:13, 29:23, 30:6, 30:21, 31:4, 31:14, 32:1, 32:4, 32:9, 32:11, 33:1, 33:5, 33:17, 34:5, 34:12, 34:14, 35:7, 35:17, 36:5, 36:12, 37:15, 37:20, 37:25, 38:5, 38:7, 38:9, 38:14, 38:19, 39:9, 39:12, 39:18, 39:21, 39:23, 40:3, 40:8, 40:22, 41:7, 41:21, 42:17, 42:20, 43:1, 43:5, 43:13, 43:17, 44:5
Court [9] - 1:23, 6:10, 6:25, 20:2, 26:11, 26:17, 35:11, 37:5, 42:23
court [5] - 2:1, 20:18, 24:20, 24:21, 41:21
Court's [2] - 14:24, 37:4
Courthouse [1] - 1:5
courthouse [1] - 14:4
COURTROOM [1] - 2:2
courts [3] - 10:7, 24:22, 34:10
cover [6] - 3:2, 17:13, 19:4, 25:23, 27:4, 28:18
covers [4] - 21:22, 22:18, 27:5, 28:18

crafting [1] - 9:1
create [7] - 5:15, 5:25, 6:17, 27:10, 27:11, 27:12, 27:14
creep [1] - 28:20
critical [1] - 29:16
CRR [1] - 1:23
crypto [1] - 28:19
currencies [1] - 28:19
current [1] - 23:7
Customer [1] - 38:7
customer [22] - 3:19, 3:21, 5:8, 14:13, 14:14, 30:17, 30:18, 31:22, 31:23, 32:7, 35:15, 35:16, 36:3, 36:20, 37:22, 41:17, 41:19, 41:24, 42:3, 42:11
customer's [1] - 42:6
customers [43] - 3:18, 3:24, 4:8, 4:11, 5:2, 5:7, 7:22, 9:2, 10:20, 13:24, 14:3, 14:12, 14:14, 14:17, 15:21, 15:22, 15:24, 15:25, 16:2, 16:8, 30:20, 30:22, 31:19, 32:23, 33:16, 34:2, 34:3, 34:7, 36:18, 37:3, 37:24, 38:24, 39:4, 39:15, 41:12, 42:19, 42:24, 43:7, 43:9, 43:10, 43:11, 43:16, 44:2

D

DAVID [1] - 1:18
David [1] - 2:12
DAVIS [1] - 1:19
days [4] - 19:13, 19:20, 29:24, 30:3
dealership [9] - 30:1, 30:2, 30:3, 30:5, 30:6, 30:10, 30:11, 33:13, 33:15
December [6] - 1:7, 32:17, 32:18, 32:21, 35:12, 40:16
deceptive [1] - 23:25
decided [1] - 12:7
decision [5] - 6:3, 12:4, 20:13, 24:15, 44:11
decisions [2] - 20:18, 20:20
declaration [3] - 36:25, 37:19, 38:3
defendant [6] - 2:17, 10:25, 24:25, 25:5, 25:10, 27:6
Defendant [1] - 1:19
defendants [17] - 2:6, 2:9, 3:9, 3:10, 7:16, 8:4, 8:22, 12:22, 12:25, 13:2, 13:7, 13:22, 14:1, 14:6, 14:8, 14:25, 26:23
Defendants [1] - 1:9
defendants' [2] - 2:4, 8:7
defense [2] - 12:10, 35:20
deference [2] - 10:11, 10:12
deficient [1] - 28:24
defined [1] - 38:20
definitely [1] - 25:25
definition [8] - 25:15, 25:17, 25:20, 26:2, 28:9, 28:16
defrauded [6] - 7:23, 13:22, 14:2, 16:2, 41:3, 41:17
delivered [1] - 19:13
delivery [8] - 19:12, 19:20, 23:24, 26:2, 26:25, 27:11, 27:13, 27:14

denied [1] - 44:7
DENISE [1] - 1:23
DeniseParisi72@gmail.com [1] - 1:23
depositions [2] - 6:22, 6:23
DEPUTY [1] - 2:2
derivatives [2] - 18:6, 18:18
describes [1] - 41:5
description [2] - 10:19, 22:8
designed [1] - 11:11
designing [1] - 11:20
detail [2] - 34:11, 37:8
details [1] - 8:11
determine [1] - 18:2
devalued [1] - 30:9
device [1] - 23:25
difference [1] - 38:23
different [7] - 7:8, 7:9, 12:10, 13:15, 31:3, 35:3, 41:5
directed [2] - 7:24, 42:6
directly [1] - 23:21
disagree [1] - 20:9
disclose [1] - 35:5
disclosed [2] - 32:22, 36:18
disclosure [6] - 33:11, 33:15, 33:16, 35:4, 36:2, 37:23
disclosures [1] - 31:24, 32:18, 36:23, 40:7, 40:19, 40:20, 40:25, 41:3
discovery [7] - 8:17, 9:3, 9:19, 16:1, 16:5, 35:20, 42:13
discretion [2] - 10:8, 14:25
discussing [1] - 43:23
discussion [2] - 18:24, 35:2
dismiss [5] - 2:4, 26:12, 26:16, 35:24, 44:7
dismissed [7] - 2:24, 26:11, 26:18, 34:10, 40:11, 42:23, 43:6
dispute [4] - 4:14, 17:2, 19:14, 35:23
disregarded [1] - 42:3
distinguish [2] - 12:8, 12:9
DISTRICT [3] - 1:1, 1:1, 1:12
district [18] - 3:9, 3:17, 4:18, 4:20, 4:23, 4:25, 5:16, 6:1, 9:7, 9:9, 9:16, 9:20, 9:23, 10:3, 15:19, 20:18, 24:21, 24:22
District [7] - 6:12, 6:14, 7:6, 9:10, 12:4, 20:20, 43:3
DIVISION [1] - 1:15
doctrine [1] - 22:1
document [9] - 11:25, 32:9, 32:11, 32:12, 35:5, 35:8, 35:10, 35:12, 36:12
documents [1] - 35:3
Dodd [5] - 17:3, 23:17, 24:6, 24:11, 24:14
Dodd-Frank [4] - 17:3, 24:6, 24:11, 24:14
dollars [1] - 8:18
done [3] - 21:1, 22:15, 32:12
double [1] - 42:1
down [4] - 41:21, 41:22
drained [1] - 34:24
drive [1] - 30:2

4

**during** [1] - 5:8

## E

**E-mail** [1] - 1:23
**Eastern** [2] - 9:9, 20:20
**EASTERN** [1] - 1:1
**easy** [1] - 37:23
**effect** [1] - 37:1
**effects** [1] - 12:11
**either** [2] - 14:2, 39:10
**Elaine** [1] - 11:9
**elderly** [1] - 7:23
**elephant** [1] - 20:12
**elephants** [1] - 20:3
**eluded** [1] - 34:21
**emails** [1] - 9:2
**emphasize** [1] - 23:22
**employ** [2] - 23:21
**employee** [2] - 13:11, 13:13
**employees** [4] - 12:25, 13:3, 14:12, 15:22
**employer** [1] - 26:10
**enactment** [1] - 18:2
**end** [1] - 23:19
**enforce** [1] - 27:25
**ENFORCEMENT** [1] - 1:15
**enforcement** [1] - 27:25
**entire** [4] - 18:13, 18:20, 27:1, 38:1
**entirely** [1] - 19:14
**entity** [2] - 14:2, 16:10
**equivalent** [1] - 31:4
**ESQ** [6] - 1:17, 1:17, 1:18, 1:18, 1:21, 1:22
**essentially** [1] - 28:18
**establish** [1] - 15:1
**established** [1] - 13:14
**establishes** [1] - 21:13
**et** [1] - 1:8
**Evercrete** [1] - 42:22
**evidence** [1] - 35:16
**exact** [2] - 22:18, 26:9
**exactly** [2] - 4:23, 40:23
**example** [3] - 11:24, 41:17, 43:17
**examples** [5] - 25:18, 25:21, 41:16, 43:16
**exception** [5] - 19:12, 26:23, 27:11, 27:13, 27:15
**excerpt** [1] - 27:21
**Exchange** [4] - 18:4, 18:16, 19:2, 19:12
**excluded** [1] - 17:4
**exclusive** [2] - 39:4, 39:6
**excuse** [2] - 15:21, 32:3
**exempt** [1] - 19:24
**exempted** [2] - 19:15, 19:24
**exemption** [1] - 19:11
**exercise** [1] - 27:7
**Exhibit** [3] - 37:17, 37:18, 38:3
**exists** [1] - 37:23
**expand** [2] - 19:3, 20:1

**expanded** [2] - 17:6, 23:16
**expansion** [1] - 22:22
**expect** [4] - 2:22, 29:23, 31:17, 42:1
**experience** [2] - 29:15, 37:10
**explain** [2] - 22:9, 38:10
**expressly** [1] - 6:9
**extremely** [1] - 28:9

## F

**face** [1] - 21:22
**fact** [7] - 4:21, 11:15, 14:16, 27:10, 29:22, 37:6, 42:2
**factor** [1] - 6:10
**factors** [2] - 4:4, 10:7
**facts** [8] - 3:13, 3:14, 5:4, 25:8, 25:25, 26:4, 26:14, 32:20
**factual** [1] - 35:20, 35:23
**fair** [1] - 28:5
**fairly** [1] - 42:15
**false** [9] - 30:23, 31:1, 31:2, 31:8, 31:15, 41:8, 44:9
**falsehoods** [1] - 30:22
**falsely** [2] - 41:18, 41:23
**far** [5] - 3:21, 13:12, 25:7, 35:22
**federal** [4] - 20:2, 21:13, 22:3, 24:7
**Figueroa** [1] - 1:20
**figure** [1] - 6:24
**figures** [1] - 20:25
**file** [1] - 13:25
**filed** [8] - 5:10, 6:2, 6:13, 6:15, 6:16, 9:19, 15:12, 36:22
**filing** [1] - 6:15
**fine** [1] - 36:3
**firm** [13] - 7:24, 8:2, 8:13, 8:14, 8:15, 10:4, 10:17, 11:12, 11:20, 11:22, 11:25, 12:17
**first** [4] - 8:8, 17:8, 22:16, 34:20
**firsthand** [1] - 10:18
**Fisher** [13] - 2:2, 10:19, 10:21, 11:10, 11:22, 12:1, 13:13, 14:12, 16:12, 33:8, 38:23, 39:3, 42:5
**FISHER** [1] - 1:8
**fit** [3] - 26:1, 26:2, 26:3
**five** [3] - 9:22, 39:22, 39:23
**Floor** [1] - 1:15
**Florida** [1] - 3:24
**focussed** [1] - 13:20
**focussing** [1] - 8:4
**FOR** [1] - 1:11
**forces** [1] - 38:18
**former** [1] - 26:10
**forth** [1] - 25:5
**forum** [1] - 10:12
**Frank** [5] - 17:3, 23:17, 24:6, 24:11, 24:14
**frankly** [2] - 15:23, 23:20
**fraud** [13] - 4:6, 7:18, 10:20, 13:21, 25:12, 26:2, 26:6, 26:15, 34:6, 34:25, 37:6, 40:22, 40:24
**fraudulent** [2] - 12:6, 25:24, 33:20

**full** [1] - 30:5
**fully** [2] - 20:21, 32:20
**fundamental** [1] - 22:2
**fundamentally** [2] - 20:4, 21:16
**funds** [3] - 11:14, 34:24, 42:7
**furthermore** [2] - 25:10, 26:4
**future** [1] - 23:24
**futures** [2] - 26:8, 27:5
**Futures** [1] - 23:2
**FUTURES** [2] - 1:3, 1:14

## G

**GAURAV** [1] - 1:22
**Gaurav** [1] - 2:8
**generalizations** [1] - 29:3
**generally** [1] - 10:11
**gentlemen** [1] - 44:16
**genuinely** [1] - 15:12
**given** [6] - 4:16, 4:18, 4:21, 10:12, 31:24, 37:3
**gold** [5] - 11:16, 30:14, 30:15, 30:25, 42:2
**Government** [1] - 4:5
**grains** [1] - 25:21
**granted** [2] - 4:22, 15:20
**great** [1] - 37:8
**greatest** [1] - 13:24
**grossly** [1] - 42:7
**group** [3] - 10:25, 11:1, 13:5
**Group** [1] - 42:5
**GSA** [1] - 2:22
**guarantee** [1] - 11:14
**guaranteed** [1] - 11:17
**guess** [1] - 2:25
**guy** [1] - 31:5

## H

**H-Cap** [1] - 42:22
**half** [5] - 11:18, 29:24, 33:5, 36:21, 42:4
**handful** [1] - 3:18
**handled** [1] - 6:21
**hard** [1] - 2:20
**head** [1] - 22:17
**hear** [4] - 2:20, 2:23, 19:18, 30:15
**heavy** [4] - 14:25, 29:2, 29:3
**held** [1] - 40:9
**help** [1] - 11:13
**helpful** [1] - 14:17
**hide** [2] - 20:3, 42:14
**higher** [1] - 32:21
**hired** [2] - 7:23, 8:16
**history** [14] - 10:22, 11:13, 17:23, 18:1, 18:8, 18:9, 18:24, 19:7, 22:10, 22:19, 22:21, 22:22, 27:22, 28:6
**hits** [1] - 22:17
**hoc** [1] - 15:11
**hold** [1] - 17:24
**Honor** [46] - 2:7, 2:11, 2:18, 3:5, 3:7, 6:6, 7:11, 7:16, 10:6, 13:18, 14:22,

16:11, 17:11, 19:18, 22:6, 22:17,
22:24, 23:18, 24:9, 24:17, 26:21,
28:25, 31:13, 33:8, 34:13, 35:9, 36:1,
36:9, 36:25, 37:18, 37:21, 38:2, 39:11,
39:22, 40:15, 40:23, 41:1, 41:15,
42:18, 43:8, 43:22, 44:17, 44:18,
44:19, 44:20, 44:21
**Honor's** [2] - 22:20, 34:20
**HONORABLE** [1] - 1:12
**hotel** [1] - 6:18
**hundreds** [1] - 10:1
**hypotheticals** [2] - 25:6, 25:8

## I

**identified** [15] - 5:1, 5:2, 5:9, 5:11, 5:18,
7:3, 8:19, 15:10, 15:21, 16:4, 19:6,
30:16, 30:17, 30:18, 34:3
**identifies** [2] - 28:10, 28:14
**identify** [11] - 14:13, 15:23, 15:24,
31:20, 31:21, 34:6, 37:1, 42:19, 42:23,
43:11
**identity** [2] - 10:21, 14:9
**ignores** [1] - 25:10
**implications** [1] - 21:17
**important** [6] - 5:22, 10:10, 12:13, 15:7,
23:9, 40:17
**impressed** [1] - 20:7
**inadequate** [1] - 14:7
**inclined** [1] - 37:5
**included** [2] - 36:18, 40:20
**including** [1] - 40:24
**inclusion** [1] - 37:4
**Indian** [1] - 31:5
**indication** [1] - 11:23
**indirectly** [1] - 23:21
**individual** [5] - 3:11, 5:18, 16:3, 29:5,
44:2
**individuals** [1] - 42:12
**inducement** [1] - 33:20
**industry** [1] - 37:10
**inform** [1] - 37:13
**information** [2] - 13:9, 14:9
**instance** [1] - 22:18
**instantaneous** [1] - 11:17
**instantly** [1] - 42:4
**instruments** [1] - 18:7
**insufficient** [1] - 3:3
**integral** [3] - 35:14, 36:10, 36:17
**integrity** [1] - 23:12
**intend** [4] - 14:6, 14:10, 14:15
**intended** [4] - 17:16, 17:18, 22:15,
28:21
**intending** [1] - 19:3
**intent** [2] - 18:20, 20:1
**intention** [2] - 11:4, 19:16
**interesting** [1] - 11:1
**interpretation** [2] - 17:23, 20:9
**interpreting** [1] - 21:6
**interstate** [3] - 16:25, 17:13, 23:24
**introduced** [1] - 8:8

**introducing** [1] - 8:11
**invest** [2] - 30:24
**investigation** [1] - 36:21
**investigator** [1] - 5:11
**investing** [1] - 30:13
**investment** [4] - 29:17, 30:7, 33:19,
37:12
**invoke** [1] - 21:24
**involves** [1] - 16:21
**IRA** [1] - 30:24
**irrelevant** [1] - 5:10
**issue** [25] - 4:9, 7:10, 10:2, 12:5, 12:13,
15:5, 16:17, 16:19, 20:5, 20:7, 20:16,
20:21, 23:20, 24:8, 24:23, 26:11,
26:13, 27:6, 27:19, 28:5, 34:21, 35:20,
40:11, 44:11, 44:12
**issues** [4] - 12:10, 21:1, 26:16, 44:15
**item** [1] - 31:21
**itself** [2] - 11:23, 37:20

## J

**JACOB** [1] - 1:17
**Jacob** [1] - 2:12
**Judge** [2] - 12:4, 20:23
**JUDGE** [1] - 1:12
**judicial** [1] - 36:10
**June** [3] - 39:15, 39:20, 40:2
**jurisdiction** [22] - 16:20, 17:4, 17:6,
18:13, 19:4, 19:9, 20:1, 21:13, 22:9,
22:13, 22:23, 23:16, 24:5, 24:8, 24:20,
24:21, 24:23, 25:7, 25:9, 25:11, 26:17,
26:20
**jurisdictional** [1] - 16:19
**justification** [1] - 15:11

## K

**Katherine** [1] - 2:13
**KATHERINE** [1] - 1:18
**Katie** [1] - 34:13
**key** [2] - 10:6, 10:20
**kind** [9] - 15:10, 21:22, 23:11, 25:5,
26:6, 26:9, 28:20, 33:25, 42:9
**kinds** [1] - 26:7
**knowledge** [4] - 10:18, 11:9, 11:24
**known** [2] - 24:19, 38:25

## L

**lack** [1] - 43:23
**lacks** [1] - 29:5
**ladies** [1] - 44:16
**language** [21] - 17:9, 17:16, 17:19,
17:20, 17:23, 17:24, 18:15, 18:23,
18:25, 19:2, 19:17, 19:25, 21:21, 22:9,
22:17, 22:21, 23:18, 24:3, 26:23,
28:17
**largest** [2] - 3:23, 16:8
**last** [4] - 28:23, 38:3, 38:7, 38:12
**law** [10] - 4:9, 4:19, 12:24, 15:15, 15:20,
17:21, 20:3, 23:7, 23:10, 36:16

**lawyers** [1] - 6:9
**leaning** [1] - 2:21
**least** [1] - 32:19
**leaves** [1] - 32:18
**left** [3] - 36:23, 36:24
**legislation** [1] - 23:6
**legislative** [12] - 17:22, 18:1, 18:8, 18:9,
18:24, 19:7, 22:10, 22:19, 22:21,
22:22, 27:22, 28:6
**lengthy** [1] - 11:21
**less** [2] - 3:19, 13:1
**leverage** [3] - 16:21, 18:5, 27:6
**leveraged** [4] - 17:7, 27:5, 27:8, 28:1
**liable** [1] - 40:9
**lies** [1] - 34:23
**life** [1] - 30:24
**limit** [1] - 25:11
**limitation** [1] - 25:13
**limitations** [3] - 25:10, 35:8, 39:18
**Limited** [1] - 42:22
**limited** [3] - 21:13, 28:12, 28:14
**line** [3] - 20:11, 23:10, 25:8
**liquidating** [1] - 11:16
**list** [1] - 39:5
**lists** [2] - 25:18, 25:20
**literal** [1] - 18:2
**litigate** [1] - 6:8
**LLC** [2] - 1:8, 2:3
**LLP** [1] - 1:19
**located** [10] - 4:9, 4:11, 5:5, 5:14, 5:17,
9:5, 9:6, 9:12, 13:25, 14:4
**location** [7] - 8:11, 12:12, 12:13, 12:25,
13:1, 13:23, 14:14
**locus** [3] - 3:13, 5:3, 12:11
**look** [24] - 3:13, 4:3, 4:7, 4:10, 4:12,
4:24, 6:7, 7:1, 13:6, 15:15, 17:1, 17:9,
17:22, 18:1, 18:8, 18:9, 18:11, 20:18,
22:19, 22:20, 22:21, 26:7, 41:16
**looking** [7] - 4:5, 5:3, 5:4, 5:6, 12:5,
39:17, 40:11
**Los** [1] - 1:20
**lose** [2] - 11:18, 29:24
**lost** [3] - 30:19, 31:11, 42:4
**lying** [1] - 37:9

## M

**MacGregor** [2] - 1:18, 2:12
**mail** [1] - 1:23
**main** [1] - 3:14
**major** [2] - 3:21, 22:1
**majority** [1] - 40:21
**management** [1] - 37:10
**Manhattan** [2] - 9:13, 9:17
**manifest** [2] - 18:3, 18:5
**manipulate** [1] - 18:20
**manipulated** [1] - 18:18
**manipulation** [9] - 18:17, 23:3, 23:10,
25:12, 26:3, 27:24, 28:1
**manipulative** [1] - 23:24

**March** [2] - 41:18, 41:24
**margin** [1] - 29:22
**Maria** [1] - 22:25
**market** [5] - 7:24, 8:18, 26:8, 28:3, 38:18
**marketed** [2] - 8:24, 11:11
**marketing** [16] - 7:24, 8:2, 8:13, 8:14, 8:15, 9:1, 9:5, 10:4, 10:17, 10:25, 11:20, 11:22, 11:25, 13:4, 13:14, 15:7
**marketplace** [1] - 38:23
**markets** [4] - 18:18, 23:4, 23:13, 28:2
**markup** [17] - 32:16, 32:21, 33:4, 33:9, 34:15, 34:16, 34:18, 34:22, 35:2, 37:9, 37:14, 37:23, 39:1, 41:6, 41:9, 41:12
**markups** [2] - 35:6, 42:8
**material** [7] - 4:17, 4:19, 4:22, 15:18, 31:10, 34:1
**materially** [1] - 15:1
**materials** [1] - 9:1
**matter** [2] - 40:6, 44:22
**mean** [23] - 9:10, 13:11, 15:6, 15:10, 17:18, 19:6, 20:10, 21:19, 21:21, 25:1, 25:3, 29:13, 30:11, 30:14, 31:14, 32:19, 33:24, 36:5, 38:19, 40:5, 40:9, 40:10, 41:13
**meaning** [1] - 11:11
**means** [3] - 22:9, 40:8, 44:12
**meant** [4] - 19:8, 25:2, 38:10
**meet** [1] - 15:16
**meets** [1] - 44:10
**mention** [2] - 35:13, 36:12
**mentioned** [2] - 5:20, 13:23
**merely** [1] - 24:25
**Mermelstein** [1] - 2:12
**MERMELSTEIN** [32] - 1:17, 2:11, 7:11, 7:13, 7:15, 7:22, 8:3, 8:15, 8:23, 9:1, 9:6, 9:12, 9:15, 9:18, 9:22, 10:1, 10:6, 10:10, 10:16, 11:3, 11:8, 12:9, 12:18, 12:24, 13:7, 13:12, 13:17, 13:20, 14:22, 31:13, 37:21, 44:17
**messed** [1] - 17:20
**metals** [18] - 16:15, 16:16, 16:23, 25:19, 26:6, 26:8, 26:15, 28:10, 28:12, 28:15, 31:19, 38:17, 38:22, 39:3, 39:4, 39:7, 41:25
**microphone** [2] - 2:20, 2:21
**might** [2] - 23:5, 35:21
**mind** [1] - 3:5
**mislead** [1] - 30:18
**misleading** [1] - 12:2
**misremembering** [1] - 29:10
**misrepresentation** [1] - 5:5
**misrepresentations** [8] - 4:7, 4:8, 4:12, 5:6, 16:4, 37:7, 41:6, 43:24
**misrepresenting** [1] - 10:21
**missed** [1] - 43:19
**Monex** [1] - 20:13
**money** [4] - 8:16, 30:24, 31:12, 42:1
**months** [1] - 42:1
**moreover** [1] - 27:9

**morning** [3] - 2:11, 7:13, 7:14
**most** [2] - 10:10, 20:25
**motion** [20] - 2:4, 3:6, 3:7, 3:15, 4:4, 7:15, 7:16, 8:7, 8:9, 11:21, 14:8, 14:22, 14:24, 15:17, 26:12, 26:16, 26:18, 35:24, 44:7
**mousehole** [1] - 20:13
**mouseholes** [1] - 20:4
**moved** [1] - 24:20
**MR** [94] - 2:7, 2:11, 2:18, 3:5, 3:23, 4:3, 4:17, 6:6, 6:23, 7:11, 7:13, 7:15, 7:22, 8:3, 8:15, 8:23, 9:1, 9:6, 9:12, 9:15, 9:18, 9:22, 10:1, 10:6, 10:10, 10:16, 11:3, 11:8, 12:9, 12:18, 12:24, 13:7, 13:12, 13:17, 13:20, 14:22, 15:6, 16:11, 16:15, 16:18, 17:1, 17:11, 17:15, 17:21, 19:1, 19:18, 19:22, 20:9, 20:15, 20:24, 21:4, 21:8, 21:11, 21:25, 27:21, 28:13, 28:25, 29:11, 29:18, 29:25, 30:16, 31:3, 31:13, 31:18, 32:3, 32:6, 32:10, 32:13, 33:3, 33:7, 33:22, 34:9, 36:9, 36:14, 37:18, 37:21, 38:2, 38:6, 38:8, 38:12, 38:15, 38:20, 40:5, 40:14, 40:23, 42:18, 42:21, 43:3, 43:8, 43:15, 43:19, 44:17, 44:18, 44:19
**MS** [26] - 22:6, 22:11, 22:16, 24:9, 24:14, 24:17, 25:18, 25:25, 27:3, 27:5, 34:13, 34:19, 35:9, 35:18, 36:25, 39:11, 39:13, 39:20, 39:22, 39:25, 41:1, 41:11, 41:23, 43:20, 44:20, 44:21
**multiple** [2] - 6:13, 6:19

**N**

**nail** [1] - 22:17
**name** [7] - 9:7, 31:5, 31:7, 34:6, 37:9, 43:6, 43:7
**named** [3] - 8:21, 12:22, 13:5
**names** [6] - 31:1, 31:2, 31:8, 42:11, 43:9, 43:10
**narrow** [1] - 24:20
**narrowed** [1] - 24:21
**national** [1] - 13:21
**nationwide** [1] - 25:23
**natural** [1] - 27:12
**nature** [1] - 6:22
**necessarily** [1] - 30:12
**need** [5] - 8:6, 14:8, 22:19, 23:6, 44:14
**needed** [2] - 27:25, 42:19
**needs** [4] - 6:25, 21:18, 22:1, 31:20
**never** [10] - 18:22, 19:10, 20:1, 22:13, 26:25, 28:6, 28:7, 28:21, 39:16
**NEW** [1] - 1:1
**new** [3] - 8:1, 19:25, 27:24
**New** [16] - 1:5, 1:16, 5:14, 6:18, 7:19, 7:21, 7:23, 7:24, 7:25, 8:2, 8:20, 9:6, 9:10, 20:20, 43:4
**next** [4] - 15:5, 16:17, 16:18, 23:23
**Ninth** [1] - 20:6
**nobody** [2] - 18:10, 18:11

**non** [2] - 16:21, 17:7
**non-leverage** [1] - 16:21
**non-leveraged** [1] - 17:7
**none** [1] - 25:7
**nonviable** [1] - 7:17
**note** [1] - 39:13
**nothing** [1] - 28:4
**notice** [2] - 36:10, 42:15
**number** [7] - 2:3, 3:24, 13:24, 16:8, 22:25, 29:13, 40:15
**numismatic** [1] - 39:4, 39:6, 42:7
**NY** [1] - 1:16

**O**

**obvious** [1] - 31:7
**obviously** [3] - 15:22, 20:10, 31:6
**occurred** [3] - 3:12, 19:14, 40:16
**odd** [1] - 22:7
**OF** [3] - 1:1, 1:11, 1:15
**offer** [1] - 14:11
**office** [1] - 9:12
**one** [30] - 5:1, 5:7, 7:7, 8:20, 11:21, 12:10, 13:9, 13:17, 14:18, 15:23, 17:25, 20:20, 22:5, 24:15, 25:13, 25:19, 27:11, 27:14, 29:9, 29:11, 33:17, 33:19, 34:16, 34:22, 35:4, 36:5, 36:15, 36:19, 42:1, 42:13
**ongoing** [1] - 16:10
**online** [2] - 9:2, 11:20
**open** [1] - 2:1
**operating** [2] - 10:22, 11:13
**operations** [2] - 3:11, 16:6
**operative** [5] - 3:13, 3:14, 5:4, 5:8, 12:11
**opinion** [1] - 44:16
**optimism** [1] - 33:25
**ORAL** [1] - 1:11
**oral** [1] - 2:3
**order** [2] - 3:4, 26:3
**ordinary** [3] - 19:4, 29:19, 32:14
**original** [2] - 21:9, 21:11
**outlined** [1] - 15:8
**outside** [3] - 10:3, 36:6, 39:8
**over-priced** [1] - 31:19
**overall** [2] - 3:19, 10:22
**overcharged** [1] - 31:22
**overpriced** [1] - 42:7
**own** [1] - 36:25

**P**

**p.m** [1] - 1:7
**page** [3] - 38:2, 38:5, 42:21
**pages** [1] - 29:2
**paid** [1] - 8:16
**papers** [4] - 11:21, 29:1, 36:2, 36:8
**paragraph** [11] - 38:13, 38:15, 38:21, 38:22, 39:2, 41:16, 42:21, 43:20, 44:3
**PARISI** [1] - 1:23
**part** [7] - 5:22, 10:20, 13:25, 15:7,

15:12, 24:5, 36:9
**particular** [3] - 25:18, 39:7, 44:2
**parties** [4] - 2:5, 7:2, 17:2, 17:4
**party** [9] - 10:13, 10:14, 10:15, 11:7, 12:14, 12:20, 12:22, 13:2
**pass** [1] - 18:12
**passed** [1] - 18:10
**passing** [1] - 28:21
**past** [2] - 40:22, 40:24
**pay** [1] - 6:18
**paying** [1] - 33:5
**people** [16] - 7:3, 8:21, 12:19, 12:21, 13:4, 13:5, 23:5, 23:13, 30:15, 30:23, 31:11, 34:17, 34:24, 41:2, 41:3, 41:9
**percent** [11] - 3:19, 32:22, 32:23, 32:25, 33:1, 33:9, 37:9, 39:6, 41:14, 42:8
**period** [6] - 5:8, 39:18, 40:1, 40:9, 40:18, 40:19
**person** [4] - 5:4, 5:14, 12:16, 23:20
**person's** [1] - 31:7
**personal** [1] - 29:8
**pervert** [2] - 17:23, 18:3
**phone** [1] - 5:12
**phrase** [2] - 17:12, 23:23
**picked** [2] - 40:18, 41:1
**piece** [1] - 34:23
**place** [2] - 14:21, 23:7
**plain** [2] - 17:9, 17:23
**plaintiff** [2] - 2:13, 14:23
**Plaintiff** [2] - 1:4, 1:14
**plaintiff's** [5] - 4:15, 7:8, 10:12, 22:4, 44:6
**plenty** [1] - 14:3
**point** [8] - 10:12, 19:23, 22:24, 23:18, 34:7, 40:24, 42:10, 44:4
**pointed** [2] - 11:25, 29:1
**points** [2] - 12:3, 34:19
**PORTER** [63] - 1:21, 2:7, 2:18, 3:5, 3:23, 4:3, 4:17, 6:6, 6:23, 15:6, 16:11, 16:15, 16:18, 17:1, 17:11, 17:15, 17:21, 19:1, 19:18, 19:22, 20:9, 20:15, 20:24, 21:4, 21:8, 21:11, 21:25, 27:21, 28:13, 28:25, 29:11, 29:18, 29:25, 30:16, 31:3, 31:18, 32:3, 32:6, 32:10, 32:13, 33:3, 33:7, 33:22, 34:9, 36:9, 36:14, 37:18, 38:2, 38:6, 38:8, 38:12, 38:15, 38:20, 40:5, 40:14, 40:23, 42:18, 42:21, 43:3, 43:8, 43:15, 43:19, 44:18
**Porter** [2] - 2:8, 2:16
**portion** [2] - 19:20, 33:19
**portray** [2] - 10:19, 11:23
**position** [3] - 10:24, 19:19, 19:22
**post** [2] - 15:11, 35:12
**potential** [2] - 10:25, 12:20
**potentially** [3] - 12:2, 14:12, 40:1
**powers** [3] - 21:18, 21:19, 21:24
**practice** [1] - 42:11
**pre** [1] - 7:15
**pre-motion** [1] - 7:15

**precious** [17] - 16:15, 16:16, 16:23, 25:19, 26:6, 26:8, 26:15, 28:10, 28:12, 28:14, 38:17, 38:22, 39:3, 39:4, 39:6, 41:25
**present** [2] - 11:4, 26:5
**presented** [4] - 12:7, 20:12, 20:17
**preservation** [1] - 11:12
**presumably** [2] - 5:13, 40:8
**presumptuous** [1] - 37:22
**previous** [1] - 38:20
**price** [11] - 27:24, 27:25, 28:1, 30:5, 31:23, 32:15, 33:10, 38:24, 39:3, 42:2
**priced** [1] - 31:19
**principal** [1] - 15:22
**principle** [1] - 11:14
**print** [1] - 36:3
**private** [2] - 42:11, 43:12
**pro** [3] - 20:20, 20:21, 21:1
**problem** [2] - 6:15, 29:12
**proceed** [2] - 26:12, 26:19
**Proceedings** [1] - 1:24
**produced** [1] - 1:25
**product** [3] - 25:24, 29:22, 38:8
**products** [2] - 38:18, 39:5
**profit** [2] - 11:18, 29:22
**promulgate** [1] - 24:1
**promulgated** [1] - 24:2
**prongs** [1] - 2:25
**propriety** [1] - 14:23
**protect** [1] - 11:13
**protected** [1] - 30:7
**protecting** [1] - 23:12
**protection** [1] - 23:8
**provide** [3] - 10:23, 14:8, 14:17
**provided** [1] - 34:11
**provides** [1] - 13:14
**puffery** [1] - 33:25
**pulling** [1] - 28:15
**purchase** [5] - 30:2, 31:20, 32:5, 38:17, 38:24
**purported** [1] - 5:25
**purpose** [5] - 17:24, 18:3, 18:5, 18:14, 18:20
**pursued** [1] - 18:17
**push** [1] - 11:15
**put** [4] - 36:2, 42:11, 42:15, 43:10
**puts** [1] - 25:5

---

**Q**

**qualify** [1] - 25:15
**quantity** [1] - 38:17
**questions** [1] - 22:1
**quote** [1] - 11:6
**quote/unquote** [1] - 30:19
**quoted** [1] - 19:20
**Quotes** [2] - 38:7, 38:8
**quotes** [1] - 39:3

---

**R**

**raise** [1] - 35:20
**raised** [3] - 16:19, 20:5, 26:11
**ranges** [1] - 39:8
**ranging** [1] - 42:8
**RASOR** [16] - 1:18, 34:13, 34:19, 35:9, 35:18, 36:25, 39:11, 39:13, 39:20, 39:22, 39:25, 41:1, 41:11, 41:23, 43:20, 44:20
**Rasor** [2] - 2:13, 34:13
**rather** [1] - 15:12
**reach** [2] - 20:10, 26:5
**read** [4] - 27:22, 38:1, 43:18, 43:20
**reading** [1] - 28:5
**real** [2] - 12:5, 15:12
**really** [7] - 3:14, 23:19, 24:4, 35:22, 35:23, 37:13, 37:14
**reason** [1] - 35:15
**reasons** [2] - 15:23, 31:3
**received** [3] - 4:11, 36:20, 39:16
**receiving** [2] - 5:5, 37:22
**recent** [2] - 6:14, 17:6
**recently** [1] - 5:9
**recklessly** [1] - 42:3
**recklessness** [1] - 18:19
**record** [1] - 22:25
**recorded** [2] - 1:24, 32:23
**records** [2] - 5:13
**Red** [1] - 26:12
**refer** [2] - 33:24, 35:4, 36:14
**reference** [1] - 5:21
**regarding** [3] - 8:5, 8:6, 8:7
**regulate** [2] - 18:5, 18:14
**regulating** [1] - 28:8
**regulation** [2] - 21:12, 24:2
**regulations** [1] - 24:1
**regulatory** [2] - 19:23, 28:20
**relevant** [5] - 4:4, 11:24, 27:9, 27:15, 40:1
**relies** [1] - 20:19
**rely** [4] - 23:13, 24:25, 26:23, 30:12
**remain** [1] - 2:19
**remember** [2] - 9:7, 41:9
**renders** [1] - 23:20
**repeated** [1] - 30:21
**replay** [1] - 15:4
**replete** [1] - 31:15
**reply** [3] - 4:10, 34:10, 42:21
**Reporter** [1] - 1:23
**reporter** [1] - 41:22
**representation** [1] - 41:8
**representations** [1] - 44:1
**representative** [2] - 10:17, 11:9
**representatives** [1] - 16:3
**representing** [1] - 6:9
**reputation** [1] - 6:4
**request** [1] - 36:10
**required** [3] - 8:11, 15:16, 32:20
**requirement** [2] - 18:19

**requirements** [1] - 44:10
**reserve** [1] - 44:11
**residents** [2] - 7:25, 8:18
**resolve** [1] - 20:6
**respect** [4] - 3:7, 10:24, 15:14, 43:22
**respectfully** [2] - 5:24, 7:5
**response** [1] - 20:14
**restructure** [1] - 20:4
**restructuring** [1] - 21:16
**retail** [12] - 16:22, 18:7, 18:14, 19:4, 19:9, 28:2, 29:18, 29:19, 30:5, 32:14, 33:8, 33:10
**retirement** [9] - 11:14, 11:15, 11:16, 11:19, 34:24, 41:19, 41:25, 42:4, 42:6
**revealed** [2] - 34:16, 34:18
**reviewed** [1] - 44:6
**rise** [1] - 42:2
**river** [1] - 9:13
**Rock** [1] - 26:13
**Rockland** [2] - 9:8, 10:5
**role** [2] - 8:25, 22:8
**rooms** [1] - 6:18
**routinely** [1] - 11:18
**RPR** [1] - 1:23
**rule** [1] - 11:4
**rules** [1] - 23:25

## S

**S3348** [1] - 22:25
**safe** [1] - 37:12
**Safeguard** [1] - 26:10
**safety** [1] - 33:18
**sale** [6] - 16:25, 17:13, 23:23, 32:8, 32:12, 32:13
**sales** [5] - 16:3, 16:22, 27:8, 32:24, 33:24
**salespeople** [2] - 10:21, 16:7
**satisfy** [1] - 15:16
**savings** [1] - 30:24
**saw** [3] - 35:16, 37:2
**scheme** [1] - 37:14
**scienter** [1] - 18:18
**se** [3] - 20:20, 20:21, 21:1
**seated** [2] - 2:15, 2:19
**second** [4] - 3:25, 13:18, 16:7, 17:25
**Second** [2] - 17:21, 36:16
**section** [1] - 19:21
**secure** [3] - 30:25, 37:12
**Securities** [3] - 18:16, 19:2, 26:13
**see** [2] - 24:25, 40:3
**seem** [2] - 6:15, 22:7
**sell** [5] - 30:4, 30:8, 33:8, 33:14, 37:8
**selling** [5] - 16:13, 25:24, 26:14, 29:20
**semi** [1] - 42:7
**semi-numismatic** [1] - 42:7
**Senator** [4] - 22:24, 23:1, 23:14, 27:22
**senator** [1] - 18:11
**sentence** [2] - 38:4, 38:7
**sentences** [1] - 38:12

**separation** [3] - 21:18, 21:19, 21:24
**serious** [1] - 21:17
**serve** [1] - 14:1
**services** [3] - 8:18, 10:23, 13:14
**set** [1] - 19:24
**setting** [1] - 35:1
**setup** [2] - 2:20, 2:21
**several** [1] - 2:25
**shall** [3] - 24:1, 26:24, 27:1
**shared** [1] - 36:22
**shipping** [9] - 31:24, 32:1, 32:4, 32:7, 32:22, 35:13, 36:7, 36:14, 36:15
**show** [1] - 13:8
**showed** [2] - 27:10, 30:19
**showing** [2] - 14:19, 14:20
**shows** [2] - 18:9, 27:12
**side** [1] - 39:10
**sides'** [1] - 27:18
**sign** [3] - 32:7, 32:11, 35:17
**significant** [1] - 40:14
**signing** [1] - 41:3
**signs** [1] - 36:3
**silver** [1] - 11:16, 42:2
**similar** [3] - 18:15, 19:2, 26:14
**simple** [1] - 16:22
**simply** [5] - 16:9, 18:15, 26:4, 27:9, 27:15
**single** [4] - 12:16, 30:16, 30:17, 30:18
**six** [2] - 8:19, 42:1
**sloppy** [1] - 21:23
**slow** [1] - 41:21
**smaller** [1] - 40:15
**solicited** [1] - 7:22
**someone** [1] - 37:9
**somewhere** [1] - 15:10
**sorry** [3] - 19:18, 41:23, 43:2
**sort** [7] - 13:4, 20:7, 34:21, 35:1, 35:3, 35:12, 35:21
**sorts** [1] - 19:9
**Southern** [2] - 12:4, 43:3
**specific** [21] - 14:9, 15:24, 15:25, 18:20, 18:24, 19:11, 28:5, 29:4, 31:20, 34:3, 41:7, 41:10, 41:15, 41:17, 42:10, 42:24, 43:11, 43:16, 43:24, 44:1
**specifically** [6] - 8:19, 26:24, 27:24, 28:10, 28:14, 34:6
**specifics** [1] - 42:15
**speculate** [1] - 6:2
**Spellane** [7] - 15:22, 37:19, 38:3, 41:18, 41:23, 42:3, 42:6
**Spellane's** [1] - 26:10
**spread** [5] - 33:3, 38:11, 38:13, 38:25, 39:1
**spreads** [5] - 38:16, 38:19, 39:2, 39:6
**squarely** [2] - 24:4, 26:17
**standing** [1] - 2:21
**start** [1] - 3:6
**starting** [2] - 10:11, 44:4
**state** [3] - 2:5, 3:3, 13:23
**State** [1] - 9:6

**statement** [2] - 22:24, 37:16
**statements** [18] - 4:13, 12:1, 12:6, 29:3, 29:4, 30:12, 30:13, 30:21, 30:23, 31:8, 31:9, 31:15, 31:16, 33:25, 34:2, 42:24, 43:24, 44:9
**states** [2] - 8:19
**STATES** [2] - 1:1, 1:12
**States** [1] - 1:5
**statue** [1] - 18:4
**statute** [17] - 3:1, 17:9, 17:10, 17:24, 18:2, 18:16, 19:15, 21:7, 21:12, 21:21, 22:21, 24:18, 25:20, 28:22, 35:7, 44:12
**stenography** [1] - 1:24
**still** [1] - 16:12
**store** [2] - 29:20, 29:21
**Street** [1] - 1:20
**strengthens** [1] - 23:2
**strikes** [1] - 15:11
**strong** [3] - 21:2, 23:10, 23:11
**structure** [4] - 19:23, 21:9, 21:11, 22:2
**submission** [1] - 14:7
**submit** [2] - 3:15, 7:5
**submitted** [2] - 4:25, 15:14
**subsection** [2] - 26:24, 27:2, 27:12
**subsequent** [2] - 40:20, 44:15
**substantial** [13] - 3:8, 3:16, 4:17, 4:20, 4:23, 5:16, 5:25, 6:17, 7:2, 7:19, 7:20, 8:16, 15:18
**successful** [1] - 11:13
**sued** [1] - 11:3
**sufficient** [5] - 15:16, 30:22, 31:10, 44:8, 44:14
**suggest** [1] - 40:6
**Suite** [2] - 1:15, 1:20
**summarize** [1] - 5:12
**summary** [3] - 5:12, 5:14, 5:17
**support** [1] - 27:23
**supporting** [1] - 8:9
**supports** [1] - 22:22
**supposedly** [2] - 31:22, 42:7
**Supreme** [1] - 20:2
**swap** [1] - 23:22
**swaps** [1] - 23:4

## T

**talks** [2] - 12:4, 38:13
**TALWAR** [1] - 1:22, 44:19
**Talwar** [1] - 2:8
**ten** [4] - 24:10, 24:13, 29:24, 30:3
**tens** [1] - 8:17
**term** [1] - 16:24
**terms** [6] - 22:10, 26:14, 33:20, 44:1, 44:8, 44:13
**testify** [5] - 5:20, 12:12, 12:15, 13:3, 14:4
**testimony** [3] - 6:25, 14:10, 14:17
**Texas** [6] - 3:24, 4:2, 13:24, 13:25, 14:1, 14:5
**THE** [113] - 1:12, 2:2, 2:10, 2:14, 2:19,

3:21, 4:1, 4:15, 6:4, 6:21, 7:7, 7:12, 7:14, 7:20, 8:1, 8:13, 8:21, 8:24, 9:5, 9:9, 9:14, 9:17, 9:21, 9:24, 10:2, 10:9, 10:15, 10:24, 11:6, 12:3, 12:16, 12:19, 13:4, 13:11, 13:16, 13:19, 14:19, 15:3, 16:10, 16:12, 16:16, 16:24, 17:8, 17:12, 17:17, 18:23, 19:16, 19:19, 20:5, 20:11, 20:23, 20:25, 21:5, 21:10, 21:19, 22:4, 22:7, 22:12, 24:7, 24:12, 24:15, 25:17, 25:23, 27:2, 27:4, 27:16, 28:11, 29:6, 29:13, 29:23, 30:6, 30:21, 31:4, 31:14, 32:1, 32:4, 32:9, 32:11, 33:1, 33:5, 33:17, 34:5, 34:12, 34:14, 35:7, 35:17, 36:5, 36:12, 37:15, 37:20, 37:25, 38:5, 38:7, 38:9, 38:14, 38:19, 39:9, 39:12, 39:18, 39:21, 39:23, 40:3, 40:8, 40:22, 41:7, 41:21, 42:17, 42:20, 43:1, 43:5, 43:13, 43:17, 44:5
**theory** [1] - 31:18
**they've** [8] - 5:1, 5:9, 5:11, 5:18, 6:15, 7:22, 40:18
**thinking** [1] - 23:6
**third** [8] - 10:13, 10:15, 11:7, 12:14, 12:20, 12:22, 13:2
**third-party** [7] - 10:13, 10:15, 12:14, 12:20, 12:22, 13:2
**thousands** [1] - 8:17
**three** [2] - 7:2, 41:13
**ties** [1] - 10:3
**timing** [1] - 32:4
**together** [1] - 9:25
**tools** [1] - 23:11
**tracks** [1] - 24:3
**TRADING** [2] - 1:3, 1:14
**trading** [1] - 27:5
**Trading** [1] - 23:2
**traditional** [2] - 41:19, 41:25
**transacting** [1] - 42:5
**transaction** [8] - 21:22, 29:19, 31:23, 32:6, 32:8, 32:15, 38:11, 39:7
**transactions** [11] - 11:17, 16:22, 18:6, 18:7, 18:14, 19:5, 19:9, 19:24, 19:25, 28:8, 40:16
**Transcript** [1] - 1:24
**TRANSCRIPT** [1] - 1:11
**Transcription** [1] - 1:25
**transfer** [14] - 2:4, 3:6, 3:8, 3:15, 4:4, 4:22, 7:16, 8:8, 8:9, 14:8, 14:24, 15:1, 15:17, 15:20
**transferred** [2] - 4:1, 7:6
**travel** [1] - 6:18
**TREMAINE** [1] - 1:19
**trial** [2] - 6:25, 12:12
**true** [2] - 32:20, 35:25
**trying** [4] - 7:1, 26:5, 41:9, 42:14
**turn** [6] - 16:17, 22:4, 24:2, 28:23, 30:14, 34:14
**TV** [1] - 30:14
**two** [8] - 5:2, 12:10, 30:10, 35:3, 37:16, 38:12, 41:13, 44:15

**type** [10] - 3:2, 22:13, 24:8, 24:12, 25:24, 29:19, 29:21, 30:13, 34:11
**types** [3] - 18:6, 24:19, 41:5
**typical** [1] - 8:10
**typically** [1] - 8:12

## U

**unaffiliated** [1] - 13:1
**under** [14] - 14:24, 18:16, 19:11, 22:1, 24:18, 25:15, 25:16, 25:20, 26:3, 36:16, 37:2, 37:10, 38:7, 44:7
**understood** [1] - 25:22
**undisputed** [1] - 16:6
**unfortunately** [1] - 23:7
**uniformly** [1] - 11:15
**UNITED** [2] - 1:1, 1:12
**United** [1] - 1:5
**unlawful** [1] - 23:20
**unless** [1] - 17:18
**unsupported** [2] - 29:14, 29:15
**up** [8] - 2:21, 13:8, 17:20, 19:24, 26:14, 28:15, 40:12, 40:16
**upwards** [1] - 39:5

## V

**vague** [1] - 28:17
**value** [3] - 29:24, 31:21, 42:4
**variety** [3] - 8:18, 10:7, 25:6
**vary** [2] - 38:16, 39:7
**vendor** [1] - 13:9
**venue** [23] - 2:4, 3:1, 3:6, 3:8, 3:16, 4:4, 4:16, 7:10, 7:17, 8:5, 8:6, 8:8, 8:9, 10:3, 10:8, 12:5, 14:8, 14:19, 14:23, 14:24, 15:1, 15:17, 44:11
**version** [2] - 36:15, 36:19
**versus** [1] - 2:2
**vet** [1] - 35:21
**viable** [1] - 40:12
**victim** [1] - 14:3
**victims** [12] - 7:23, 9:15, 9:17, 9:20, 9:23, 9:24, 10:16, 11:16, 11:17, 11:18, 12:14, 13:22
**victims'** [2] - 11:13, 11:14
**view** [4] - 11:2, 21:20, 37:3, 44:13
**views** [1] - 27:18
**virtually** [2] - 13:23, 42:6
**vs** [1] - 42:22

## W

**waste** [1] - 7:17
**wealth** [1] - 11:12
**weight** [3] - 4:16, 4:18, 4:21
**Weinstein** [1] - 20:23
**whole** [1] - 30:19
**wholesale** [2] - 33:8, 33:10
**wide** [1] - 10:8
**wishes** [1] - 39:10
**witness** [4] - 5:12, 5:15, 5:17, 11:8
**witnesses** [19] - 5:3, 5:25, 6:19, 7:4,

8:12, 10:13, 10:14, 10:15, 10:16, 12:12, 12:15, 12:20, 12:21, 12:23, 13:2, 14:3, 14:6, 14:9, 14:10
**woefully** [1] - 14:7
**woman** [1] - 18:11
**words** [3] - 10:4, 32:11, 33:5
**worth** [2] - 33:6, 33:7
**WRIGHT** [1] - 1:19
**wrongly** [1] - 12:7

## Y

**year** [2] - 36:21, 42:1
**years** [9] - 24:10, 24:13, 29:7, 29:8, 30:10, 30:11, 39:22, 39:23
**YORK** [1] - 1:1
**York** [16] - 1:5, 1:16, 5:14, 6:18, 7:19, 7:21, 7:23, 7:24, 7:25, 8:2, 8:20, 9:6, 9:10, 20:21, 43:4
**York-based** [1] - 8:2

## Z

**Zoom** [1] - 6:21